# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

DIOCESE OF FORT WAYNE-SOUTH
BEND, INC.; CATHOLIC CHARITIES
OF THE DIOCESE OF FORT WAYNE–
SOUTH BEND, INC.; SAINT ANNE
HOME & RETIREMENT COMMUNITY
OF THE DIOCESE OF FORT WAYNE-
SOUTH BEND, INC.; FRANCISCAN
ALLIANCE, INC.; UNIVERSITY OF
SAINT FRANCIS; and OUR SUNDAY
VISITOR, INC.,

> *Plaintiffs,*

v.

KATHLEEN SEBELIUS, in her official
capacity as Secretary of the U.S.
Department of Health and Human
Services; HILDA SOLIS, in her official
capacity as Secretary of the U.S.
Department of Labor; TIMOTHY
GEITHNER, in his official capacity as
Secretary of the U.S. Department of
Treasury; U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
U.S. DEPARTMENT OF LABOR; and
U.S. DEPARTMENT OF TREASURY,

> *Defendants.*

CASE NO.: 1:12CV159 *WCL*

FILED
12 MAY 21 AM 10: 52

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.      This lawsuit is about one of America's most cherished freedoms:  the freedom to

practice one's religion without government interference.  It is not about whether people have a

right to abortion-inducing drugs, sterilization, and contraception.  Those services are, and will

continue to be, freely available in the United States, and nothing prevents the Government itself

from making them more widely available. But the right to such services does not authorize the Government to force the Plaintiffs to violate their own consciences by making them provide, pay for, and/or facilitate those services to others, contrary to their sincerely held religious beliefs. American history and tradition, embodied in the First Amendment to the United States Constitution and the Religious Freedom Restoration Act ("RFRA"), protects religious entities from such overbearing and oppressive governmental action. Plaintiffs therefore seek relief in this Court to protect this most fundamental of American rights.

2. This country was founded by those searching for religious liberty and freedom from religious persecution. And since the founding of this country, religious organizations such as Plaintiffs have been free to fulfill their religious beliefs through service to all, including the underprivileged and underserved, without regard to the beneficiaries' religious views. As a result, Plaintiffs and other such organizations have played a vital role in securing and protecting the civil liberties of all citizens.

3. The U.S. Constitution and federal statutes protect religious organizations from governmental interference with their religious views—particularly minority religious views. The founders recognized, through their own experiences, that the mixture of government and religion is destructive to both institutions and divisive to the social fabric upon which the country depends. The Constitution and federal law thus stand as bulwarks against oppressive government actions even if supported by a majority of citizens. This "wall of separation between church and state" is critical to the preservation of religious freedom. As the Supreme Court has recognized, "[t]he structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasion of civil authority." Through this lawsuit, Plaintiffs do not seek to

2

impose their religious beliefs on others. They simply ask that the Government not impose its values and policies on Plaintiffs, in direct violation of their religious beliefs.

4.    Under current federal law described below (the "U.S. Government Mandate"), many Catholic organizations must provide, or facilitate the provision of, abortifacients, sterilization, and contraceptive services to their employees in violation of the centuries' old teachings of the Catholic Church. Ignoring broader religious exemptions from other federal laws, the Government has crafted a narrow, discretionary exemption to this U.S. Government Mandate for "religious employers." Group health plans are eligible for the exemption only if they are "established or maintained by religious employers," and only if the "religious employer" can convince the Government that it satisfies four criteria:

- "The inculcation of religious values is the purpose of the organization";

- "The organization primarily employs persons who share the religious tenets of the organization";

- "The organization primarily serves persons who share the religious tenets of the organization"; and

- "The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."

Thus, in order to safeguard their religious freedoms, religious employers must plead with government bureaucrats for a determination that they are sufficiently "religious."

5.    It is unclear whether Plaintiffs' health benefits plans qualify for this religious exemption.

6.    With respect to the fourth requirement, it is unclear whether Plaintiffs Franciscan Alliance and the University of Saint Francis's health benefits plans qualify for this religious exemption because, for example, while they are nonprofit charitable organizations that are firmly

3

grounded in the tenets of Catholicism, they appear not to fall within sections 6033(a)(1) and 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

7.      The U.S. Government Mandate, including the narrow exemption for certain "religious employers," is irreconcilable with the First Amendment, RFRA, and other laws. The Government has not shown any compelling need to force Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing drugs, sterilization, and contraception, or for requiring Plaintiffs to submit to an intrusive governmental examination of their religious missions. The Government also has not shown that the U.S. Government Mandate is narrowly tailored to advancing its interest in increased access to these services, since these services are already widely available and nothing prevents the Government from making them even more widely available by providing or paying for them directly through a duly enacted law. The Government, therefore, cannot justify its decision to force Plaintiffs to provide, pay for, and/or facilitate access to these services in violation of their sincerely held religious beliefs.

8.      Despite repeated requests from Church leaders, the Government has insisted that it will not change the core principle of the U.S. Government Mandate—that Plaintiffs must subsidize and/or facilitate providing their employees free access to drugs and services that are contrary to Plaintiffs' religious beliefs. If the Government can force religious institutions to violate their beliefs in such a manner, there is no apparent limit to the Government's power. Such an oppression of religious freedom violates Plaintiffs' clearly established constitutional and statutory rights.

9.      The First Amendment also prohibits the Government from becoming excessively entangled in religious affairs and from interfering with a religious institution's internal decisions

4

concerning the organization's religious structure, ministers, or doctrine.  The U.S. Government Mandate tramples all of these rights.

**BACKGROUND**

**I.     PRELIMINARY MATTERS**

10.     Plaintiff, Diocese of Fort Wayne-South Bend, Inc. ("Diocese"), is a nonprofit Indiana corporation with its principal place of business in Fort Wayne, Indiana.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

11.     Plaintiff, Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc. ("Catholic Charities"), is a nonprofit Indiana corporation with its principal place of business in Fort Wayne, Indiana.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

12.     Plaintiff, Saint Anne Home & Retirement Community of the Diocese of Fort Wayne-South Bend, Inc. ("St. Anne Home"), is a nonprofit health care and retirement community incorporated in Indiana with its principal place of business in Fort Wayne, Indiana. It is organized exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

13.     Plaintiff, Franciscan Alliance, Inc. ("Franciscan"), is a nonprofit hospital system incorporated in Indiana with eleven hospitals in Indiana, two hospitals in Illinois, and its principal place of business in Mishawaka, Indiana.  It is organized exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

14.     Plaintiff, University of Saint Francis ("Saint Francis" or "University"), is a nonprofit four year liberal arts university incorporated in Indiana with its principal place of

business in Fort Wayne, Indiana, and a regional campus in Crown Point, Indiana. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. It is also an educational organization under Section 170(b)(1)(A)(ii) of the Internal Revenue Code.

15.     Plaintiff, Our Sunday Visitor, Inc. ("Our Sunday Visitor"), is a nonprofit Indiana corporation with its principal place of business in Huntington, Indiana. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

16.     Defendant Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services. She is sued in her official capacity.

17.     Defendant Hilda Solis is the Secretary of the U.S. Department of Labor. She is sued in her official capacity.

18.     Defendant Timothy Geithner is the Secretary of the U.S. Department of Treasury. He is sued in his official capacity.

19.     Defendant U.S. Department of Health and Human Services ("HHS") is an executive agency of the United States within the meaning of RFRA and the Administrative Procedure Act ("APA").

20.     Defendant U.S. Department of Labor is an executive agency of the United States within the meaning of RFRA and the APA.

21.     Defendant U.S. Department of Treasury is an executive agency of the United States within the meaning of RFRA and the APA.

22.     This is an action for declaratory and injunctive relief under 5 U.S.C. § 702; 28 U.S.C. §§ 2201, 2202; and 42 U.S.C. § 2000bb-1(c).

23.   This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(4), and 1346(a)(2).

24.   Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).

**A.   Diocese of Fort Wayne-South Bend, Inc. ("Diocese")**

25.   Plaintiff Diocese is the civil law entity for the Diocese of Fort Wayne-South Bend, which is the local embodiment of the Universal Roman Catholic Church, a community of the baptized confessing the Catholic faith, sharing in sacramental life, and entrusted since January 2010 to the ministry of Bishop Kevin C. Rhoades.  The Diocese encompasses fourteen counties located in Northeast Indiana, including Allen County, Indiana.

26.   Bishop Rhoades is the sole member of the Diocesan nonprofit corporation.

27.   The Diocese, through its eighty-one local community parishes and two oratories situated throughout the Diocese, serves the spiritual needs of its Catholic population of approximately 160,000.

28.   Through its parishes, the Diocese ensures the regular availability of the sacraments to all Catholics living in or visiting the Fort Wayne-South Bend area.  The Diocese also provides numerous other opportunities for prayer, worship, and faith formation.

29.   In 2011, approximately 2,582 adults and youth received formation in the Catholic faith through parish-level and Diocesan classes, lectures, and retreats.

30.   In addition to overseeing the sacramental life of its parishes, the Diocese coordinates Catholic campus ministries at five colleges and universities within its borders.

31.   Through its parishes, the Diocese also serves the needs of its communities with programs such as chapters of the St. Vincent DePaul Society, food pantries, soup kitchens, adopt-a-family programs at Christmas, and visits to nursing homes.  These parishes serve an indeterminate number of persons who are homeless, hungry, elderly, or otherwise in need of

material assistance without regard to whether the recipient is Catholic or non-Catholic. In 2010, the Diocese provided over $1 million dollars in support to such programs.

32.     In the fiscal year ending June 30, 2010, the Diocese provided approximately $3.9 million dollars in financial assistance to, among others, Women's Care Center, St. Augustine Soup Kitchen, Little Flower Food Pantry, St. Mary's Soup Kitchen, and Catholic Charities. Each of these organizations provides services to individuals from a diversity of faiths, means, and heritages.

33.     Neither the Diocese nor its parishes keeps a tally of persons served through the parishes' outreach programs, nor do they request to know the religious affiliation of those served.

34.     Church law, canon law, requires a diocesan bishop to establish Catholic schools based on the principles of Catholic doctrine, with teachers who are outstanding for their correct doctrine and integrity of life, so that schools imparting an education imbued with the Christian spirit are available to the faithful in the diocese. *See* Code of Canon Law, Canons 802 § 1 and 803 § 2.

35.     The Diocese conducts its educational mission through its schools.

36.     The first Catholic school opened in Fort Wayne-South Bend in 1846, at least ten years before the city had a public-school system.

37.     The Diocese currently operates a total of forty-one private, Catholic schools in its geographic territory, thirty-seven elementary and four high schools.

38.     Catholic schools within the Diocese have been among those schools nationwide to receive the U.S. Department of Education's Blue Ribbon Schools Award.

8

39.     Presently the Diocese has approximately 10,783 students enrolled in its elementary schools and approximately 3,125 students enrolled in its high schools.  Enrollment in Diocesan schools is open to Catholics and non-Catholics.

40.     The Diocesan schools serve poor and underprivileged students; approximately 2,446 of its students live at or below the federal poverty line.

41.     The Diocese's educational mission is all the more important in Indiana where recent legislation gives low- to moderate-income families vouchers to transfer their children from a public school to, among others, one of the Diocese's private schools.

42.     To make a Catholic education available to as many children as possible—no matter their faith, means, or heritage—the Diocese expends substantial funds in tuition assistance programs.  For example, for the 2011-2012 academic year, the Diocese has granted over $2.1 million dollars in financial aid through its four high schools.

43.     Diocesan schools also serve minorities.  For example, Bishop Luers High School has approximately 20% minority students and St. Adalbert Elementary School has approximately 91% minority students.

44.     The Diocese employs Catholic and non-Catholic teachers in its schools who must have a knowledge of and respect for the Catholic faith, abide by the tenets of the Catholic Church as they apply to that person, exhibit a commitment to the ideal of Christian living, and be supportive of the Catholic faith.

45.     The Diocese has approximately 2,741 employees, with over 1,500 classified as full-time (working an average of at least 30 hours per week) and over 1,200 classified as part-time (working an average of less than 30 hours per week).

9

46.     The Diocese does not know how many of those it hires or serves are Catholic. In order to determine those statistics, the Diocese would be required to ask the religious affiliation of all individuals that it employs or serves. That inquiry, however, would substantially burden the Diocese's religious exercise.

47.     Consistent with Church teachings on social justice, the Diocese makes health insurance benefits available to its religious personnel, seminarians, and full-time employees. Approximately 116 active and retired priests, religious sisters and seminarians of the Diocese, and approximately 1,043 of the Diocese's full-time lay employees participate in the Diocesan employee health plan.

48.     The Diocesan employee health plan is a self-insured plan. That is, the Diocese does not contract with a separate insurance company that provides health coverage to its employees. Instead, the Diocese itself underwrites its employees' medical costs.

49.     Consistent with Church teachings regarding the sanctity of life, the Diocesan employee health plan specifically excludes coverage for abortion, sterilization, and contraceptives.

50.     The Diocesan health plan year begins each year on January 1st.

51.     The Diocesan health plan meets the Affordable Care Act's definition of a "grandfathered" plan and includes a statement in plan materials provided to participants or beneficiaries that it believes it is a grandfathered plan, as is required to maintain the status of a grandfathered health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i).

10

**B.      Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc. ("Catholic Charities")**

52.      Plaintiff Catholic Charities—a nonprofit corporation affiliated with the Diocese— was created in 1922 to provide organized, concerted charitable efforts.  Bishop Rhoades is a member of the nonprofit corporation.

53.      Catholic Charities provided social services to over 22,500 people in 2011.

54.      The more than twelve programs run by Catholic Charities at locations in and around the Fort Wayne-South Bend community provide a panoply of services including adoption and pregnancy services, food pantries, refugee resettlement, immigration services, retired senior volunteer programs, senior employment programs, Hispanic health advocacy, foreclosure prevention, community education, and many other community services.

55.      For example, Catholic Charities' Resource and Referral Services, which distributed over $233,918 in fiscal year 2011, serves as an integral part of the Fort Wayne community's services by helping families receive assistance for their basic needs, such as housing, utilities, food, clothing, personal products, and bus passes.  Resource and Referral Services also helps families that are facing the disconnection of their utilities, but are above the maximum income level to qualify for the Energy Assistance Program.

56.      Together, Catholic Charities' two food pantries served over 15,000 individuals from 2010 to 2011, one-third of who were new to the pantry.  When possible, the food pantries distribute to their clients hats, scarves, blankets, mittens, toiletries, personal-care items, nonperishable products, recipes, community referrals, and nutrition and food-handling safety information.

57.      In Fort Wayne, Catholic Charities' Adoption and Pregnancy Services facilitates the placement of newborn infants, in addition to home studies for agency, private, stepparent,

relative, special-needs, and international adoptions. Over the years, Catholic Charities has placed more than 1,600 children in homes through its adoption program.

58.     Catholic Charities recently entered into an agreement with the U.S. Conference of Catholic Bishops Migration and Refugee Services to participate in the Unaccompanied Alien Children Program, which provides for the release and family reunification and long-term foster care of unaccompanied, undocumented children who have been taken into custody by immigration officials. There are no statistics on this program yet.

59.     Catholic Charities' own Refugee Resettlement program, during fiscal year 2010-2011, resettled and provided services to a total of 111 refugees. Refugee health advocates and interpreters assisted with approximately 1,051 appointments for infectious disease control.

60.     Volunteers from Catholic Charities' Retired Seniors Volunteer Program ("RSVP") provide free services to the elderly. According to the Points of Light Institute, during fiscal year 2010-2011, RSVP volunteers provided services to the community that had a private-sector value of over $2.5 million dollars.

61.     In addition to serving older adults, in fiscal year 2010-2011, Catholic Charities' RSVP volunteers provided 900 backpacks filled with school supplies to children in need and lazy-eye screenings for more than 500 children. RSVP volunteers also helped 100 individuals through its new Volunteer Income Tax Assistance program that provides tax assistance to low-income individuals.

62.     Catholic Charities serves people in need without regard to their religion. It does not ask whether the people it serves are Catholic and, therefore, it does not know whether they are Catholic.

12

63.     Catholic Charities does not inquire about the religion of its applicants for employment. As a result, it does not know how many of its employees are Catholic.

64.     Catholic Charities' thirty-nine full-time employees are offered health insurance through the Diocesan health plan, which does not cover abortion, sterilization, or contraceptives.

65.     Though the Government's position is unclear, it appears that if an entity qualifies as a "religious employer" for purposes of the exemption, any affiliated corporation that provides coverage to its employees through the exempt entity's group health plan would also receive the benefit of the exemption. Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. at 16,502 (Mar. 21, 2012).

66.     If the Diocese qualifies as a "religious employer" under the exemption to the U.S. Government Mandate, Catholic Charities thus also appears to receive the benefit of the exemption.

## C.     Saint Anne Home & Retirement Community of the Diocese of Fort Wayne-South Bend, Inc. ("St. Anne Home")

67.     Plaintiff St. Anne Home is a nonprofit corporation that provides quality and compassionate care for the aged in a home-like setting within a spiritual environment. Bishop Rhoades is a member of the nonprofit corporation.

68.     St. Anne Home was created by Geneva Davidson who, upon her death, left the residue of her estate in trust to the Diocese with instructions that the money be used to build a home for the aged of the Diocese. On January 3, 1966, groundbreaking ceremonies were held on what is now St. Anne Home. This home was intended to be a partial solution to the lack of critical housing in the area for the elderly.

69.     Since opening, St. Anne Home has become the benchmark for high-quality health care in Fort Wayne, Indiana.

70.     Today, St. Anne Home offers residential apartments, a nursing facility, rehab suites, and adult day services. The ninety-seven residential apartments include both independent and assisted living. The nursing facility with approximately 164 beds includes specialized programs for Alzheimer's and dementia care.

71.     St. Anne Home's Alzheimer's and dementia care unit provides care for approximately fifty-two people, the majority of which are women.

72.     St. Anne Home serves approximately 563 people a year.

73.     All of St. Anne Home's facilities are operated in a manner that abides by *The Ethical and Religious Directives for Catholic Health Care Services* as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop and as modified from time to time. St. Anne Home also abides by The National Catholic Bioethics Center's *A Catholic Guide to End-of-Life Decisions: An Explanation of Church Teaching on Advanced Directives, Euthanasia, and Physician-Assisted Suicide*.

74.     St. Anne Home's mission is to "offer[] residents a culture of self-respect and dignity in a Christian atmosphere. Each resident is offered individualized, high quality health care that encourages freedom and independence while preserving their dignity and uniqueness as creations of God." This mission is driven by the Catholic belief that all human life is equally valuable and worthy of respect and support.

75.     St. Anne Home's goal is to maintain the highest level of self esteem and dignity for its residents, and it strives to enrich its residents' spiritual, social, cognitive, and physical well-beings.

76.     Since opening its doors, St. Anne Home has been committed to serving the aged of all faiths, and that commitment continues to the present day. The residents at St. Anne Home

14

also serve the local community through their Tools for Schools program. Residents donate funds that are then used to purchase "tools" for children to use in local elementary schools.

77.    St. Anne Home collects religious census information in order to meet the physical and spiritual needs of its residents, but does not discriminate on the basis of religion. Although the census shows that most residents identify themselves as Catholic, St. Anne Home does not know or inquire into their religious tenets.

78.    St. Anne Home has approximately 310 employees and does not inquire about the religious persuasion of its applicants for employment. As a result, it does not know how many of its employees are Catholic.

79.    St. Anne Home's employees are offered the Saint Anne Home of the Diocese of Fort Wayne-South Bend Employee Benefit Plan. This self-insured health plan does not cover abortion, sterilization, or contraceptives. St. Anne Home's plan year begins on January 1st.

80.    St. Anne Home's self-insured health plan has undergone a number of changes and amendments since March 23, 2010, and, accordingly, does not meet the Affordable Care Act's definition of a "grandfathered" health plan. Additionally, the St. Anne Home plan does not include a statement in any plan materials provided to participants or beneficiaries that it believes it is a grandfathered plan, as is required to maintain the status of a grandfathered health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i).

## D.    Franciscan Alliance, Inc. ("Franciscan")

81.    Plaintiff Franciscan is a nonprofit health system that includes eleven facilities in Indiana, two facilities in Illinois, and a number of support companies for these facilities. It is one of the strongest regional health systems in the country and in the State of Indiana.

82.    Performing more than 3.5 million outpatient services and caring for more than 100,000 inpatients annually, Franciscan's vision is to be a recognized leader in the provision of

15

high quality, value based, compassionate care through collaboration with others in the communities it is privileged to serve.

83. Franciscan's major service locations have at least 3,500 beds and it has significant market share in the markets where it provides health care.

84. Franciscan, since its founding by Mother Maria Theresia Bonzel in 1875, has been and is faithful to the Catholic Church. For example, one of Franciscan's core values is that the witness of Franciscan presence throughout the institution encompasses, but is not limited to, joyful availability, compassionate and respectful care, and dynamic stewardship in the service of the Church.

85. Another of Franciscan's core values is that Christian stewardship is evidenced by the just and fair allocation of human, spiritual, physical, and financial resources in a manner respectful of the individual, responsive to the needs of society, and consistent with Church teachings.

86. All of Franciscan's facilities are operated in a manner that abides by *The Ethical and Religious Directives for Catholic Health Care Services* as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop and as modified from time to time.

87. Franciscan's goal to advocate for those in need is demonstrated by its commitment to providing charity medical care at cost. For example, from January to December of 2011, Franciscan spent over $189.3 million dollars through its various medical care and community service programs helping over 503,000 people living in poverty.

88. Franciscan's benefits to the broader community—including health screenings; health fairs; programs for children, the elderly, and the community at large; and health

16

professions education—from January to December 2011, benefitted more than 2.3 million individuals at a cost to Franciscan of over \$63.2 million dollars.

89.     Franciscan specifically serves women through its Franciscan Alliance Spirit of Women membership program, which seeks to bring together women of all ages and backgrounds by motivating and inspiring them to make positive changes in their lives. Franciscan does this through innovative clinical care, education, and wellness programs.

90.     In December of 2011, Franciscan was selected by the Center for Medicare & Medicaid Services as one of thirty-two Pioneer Accountable Care Organizations ("ACOs"). ACOs are groups of doctors, hospitals, and other health care providers who come together voluntarily to give coordinated high quality care to their Medicare patients. The goal of coordinated care is to ensure that patients, especially the chronically ill, get the right care at the right time, while avoiding unnecessary duplication of services and preventing medical errors.

91.     Franciscan serves individuals of all faiths. Franciscan receives religious information in order to meet the physical and spiritual needs of its patients, but does not discriminate on the basis of religion.

92.     Franciscan has approximately 18,000 employees, approximately 600 of which are physicians. Franciscan does not inquire about the religious commitments of its applicants for employment; as a result, it does not know how many of its employees are Catholic.

93.     Franciscan's benefits-eligible employees may participate in a number of health benefits programs, depending on the region in which they work: Central Indiana Region, Northern Indiana Region, Western Indiana Region, and the South Suburban Chicago Region in Illinois.

94.     Franciscan's approximately 3,963 benefits-eligible employees in its Central
Indiana Region are offered six Advantage Health Solutions, Inc. fully-insured benefits program
options. All six of these Advantage health plans lost their grandfathered status as of January 1,
2012 after Franciscan added various co-pay and co-insurance provisions to those plans. Nor do
plan materials provided to participants or beneficiaries contain a statement that Franciscan
believes they are grandfathered plans, as is required to maintain the status of a grandfathered
health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i).

95.     Franciscan's approximately 8,266 benefits-eligible employees in its Western
Indiana and Northern Indiana Regions are offered six benefits plan options, four of which are
self-insured plans administered by Advantage Health Solutions, Inc., and two of which are Blue
Cross Blue Shield of Illinois fully-insured benefits plans. All four of the self-insured Advantage
plans lost their grandfathered status as of January 1, 2012 after various co-insurance provisions
were added to those plans. Nor do plan materials provided to participants or beneficiaries
contain a statement that Franciscan believes they are grandfathered plans, as is required to
maintain the status of a grandfathered health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i). The two
Blue Cross Blue Shield of Illinois fully-insured benefits plans are not grandfathered, and never
were, because they were not in existence as of March 23, 2010.

96.     Franciscan's approximately 1,789 benefits-eligible employees in its South
Suburban Chicago Region are offered three benefits plan options, two of which are Blue Cross
Blue Shield of Illinois fully-insured benefits plans, and one of which is a self-insured benefits
plan that is administered by Blue Cross Blue Shield of Illinois. All three of these plans lost their
grandfathered status as of January 1, 2011 after employee premiums were increased. Nor do
plan materials provided to participants or beneficiaries contain a statement that Franciscan

18

believes they are grandfathered plans, as is required to maintain the status of a grandfathered health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i).

97.    None of the benefits plans offered by Franciscan covers abortion, sterilization, or contraceptives. Franciscan's employee health benefits plans years begin on January 1st.

**E.    University of Saint Francis ("Saint Francis" or "University")**

98.    Plaintiff Saint Francis is a nonprofit corporation that confers undergraduate and graduate degrees. The University's members are the Sisters of Saint Francis of Perpetual Adoration Provincial and her Council.

99.    The University was established in 1890 in Lafayette, Indiana as a teacher training school for the Sisters of Saint Francis and transformed into a Catholic, Franciscan-sponsored, coeducational, liberal arts college in 1940. In 1944, Saint Francis moved to its current location in Fort Wayne, Indiana, and was designated a "university" in 1998.

100.    Saint Francis has approximately 2,300 undergraduate and graduate students enrolled, the majority of which are from the midwest, although students from other regions of the United States and foreign countries attend as well.

101.    As described in its mission statement, "Rooted in the Catholic and Franciscan traditions of Faith and Reason, the University of Saint Francis engages a diverse community in learning, leadership and service." The University's five widely held Franciscan values are: (1) reverence the unique dignity of each person; (2) encourage a trustful, prayerful community of learners; (3) serve one another, society and the Church; (4) foster peace and justice; and (5) respect creation.

102.    At the same time, the University's commitment to continuous study and improvement is underscored by its participation in the Academic Quality Improvement Program of the Higher Learning Commission, and by the variety of professional accreditations for its

19

academic programs. Quality at the University of Saint Francis is a persistent quest for excellence shaped by the needs of students, professional and academic standards, and best practices.

103. Saint Francis pursues the highest academic achievement in every discipline. To that end, the University is composed of five undergraduate schools—Arts & Sciences, Business, Creative Arts, Health Sciences, and Professional Studies—and one Graduate School. The Graduate School offers degree and certification programs in art, business, education, environmental science, school and mental health counseling, nursing, physician assistant, theology, and psychology. In the past two decades, Saint Francis has conferred more than 5,000 graduate degrees.

104. Nearly half of the University's students are studying health care, which makes Saint Francis the largest provider of health care graduates in the northern half of Indiana. For example, Saint Francis offers an associate, bachelor, and master degree in nursing, in addition to programs such as radiologic technology, physical therapy, and surgical technology.

105. Students currently enrolled in the University's Crown Point, Indiana campus are exclusively pursuing health care degrees.

106. At the core of the University's curriculum is the Franciscan value of service to all, and its mission to educate and serve others extends beyond the borders of campus.

107. The Saint Francis community, through its Center for Service Engagement, creates positive change in local, national, and global communities. Saint Francis also acknowledges that although many in its community do not daily experience social justice issues such as hunger, homelessness, poverty, or illiteracy, these issues continue to affect the lives of many in the global community. Through service, God calls the Saint Francis community to work for the common good in the world.

108.    Service opportunities through the Center for Service Engagement help nonprofit agencies and organizations maintain and/or expand their programs to those in need, while providing students, faculty, staff, and alumni with opportunities to build awareness, appreciation, and commitment to social justice issues that impact everyone.  Through community/volunteer service, service-learning, service days or projects, and service/missions trips, the University is committed to the Franciscan values of "Serve one another, society and the Church" and "Foster Peace and Justice."

109.    For example, during academic year 2010-2011, campus clubs, organizations, and residence hall students engaged in multiple service activities.  Campus-wide events included the 3rd Annual "USF Feeds the Fort," a collection to benefit a local food bank, through which over 34,200 items were collected and approximately $9,000 was raised.  The University's 8th annual MLK Day of Service involved approximately 256 faculty, staff, students, and alumni in service at eighteen local agencies, providing around 910 hours of service.

110.    During the 2009-2010 academic year, approximately 1,820 students contributed around 12,125 service hours to alleviating issues related to homelessness, feeding the hungry, and preserving the environment.  These service hours aided programs such as Fort Wayne's Rescue Mission, Habitat for Humanity, Community Harvest Food Bank, Black Pine Animal Park, and Great Tree Canopy Comeback.

111.    For its service, the University has been awarded the President's Volunteer Service Award, created by the President's Council on Service and Civic Participation.

112.    In addition, Saint Francis hosts a number of educational events, lectures, and programs on its campuses that are open to the public.  For example, for the past eighteen years

the University has hosted a "CEO Forum," which is a three-quarter day seminar attended by around 500 business people from the community.

113.    The University is also committed to providing a quality education to students of all financial backgrounds.  More than 99% of the University's students apply for and receive some form of financial aid, with the Office of Student Financial aid awarding nearly $16 million in institutional grants and scholarships as well as more than $24 million in federal and state grant funds to undergraduate students in the 2010-2011 school year.  Over 50% of the University's students are low income, first generation college attendees who qualify for federal grants.

114.    Faith is at the heart of the University's efforts.  The apostolic constitution *Ex Corde Ecclesiae*, which governs and defines the role of Catholic colleges and universities, provides that "the objective of a Catholic University is to assure . . . [f]idelity to the Christian message as it comes to us through the Church."

115.    In accordance with the *Ex Corde Ecclesiae*, Saint Francis believes and teaches that "besides the teaching, research and services common to all Universities," it must "bring[] to its task the inspiration and light of the Christian message."  "Catholic teaching and discipline are to influence all university activities," and  "[a]ny official action or commitment of the University [must] be in accord with its Catholic identity."

116.    "In a word, being both a University and Catholic, it must be both a community of scholars representing various branches of human knowledge, and an academic institution in which Catholicism is vitally present and operative."

117.    Though committed to remaining a distinctly Catholic institution, the University opens its doors to students, academics, and prospective employees of all faiths and creeds.  The majority of the University's faculty, students, and staff are not Catholic.

22

118.   The University has approximately 2,300 students.  Approximately 30% of the undergraduate population is Catholic and approximately 20% of the graduate population is Catholic.  The University's students are not offered a health plan.

119.   The University has approximately 413 total faculty and staff members.  While approximately 50% of the faculty are Catholic, only 31% of all University employees are Catholic.  Saint Francis retains approximately 346 full-time employees eligible for health care benefits.

120.   The University's employees are offered a self-insured health care plan.  This plan does not cover abortion, sterilization, or contraception.  The plan year begins on January 1st.

121.   The health plan offered by Saint Francis to its employees was at one point in time grandfathered under the Affordable Care Act's definition of a "grandfathered" plan.  Changes made to the University's employee health plan in 2012, however, caused the plan to lose its grandfathered status.  Going forward, Saint Francis's employee health plan will not include a statement in any plan materials provided to participants or beneficiaries that it believes it is a grandfathered plan, as is required to maintain the status of a grandfathered health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i).

### F.      Our Sunday Visitor, Inc. ("Our Sunday Visitor")

122.   Plaintiff Our Sunday Visitor is a nonprofit Catholic publishing company located in Huntington, Indiana.  Our Sunday Visitor is comprised of a publishing division and an offertory solutions division.

123.   The publishing division is responsible for the writing and promotion of six religious periodicals, which include: *OSV Newsweekly*, *Take Out: Family Faith on the Go*, *The Catholic Answer*, *The Priest*, *My Daily Visitor*, and *Grace In Action*.  In addition to the religious

periodicals, Our Sunday Visitor publishes and markets over 1,800 products including books, parish education resources, and curricula.

124.    The offertory solutions division offers envelope products and services to Catholic parishes throughout the United States.

125.    As a nonprofit company, Our Sunday Visitor serves the Church not only with its products and services, but also by financially supporting charitable activities of other Catholic organizations.  The Our Sunday Visitor Institute funds Catholic projects throughout the United States, including projects that address evangelism, catechesis, service to the needy, vocation, and stewardship.

126.    For example, the Institute supports a program at Seton Hall University that is designed to encourage graduate students to teach for two years in New Jersey's poorest Catholic schools while earning their master's degrees.  New Jersey's poorest Catholic schools serve students of all faiths, in keeping with the Catholic value to serve all.

127.    The Institute also supports Bethlehem Farm, Inc., which is a Catholic community in Appalachia dedicated to serving the area's poor in various ways, including home repair, soup kitchens, and visiting the sick.

128.    In the past five years, the Institute has granted approximately $30,000 to seven dioceses in Florida that developed a one year volunteer program for fifteen to twenty-five recent college graduates from throughout the United States to serve in health care, homeless shelters, food banks, prisons, and inner-city Catholic schools.

129.    Between its publishing and offertory solutions divisions, Our Sunday Visitor employs approximately 300 benefits-eligible employees.  Our Sunday Visitor does not document the religious status of its employees.

24

130.    Our Sunday Visitor's employees are offered a self-insured health care plan. This plan does not cover abortion, sterilization, or contraceptives for non-therapeutic purposes. Our Sunday Visitor's plan year begins on October 1st.

131.    The health plan offered by Our Sunday Visitor to its employees was at one point in time grandfathered under the Affordable Care Act's definition of a "grandfathered" plan. Changes made to its employee health plan as of January 1, 2012 caused that plan to lose its grandfathered status. Going forward, Our Sunday Visitor's employee health plan will not include a statement in any plan materials provided to participants or beneficiaries that it believes it is a grandfathered plan, as is required to maintain the status of a grandfathered health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i).

## II.    STATUTORY AND REGULATORY BACKGROUND

### A.    Statutory Background

132.    In March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 119 (2010) (collectively, the "Affordable Care Act" or the "Act").

133.    The Affordable Care Act established many new requirements for "group health plan[s]," broadly defined as "employee welfare benefit plan[s]" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), that "provide[] medical care . . . to employees or their dependents." 42 U.S.C. § 300gg-91(a)(1).

134.    The Affordable Care Act requires an employer's group health plan to cover certain women's "preventive care," leaving the definition of that term up to an agency within HHS. Specifically, it provided that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum[,] provide coverage for and

25

shall not impose any cost sharing requirements for—(4) with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph."

Pub. L. No. 111-148 § 1001(5), 124 Stat. 131 (codified at 42 U.S.C. § 300gg-13(a)(4)).

135.    Because the Act prohibits "cost sharing requirements," the health plan must pay for the full costs of these "preventive care" services without any deductible or co-payment.

136.    Some provisions of the Affordable Care Act exempt individuals with religious objections.  For example, individuals are exempt from the requirement to obtain health insurance if they are members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds or are members of a "health care sharing ministry."  26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii) (conscientious objectors); 5000A(d)(2)(b)(ii) ("health care sharing ministry").

137.    Not every employer is required to immediately comply with the U.S. Government Mandate.  "Grandfathered" health plans are exempt from the "preventive care" U.S. Government Mandate.  Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,276, 41,731 (July 19, 2010) ("Interim Final Rules"); 42 U.S.C. § 18011.  Such plans cannot undergo substantial change after March 23, 2010.  *Id.*  HHS estimates that "98 million individuals will be enrolled in grandfathered group health plans in 2013."  *Id.* at 41,732.

138.    Violations of the Affordable Care Act can subject an employer and an insurer to substantial monetary penalties.

139.   Under the Internal Revenue Code, employers who fail to provide all coverage required by the U.S. Government Mandate will be exposed to significant annual fines of $2,000 per full-time employee. *See* 26 U.S.C. § 4980H(a), (c)(1).

140.   Additionally, under the Internal Revenue Code, group health plans that fail to provide certain required coverage may be subject to an assessment of $100 a day per individual. *See id.* § 4980D(b); *see also* Jennifer Staman & Jon Shimabukuro, Cong. Research Serv., RL 7-5700, Enforcement of the Preventative Health Care Services Requirements of the Patient Protection and Affordable Care Act (2012) (asserting that this assessment applies to employers who violate the "preventive care" provision of the Affordable Care Act).

141.   Under the Public Health Service Act, the Secretary of HHS may impose a monetary penalty of $100 a day per individual where an insurer fails to provide the coverage required by the U.S. Government Mandate. *See* 42 U.S.C. § 300gg-22(b)(2)(C)(i); *see also* Cong. Research Serv., RL 7-5700 (asserting that this penalty applies to insurers who violate the "preventive care" provision of the Affordable Care Act).

142.   ERISA may provide for additional fines. Under ERISA, plan participants can bring civil actions against insurers for unpaid benefits. 29 U.S.C. § 1132(a)(1)(B); *see also* Cong. Research Serv., RL 7-5700. Similarly, the Secretary of Labor may bring an enforcement action against group health plans of employers that violate the U.S. Government Mandate, as incorporated by ERISA. *See* 29 U.S.C. § 1132(b)(3); *see also* Cong. Research Serv., RL 7-5700 (asserting that these fines can apply to employers and insurers who violate the "preventive care" provision of the Affordable Care Act).

143.   The Affordable Care Act limits the Government's regulatory authority. The Act and an accompanying Executive Order reflect a clear intent to exclude abortion-related services

from the Act and regulations implementing it.  The Act itself provides that "nothing in this title (or any amendment made by this title) shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i).  The ability "[to] determine whether or not the plan provides coverage of" abortifacients is expressly reserved for "the issuer of a qualified health plan," not the Government.  *Id.* § 18023(b)(1)(A)(ii).

144.   Likewise, the Weldon Amendment, which has been included in every HHS and Department of Labor appropriations bill since 2004—states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V., § 507(d)(1), 125 Stat 786, 1111 (2011).

145.   The  intent to exclude abortions was instrumental in the Affordable Care Act's passage, as cemented by an executive order without which the Act would not have passed. Indeed, the Act's legislative history could not show a clearer congressional intent to prohibit the executive branch from requiring group health plans to provide abortion-related services.  For example, the House of Representatives originally passed a bill that included an amendment by Congressman Bart Stupak prohibiting the use of federal funds for abortion services. *See* H.R. 3962, 111th Cong. § 265 (Nov. 7, 2009).  The Senate version, however, lacked that restriction. S. Amend. No. 2786 to H.R. 3590, 111th Cong. (Dec. 23, 2009).  To avoid filibuster in the Senate, congressional proponents of the Act engaged in a procedure known as "budget

28

reconciliation" that required the House to adopt the Senate version of the bill largely in its entirety. Congressman Stupak and other pro-life House members indicated that they would refuse to vote for the Senate version because it failed adequately to prohibit federal funding of abortion. To appease these Representatives, President Obama issued an executive order providing that no executive agency would authorize the federal funding of abortion services. *See* Exec. Order No. 13,535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).

146.    The Act was, therefore, passed based on the central premise that all agencies would uphold and follow "longstanding Federal laws to protect conscience" and to prohibit federal funding of abortion. *Id.*

147.    That executive order was consistent with a 2009 speech that President Obama gave at the University of Notre Dame, in which he indicated that his Administration would honor the conscience of those who disagree with abortion, and draft sensible conscience clauses.

## B.    Regulatory Background – Defining "Preventive Care" and the Narrow Exemption

148.    Less than two years later, Defendants promulgated the U.S. Government Mandate, subverting the Act's clear purpose to protect the rights of conscience. Over that time, they issued interim rules and press releases—none of which followed notice-and-comment rulemaking—that required the federal funding of abortifacients, sterilization services, contraceptives and related counseling services and commandeered religious organizations to facilitate those services as well.

149.    Within four months of the Act's passage, on July 19, 2010, Defendants issued their initial interim final rules concerning section 300gg-13(a)(4)'s requirement that group health plans provide coverage for women's "preventive care." Interim Final Rules, 75 Fed. Reg. at 41,726.

150.   Defendants dispensed with notice-and-comment rulemaking for these rules.

151.   Even though federal law had never required coverage of abortifacients, sterilization, or contraceptives, Defendants claimed both that the APA did not apply to the relevant provisions of the Affordable Care Act and that "it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final regulations in place until a full public notice and comment process was completed." *Id.* at 41,730.

152.   The interim final rules did not resolve what services constitute "preventive care"; instead, they merely track the Affordable Care Act's statutory language.  They provide that "a group health plan . . . must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or deductible) with respect to those items or services: . . . (iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  Interim Final Rules, 75 Fed. Reg. at 41,759 (codified at 45 C.F.R. § 147.130(a)(iv)).

153.   The interim final rules did not identify the women's "preventive care" that Defendants planned to require employer group health plans to cover, nor give any notice as to how it would identify those services.  42 U.S.C. § 300gg-13(a)(4).  Instead, Defendants noted that "[t]he Department of HHS [was] developing these guidelines and expects to issue them no later than August 1, 2011."  Interim Final Rules, 75 Fed. Reg. at 41,731.

154.   Defendants permitted concerned entities to provide written comments about the interim final rules. *See id.* at 41,726.  But, as Defendants have conceded, they did not comply with the notice-and-comment requirements of the APA. *Id.* at 41,730.

155.    In response, several groups engaged in a lobbying effort to persuade Defendants to include various contraceptives and abortion-inducing drugs in the "preventive care" requirements for group health plans. *See, e.g.*, http://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-supports-initial-white-house-regulations-preventive-care-highlights-need-new-33140.htm.

156.    Other commenters noted that "preventive care" could not reasonably be interpreted to include such practices. These groups explained that pregnancy was not a disease that needed to be "prevented," and that a contrary view would intrude on the sincerely held beliefs of many religiously affiliated organizations by requiring them to pay for services that violate their religious beliefs. *See, e.g.*, Comments of United States Conference of Catholic Bishops, at 1-2 (Sept. 17, 2010), *available at* http://old.usccb.org/ogc/preventive.pdf.

157.    On August 1, 2011, HHS issued the "preventive care" services that group health plans would be required to cover. *See* HHS, *Affordable Care Act Ensures Women Receive Preventive Services at No Additional Cost*, *available at* http://www.hhs.gov/news/press/2011pres/08/20110801b.html. Again acting without notice-and-comment rulemaking, HHS announced these guidelines through a press release rather than enactments in the Code of Federal Regulations or statements in the Federal Register. The press release made clear that the guidelines were developed by a non-governmental "independent" organization, the Institute of Medicine ("IOM"). *See id.* In developing the guidelines, IOM invited certain groups to make presentations on preventive care. On information and belief, no groups that oppose government-mandated coverage of contraception, abortifacients, and related education and counseling were among the invited presenters. Comm. on Preventive Servs. for

31

Women, Inst. of Med., Clinical Preventive Services for Women app. B at 217-21 (2011), http://www.nap.edu/openbook.php?record_id=13181&page=R1.

158. The IOM's own report, in turn, included a dissent that suggested that the IOM's recommendations were made on an unduly short time frame required by politicians without the appropriate transparency for all concerned persons.

159. The IOM also did not adhere to the rules governing federal agencies, including the notice-and-comment rulemaking process.

160. In stark contrast with the central premise necessary for the Affordable Care Act's passage and President Obama's promise to protect religious liberty, HHS's new guidelines required insurers and group health plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." *See* Health Res. Servs. Admin., Women's Preventive Services: Required Health Plan Coverage Guidelines, *available at* http://www.hrsa.gov/womensguidelines/.

161. FDA-approved contraceptives that qualify under these guidelines include drugs that induce abortions. For example, the FDA has approved "emergency contraceptives" such as the morning-after pill (otherwise known as Plan B), which can operate by preventing a fertilized embryo from implanting in the womb, and Ulipristal (otherwise known as HRP 2000 or Ella), which likewise can induce abortions of living embryos.

162. A few days later, on August 3, 2011, Defendants issued amendments to the interim final rules that they had previously enacted in July 2010. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46,621 (Aug. 3, 2011).

32

163.   The Government issued the amendments again without notice-and-comment rulemaking on the same grounds (namely that it would be "impracticable and contrary to the public interest" to delay putting the rules into effect) that they had provided for bypassing the APA with the original rules. *See id.* at 46,624.

164.   When announcing the amended regulations, Defendants ignored the view that "preventive care" should exclude abortion-inducing drugs, sterilization, or contraceptives that do not prevent disease.  Instead, they noted only that "commenters [had] asserted that requiring group health plans sponsored by religious employers to cover contraceptive services that their faith deems contrary to its religious tenets would impinge upon their religious freedom." *Id.* at 46,623.

165.   Defendants sought "to provide for a religious accommodation that respect[ed]" only "the unique relationship between a house of worship and its employees in ministerial positions." *Id.*

166.   Specifically, the regulatory "religious employer" exemption ignored definitions of religious employers already existing in federal law, and, instead, is available only to those employers whose purpose is to inculcate religious values, and who employ and serve primarily individuals with the same religious tenets.  It provides in full:

> (A) In developing the binding health plan coverage guidelines specified in this paragraph (a)(1)(iv), the Health Resources and Services Administration shall be informed by evidence and may establish exemptions from such guidelines with respect to group health plans established or maintained by religious employers and health insurance coverage provided in connection with group health plans established or maintained by religious employers with respect to any requirement to cover contraceptive services under such guidelines.
> (B) For purposes of this subsection, a "religious employer" is an organization that meets all of the following criteria:

33

> (1) The inculcation of religious values is the purpose of the
> organization.
> (2) The organization primarily employs persons who share
> the religious tenets of the organization.
> (3) The organization serves primarily persons who share
> the religious tenets of the organization.
> (4) The organization is a nonprofit organization as
> described in section 6033(a)(1) and section
> 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of
> 1986, as amended.

*Id.* at 46,626 (codified at 45 C.F.R. § 147.130(a)(iv)(A)-(B)).

167. The regulation delegates to the Government the job of issuing exemptions, on an *ad hoc* basis, based on a determination of whether an organization is sufficiently "religious" to qualify for the exemption.

168. The religious employer exemption mandates an unconstitutionally invasive inquiry into an organization's religious purpose, beliefs, and practices.

169. Similarly, the religious employer exemption further mandates an impermissibly invasive inquiry into the private religious beliefs of the individuals that an organization employs and serves.

170. The religious employer exemption also uses impermissibly vague, undefined terms that extend the agency's already broad discretion and fail to provide organizations with notice of their duties and obligations. There is no definition for the vague terms "inculcation of religious values," "purpose of the organization," "primarily," and "religious tenets." Similarly, there is no indication of whether an agency with multiple purposes can qualify and how much overlap there must be for religious tenets to be "share[d]."

171. The religious employer exemption does not appear to apply to educational organizations as defined in Section 170(b)(1)(A)(ii) of the Internal Revenue Code.

172.   Defendants ignored all other religiously-affiliated employers and insurance issuers, excluding from the narrow exemption all religious organizations that view their missions as providing charitable, educational, and employment opportunities to all those who request it, regardless of the requesters' religious faith.

173.   When issuing this interim final rule, Defendants did not explain why they issued such a narrow religious exemption.  Nor did Defendants explain why they refused to incorporate other "longstanding Federal laws to protect conscience" that President Obama's executive order previously had promised to respect. *See* Exec. Order No. 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).

174.   ERISA, for example, has long excluded "church plans" from its requirements, more broadly defined to cover civil law corporations, including organizations like many of the Plaintiffs, that share common religious bonds and convictions with a church. *See* 29 U.S.C. §§ 1002(33)(C)(iv), 1003.

175.   It is unclear whether Plaintiffs qualify for the exemption from compliance with the U.S. Government Mandate offered to organizations deemed "religious employers" under the U.S. Government Mandate's narrow exemption.

176.   Moreover, determining whether organizations—such as Plaintiffs—qualify for the exemption will require the Government to engage in an intrusive inquiry, based on principles inconsistent with the Catholic faith, into whether, in the view of HHS, (1) Plaintiffs' "purpose" is the "inculcation of religious values"; (2) whether Plaintiffs "primarily" employ "persons who share [its] religious tenets," even though they hire people of all faiths and do not know how many Catholics they employ; and (3) whether Plaintiffs "primarily" serve such people, even

though their facilities, schools, hospitals, and social services are open to all, without regard to their religion.

177.   Regardless of the outcome, Plaintiffs strongly object to such an intrusive and misguided governmental investigation into their religious missions.

178.   Nor did Defendants consider whether they had a compelling interest to require religiously affiliated employers' health plans to include services that violate the employers' religious beliefs, or whether Defendants could achieve their views of sound policy in a more religiously accommodating manner.

179.   Suggesting that they were open to good-faith discussion, Defendants once again permitted parties to provide comments to the amended rules.  Numerous organizations expressed the same concerns that they had before, noting that abortifacients, sterilization, and contraceptive services could not be viewed as "preventive care."  They also explained that the religious exemption was "narrower than any conscience clause ever enacted in federal law, and narrower than the vast majority of religious exemptions from state contraceptive mandates."  Comments of United States Conference of Catholic Bishops, at 1-2 (Aug. 31, 2011), *available at* http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-to-hhs-on-preventive-services-2011-08.pdf.

180.   On October 10, 2011, Defendant Sebelius spoke at a fundraiser for NARAL Pro-Choice America.  She told the pro-choice audience that "we are in a war," apparently with opponents of either federal funding of abortion-related services or federal mandates requiring coverage for abortion-related services in health care plans.

181.   Three months later, allegedly "[a]fter evaluating [the new] comments" to the interim final rules, Defendants gave their response.  They did not request further discussion or

make attempts at compromise.  Nor did they explain the basis for their decision.  Instead, Defendant Sebelius issued a short, Friday-afternoon press release.  *See* HHS, A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html.

182.   The press release announced a one-year "safe harbor" from enforcement.  With little analysis or reasoning, HHS opted to keep the exemption unchanged, but indicated that "[n]onprofit employers who, based on religious beliefs, do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August 1, 2013, to comply with the new law."  *Id.*  The safe harbor also applies to student health plans. 77 Fed. Reg. 16,453, 16,457 (Mar. 21, 2012).

183.   Taken together, these various rules and press releases amount to a U.S. Government Mandate that requires most religiously affiliated organizations to pay, sponsor and facilitate abortifacients, sterilization services, contraceptives and related counseling services through their health plans.  As noted by Cardinal Timothy Dolan, the "safe harbor" effectively gave objecting religious institutions "a year to figure out how to violate [their] consciences."

### C.    The White House Has Refused To Expand The Exemption

184.   On February 10, 2012, given the continued public outcry to the U.S. Government Mandate and its exceedingly narrow conscience protections, the White House held a press conference and issued another press release about the U.S. Government Mandate, announcing that it had come up with a "solution" to the religious objections based on First Amendment protections for religious freedom.

185.   According to the White House, Defendants planned to issue regulations at some unspecified date prior to August 1, 2013, to exempt religious organizations that have religious

objections to providing abortifacients, sterilization, or contraception services from *directly* paying for those services under the terms of their health plans.

186. When such religious organizations provide health plans, the "insurance company will be required to directly offer . . . contraceptive care free of charge." White House, *Fact Sheet: Women's Preventive Services and Religious Institutions* (Feb. 10, 2012), *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html.

187. Despite continued objections that this "accommodation" did nothing of substance to protect the right of conscience, when asked if there would be further room for compromise, White House Chief of Staff Jacob Lew responded: "No, this is our plan." David Eldridge & Cheryl Wetzstein, *White House says contraception compromise will stand*, THE WASHINGTON TIMES, Feb. 12, 2012, *available at* http://www.washingtontimes.com/news/2012/feb/12/white-house-birth-control-compromise-will-stand/print/.

188. Defendants have since "finalize[d], without change," the interim final rules containing the religious employer exemption, 77 Fed. Reg. at 8729, and issued guidelines regarding the previously announced "temporary enforcement safe harbor" for "non-exempted, non-profit religious organizations with religious objections to such coverage." *Id.* at 8725; *see* Ctr for Consumer Info. & Ins. Oversight, Guidance on the Temporary Enforcement Safe Harbor (Feb. 10, 2012), *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf.

189. The U.S. Government Mandate is therefore the current, operative law.

190. On March 16, 2012, the Government announced an Advance Notice of Proposed Rulemaking ("ANPRM"), seeking comment on various ways to structure the proposed accommodation. Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg.

16,501 (Mar. 21, 2012). The Government has indicated that a similar arrangement will apply to student health plans. *Id.* at 16,457.

191.   The ANPRM launches a 90-day comment period, to be followed by several other steps in the rulemaking process; it offers no clear end date other than repeating the assurance that an accommodation will be in place by August 1, 2013. *See id.*

192.   The ANPRM's recurring theme is that the Government has not found a solution to the problems it created when it promulgated its U.S. Government Mandate.

193.   In fact, the ANPRM contains little more than a recitation of proposals, hypotheticals, and "possible approaches." It offers almost no analysis of the relative merits of the various proposals. It is, in essence, an exercise in public brainstorming.

194.   This "regulate first, think later" approach is not an acceptable method of rulemaking when the Government is regulating in a way that may require monumental changes of the regulated entities.

195.   The ANPRM does not alter existing law. It merely states that it may do so at some point in the future. But a promise to change the law, whether issued by the White House or in the form of an ANPRM, does not, in fact, change the law.

196.   Nor does the ANPRM alter the scope of the narrow religious employer exemption.

197.   In promulgating the U.S. Government Mandate, the Government rationalized that the time-sensitive nature of the issue justified dispensing with notice and comment. This justification is inconsistent with the Government's subsequent delays in implementing the U.S. Government Mandate.

39

198.    The ANPRM does nothing of substance to avoid involving Plaintiffs in the subsidy, provision and/or facilitation of abortifacients, sterilization services, contraceptives and related counseling services or otherwise eliminate the constitutional infirmity of the U.S. Government Mandate.

199.    The U.S. Government Mandate is already causing serious, ongoing hardship to Plaintiffs that merits judicial review now.

200.    Moreover, the uncertainty surrounding the implementation of the U.S. Government Mandate has actually increased the harms Plaintiffs are incurring.  With the regulatory landscape so unsettled, it is impossible for Plaintiffs to develop their future health plans.

201.    Health plans do not take shape overnight.  Many analyses, negotiations, and decisions must occur before Plaintiffs can implement health plans for their employees.

202.    Under normal circumstances, Plaintiffs must begin the process of determining their health care packages around one year before the plan years begin.  The multiple levels of uncertainty swirling around the U.S. Government Mandate and the ANPRM make the already lengthy process of preparing a health benefits package even more complex.

203.    For example, the planning process for Franciscan's health plan—including analysis, consultation, and negotiations—begins in early Spring and all decisions must then be made by May for the following plan year.  Implementing even basic changes to Plaintiffs' health plans requires substantial lead time.

204.    The U.S. Government Mandate, however, may require Plaintiffs to make significant, and likely revolutionary, changes to its employee health coverage.  Plaintiffs,

moreover, may need to restructure their programs or health plans to fit within the U.S. Government Mandate's requirements. Such changes will require substantially more lead time.

205.   Even assuming Plaintiffs are entitled to the benefit of the safe harbor, they must be prepared to implement modified health coverage as early as October 2013 for Our Sunday Visitor and January 2014 for the other Plaintiffs.

206.   By the time that any new rule is finalized, if ever, it will be too late for Plaintiffs to bring their health plans into compliance with the law.

207.   In addition, if Plaintiffs do not comply with the U.S. Government Mandate, they may be subject to huge annual government fines and penalties. The uncertainty of the U.S. Government Mandate's applications and penalties may cause other budgeted expenses to go unfunded.

208.   The U.S. Government Mandate thus imposes a present and ongoing hardship on Plaintiffs.

III.   **The U.S. Government Mandate, The Proposed Accommodation, And The Religious Employer Exemption Violate Plaintiffs' Religious Beliefs**

A.   **The U.S. Government Mandate Violates Plaintiffs' Religious Beliefs**

209.   The Catholic Church's well-established religious beliefs are articulated in the Catechism of the Catholic Church. One of the central tenets of the Catholic faith is belief in the sanctity of human life and the dignity of all persons. Thus, the Church believes that the "dignity of the human person is rooted in his creation in the image and likeness of God." Catechism of the Catholic Church ¶ 1700.

210.   One outgrowth of belief in human life and dignity is the Church's well-established belief that "[h]uman life must be respected and protected absolutely from the

moment of conception." *Id.* ¶ 2270. As a result, the Church believes that abortion is prohibited and that it cannot facilitate the provision of abortifacients. *Id.* ¶¶ 2271-72.

211. Catholic teachings prohibit any action which "render[s] procreation impossible" and, more specifically, regard direct sterilization as "unacceptable." *Id.* ¶¶ 2370, 2399.

212. These Catholic teachings have been reaffirmed as doctrine at various times including on July 25, 1968, when his holiness Pope Paul VI issued his encyclical *Humanae Vitae* (Human Life) and again on March 25, 1995, when his holiness Pope John Paul II issued his encyclical *Evangelium Vitae* (The Gospel of Life).

213. Partially quoting *Humanae Vitae*, the Catechism states that "'every action which, whether in anticipation of the conjugal act, or in its accomplishment, or in the development of its natural consequences, proposes, whether as an end or as a means, to render procreation impossible' is intrinsically evil." Catechism of the Catholic Church ¶ 2370.

214. Plaintiffs' health plans are consistent with the Church's teachings on abortifacients and sterilization.

215. Catholic teachings also prohibit the use of contraceptives to impede conception. As articulated by the Catechism of the Catholic Church, the sexual union of spouses "achieves the twofold end of marriage: the good of the spouses themselves and the transmission of life. These two meanings or values of marriage cannot be separated without altering the couple's spiritual life and compromising the goods of marriage and the future of the family." *Id.* ¶ 2363. Consequently, artificial contraception and sterilization cannot be used for the purpose of impeding procreation. *Id.* ¶ 2370.

216. The Church, however, does not oppose the use of non-abortifacient drugs commonly used as contraceptives when a physician prescribes the medication not for the

42

purpose of acting as a contraceptive, but rather with the intent of remedying another medical condition.

217.   Consistent with the Church's teachings, Plaintiffs' health plans cover non-abortifacient drugs commonly used as contraceptives only when prescribed with the intent of treating another medical condition, not with the intent to prevent pregnancy.

218.   Plaintiffs cannot, without violating their sincerely held religious beliefs, subsidize, facilitate, and/or sponsor coverage for abortifacients, sterilization services, contraceptives and related counseling services, which are inconsistent with the teachings of the Catholic Church.

219.   The U.S. Government Mandate irreconcilably conflicts with Plaintiffs' well-established, sincerely held beliefs that strictly forbid the subsidy, facilitation, and/or sponsorship of abortifacients, sterilization, and contraception that the U.S. Government Mandate forces upon them.

220.   All of the required "contraceptive methods" and "sterilization procedures" violate Plaintiffs' well-established and sincerely held religious beliefs that prohibit contraception and sterilization to inhibit procreation.

221.   As Plaintiffs' employee health plans are self-insured—with the exception of a few of Franciscan's health plans—Plaintiffs would be paying directly for contraception and sterilization in direct conflict with their religious beliefs.

222.   Refusal or failure to provide these drugs and services to employees might expose Plaintiffs to substantial fines. *See* Cong. Research Serv., RL 7-5700 (analyzing some of the available fines).

223.   This unprecedented, direct assault on the religious beliefs of Plaintiffs and all Catholics is irreconcilable with American law.

224.    Since the founding of this country, one of the basic freedoms central to our society and legal system is that individuals and institutions are entitled to freedom of conscience and religious practice. *See, e.g.*, James Madison, *Memorial and Remonstrance Against Religious Assessments*, ¶ 1 (1785).

225.    Requiring Plaintiffs to provide, subsidize, and/or facilitate devices, drugs, procedures, or services that violate their beliefs constitutes a substantial burden on Plaintiffs' free exercise of religion.

226.    The Government has no compelling interest in forcing Plaintiffs to violate their sincerely held religious beliefs by requiring them to provide, pay for, and/or facilitate access to abortion-inducing drugs, sterilizations, and contraceptives.  The Government itself has relieved numerous other employers from this requirement by exempting grandfathered plans and plans of employers it deems to be sufficiently religious.  Moreover, these services are widely available in the United States.  The U.S. Supreme Court has held that individuals have a constitutional right to use such services.

227.    Furthermore, the U.S. Government Mandate is not narrowly tailored to promoting a compelling governmental interest.  Even assuming the interest was compelling, the Government has numerous alternatives to furthering that interest other than forcing Plaintiffs to violate their religious beliefs.

228.    For example, the Government could provide or pay for the objectionable services through expansion of its existing network of family planning clinics funded by HHS under Title X or through other programs established by a duly enacted law.  Or, at a minimum, it could create a broader exemption for religious employers, such as those found in numerous state laws throughout the country and in other federal laws.

229. The Government therefore cannot possibly demonstrate that requiring Plaintiffs to violate their consciences is the least restrictive means of furthering its interest.

230. The U.S. Government Mandate, moreover, would simultaneously undermine both religious freedom—a fundamental right enshrined in the U.S. Constitution—and access to the wide variety of social, medical, and educational services that Plaintiffs provide. As President Obama acknowledged in his February 10th announcement, religious organizations like Plaintiffs do "more good for a community than a government program ever could."

## B.    The U.S. Government Mandate's Religious Employer Exemption Aggravates The Constitutional And Statutory Violations

231. The constitutional and statutory violations of the U.S. Government Mandate are aggravated, not alleviated, by its "religious employer" exemption.

232. The religious employer exemption substantially burdens Plaintiffs' religious exercise. The exemption forces Plaintiffs to choose between their religious beliefs (that abortifacients, sterilization, and contraception are strictly forbidden), their mission (serving, employing, providing care for, and educating individuals of all faith traditions to enrich and enlighten), and obeying the law.

233. The U.S. Government Mandate also seeks to compel Plaintiffs to fund "patient education and counseling for all women with reproductive capacity." It therefore compels Plaintiffs to pay for, provide, and/or facilitate speech that is contrary to their firmly held religious beliefs.

234. In addition to believing in the sanctity of human life from conception, Plaintiffs believe that devotion to God is demonstrated through devotion to fellow man and service of others; the two are so closely related and dependent upon each other that they cannot be

separated.  Catholic doctrine recognizes that, "[l]iving faith 'work[s] through charity.'"
Catechism of the Catholic Church ¶ 1814.

235.  To effectuate this religious belief, Plaintiffs—like the Catholic Church that
inspires their work—are committed to serving anyone in need, regardless of religion.

236.  In addition to serving individuals of all faiths, Plaintiffs also employ, serve, and in
some cases provide medical care for and educate individuals of all faiths.

237.  Although the Government exempts some religious institutions from the U.S.
Government Mandate, it has crafted such a narrow exemption that thousands of sincere religious
institutions are being forced to make the unconscionable "choice" between violating their
religious beliefs or violating the law.

238.  Both the Constitution and RFRA protect religious institutions, whether or not
their purpose is the "inculcation of religious values" and whether or not they "primarily" serve
and employ people with shared "religious tenets."

239.  However, only institutions with such a narrow purpose and with such limitations
on employees and services qualify for the religious employer exemption under the U.S.
Government Mandate.

240.  Forcing Plaintiffs to choose between violating their religious beliefs or violating
the law constitutes a substantial burden on Plaintiffs' exercise of religion, which is protected by
the Constitution and RFRA.

241.  The Government also has not provided any process by which Plaintiffs can
determine whether they fit within the exemption.

242.  It is unclear whether Plaintiffs qualify for the exemption.

243.  It is unclear how the Government defines or will interpret religious "purpose."

244. It is unclear how the Government defines or will interpret vague terms, such as "primarily," "share," and "religious tenets."

245. It is unclear how the Government will ascertain the "religious tenets" of Plaintiffs, those they employ, and those they serve.

246. It is unclear how much overlap the Government will require for religious tenets to be "share[d]."

247. Plaintiffs encourage their employees to remain committed to Catholicism's core values. For example, Franciscan's employee handbook addresses Ethical and Religious Directives for Catholic Health Care Services. However, it is unclear how the Government will view Plaintiffs' employees' religious tenets.

248. Any attempt by Plaintiffs to qualify for the narrow religious employer exemption by restricting their charitable and educational missions to serving primarily Catholics would have devastating effects on the communities Plaintiffs serve.

249. Indeed, the Government does not even provide Plaintiffs the option to attempt to avoid the U.S. Government Mandate by exiting the health care market. Eliminating its employee group health plan or refusing to provide plans that cover abortion-inducing drugs, sterilization, or contraceptives would expose each Plaintiff to substantial annual fines. It is no "choice" to leave those employees scrambling for health insurance while subjecting Plaintiffs to significant fines for breaking the law. Yet that is what the U.S. Government Mandate requires for Plaintiffs to adhere to their religious beliefs.

250. The U.S. Government Mandate also inhibits Plaintiffs' ability to hire and retain employees, attract students, and solicit charitable contributions.

251.   The limited and ill-defined religious exemption provided in the U.S. Government

Mandate conflicts with the Constitution and RFRA.

**C.     The U.S. Government Mandate's Religious Employer Exemption Excessively
         Entangles The Government In Religion, Interferes With Religious
         Institutions' Religious Doctrine, And Discriminates Against And Among
         Religions**

252.   The U.S. Government Mandate's religious employer exemption further

excessively entangles the Government in defining the religious tenets of each Plaintiff

organization and their employees and beneficiaries.

253.   In order to determine whether Plaintiffs—or any other religious organization—

qualify for the exemption, the Government would have to decide Plaintiffs' "religious tenets"

and determine whether "the purpose" of the organization is to "inculcate" those tenets.

254.   The Government would then have to conduct an inquiry into the practices and

beliefs of the individuals that Plaintiffs ultimately employ and in some cases provide medical

care for and educate.

255.   The Government would then have to compare and contrast those religious

practices and beliefs to determine whether and how many of them are "share[d]."

256.   Regardless of the outcome, this inquiry is unconstitutional, and Plaintiffs strongly

object to such an intrusive governmental investigation into their religious missions.

257.   The religious employer exemption is based on an improper Government

determination that "inculcation" is the only legitimate religious purpose.

258.   The Government should not base an exemption on an assessment of the "purity"

or legitimacy of an institution's religious purpose.

259.   By limiting that legitimate purpose to inculcation, at the expense of other

sincerely held religious purposes, the U.S. Government Mandate interferes with religious

autonomy. Plaintiffs have the right to determine their own religious purposes, including religious purposes broader than inculcation, without Government interference and without losing their religious liberties.

260.   Likewise, the exemption seeks to improperly limit the definition of legitimate religious organizations to those who primarily employ and serve "persons who share the religious tenets of the organization."  45 C.F.R. § 147.130(a)(iv)(B)(2)-(3).  This is inconsistent with the definition of religion under the Constitution and RFRA.

261.   Defining religion based on employing and serving primarily people who share the organization's religious tenets directly contradicts Plaintiffs' sincerely held religious beliefs regarding their religious mission to serve all people, regardless of whether or not they share the same faith.

262.   The U.S. Government Mandate and its extremely narrow religious employer exemption discriminate against Catholic religious institutions.

263.   The U.S. Government Mandate targets Plaintiffs precisely because of their adherence to their religious opposition to abortifacients, sterilization, and contraception.

264.   The religious employer exemption targets Plaintiffs precisely because of their commitment to serve, employ, and in some cases provide medical care for and educate, people of all faiths.

265.   Plaintiffs cannot be forced to give up their beliefs on abortifacients, sterilization, or contraception, nor their devotion to serving all mankind, without violating their religious beliefs and compromising their religious purpose.

266. The U.S. Government Mandate and its extremely narrow religious employer exemption discriminate among religions. The U.S. Government Mandate favors religions that do not oppose abortifacients by putting the Government imprimatur on those beliefs as correct.

267. Similarly, the religious employer exemption favors religions that do not believe in serving all humanity by exempting them from its requirements.

268. As a result of such discrimination, the U.S. Government Mandate is subject to the strictest scrutiny under the Constitution, as well as RFRA.

## D.    The U.S. Government Mandate Is Not A Neutral Law Of General Applicability

269. The U.S. Government Mandate is not a neutral law of general applicability. It offers multiple exemptions from its requirement that employer-based health plans include or facilitate coverage for abortion-inducing drugs, sterilization, contraception, and related education and counseling. For example, the U.S. Government Mandate exempts all "grandfathered" plans from its requirements. Moreover, the legislative history indicates that the U.S. Government Mandate was implemented at the behest of individuals and organizations who disagree with certain religious beliefs regarding abortifacients and contraception, and thus it targets religious organizations for disfavored treatment.

270. The Government has also crafted a religious employer exemption to the U.S. Government Mandate that favors certain religions over others. As noted, it applies only to plans sponsored by religious organizations that have, as their "purpose," the "inculcation of religious values"; that "primarily" serve individuals that share those religious tenets; and that "primarily" employ such individuals. 45 C.F.R. § 147.130(a)(iv)(B).

271. The U.S. Government Mandate, moreover, was promulgated by Government officials, and supported by non-governmental organizations, who strongly oppose Catholic

50

teachings and beliefs regarding marriage and family. For example, on October 5, 2011, after Defendants announced the interim final rule but before they announced the final rule, Defendant Sebelius spoke at a fundraiser for NARAL Pro-Choice America. Defendant Sebelius has long been a staunch supporter of abortion rights and a vocal critic of Catholic teachings and beliefs regarding abortifacients and contraception. NARAL Pro-Choice America is a pro-abortion organization that likewise opposes many Catholic teachings. At that fundraiser, Defendant Sebelius criticized individuals and entities whose beliefs differed from those held by her and the other attendees of the NARAL Pro-Choice America fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services? Not so much."

272.    Consequently, on information and belief, Plaintiffs allege that the purpose of the U.S. Government Mandate, including the narrow exemption, is to discriminate against religious institutions and organizations that oppose contraception, sterilization, and abortifacients.

273.    An actual, justiciable controversy exists between Plaintiffs and Defendants. Absent a declaration resolving this controversy and the validity of the U.S. Government Mandate and exemption, Plaintiffs are uncertain as to their rights and duties in planning, negotiating, and/or implementing their group health plans, and they are threatened with the impossible choice between paying for prescriptions and procedures in violation of the Catholic Church's moral teaching, or discontinuing their health plans in violation of the Catholic Church's social teaching.

## IV.    CAUSES OF ACTION

### COUNT I
### Substantial Burden on Religious Exercise
### in Violation of RFRA

274.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

275. RFRA prohibits the Government from substantially burdening an entity's exercise of religion, even if the burden results from a rule of general applicability, unless the Government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

276. RFRA protects organizations as well as individuals from Government-imposed substantial burdens on religious exercise.

277. RFRA applies to all federal law and the implementation of that law by any branch, department, agency, instrumentality, or official of the United States.

278. Abortifacients, sterilization, and contraception violate the Catholic beliefs and tenets to which Plaintiffs must adhere according to the Church's magisterial teachings and the Catechism of the Catholic Church.

279. Plaintiffs' religious beliefs preclude them from offering health care plans to their employees that include or facilitate coverage for abortifacients, sterilization, and contraception, or related education and counseling about those practices.

280. Plaintiffs have exercised their religious beliefs by refusing to offer health care plans to their employees that include or facilitate coverage for abortifacients, sterilization, and contraception, or related education and counseling about those practices.

281. The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate practices and speech that are contrary to their religious beliefs concerning abortifacients, sterilization, and contraception.

282. The U.S. Government Mandate exposes Plaintiffs to substantial monetary fines if they refuse to abandon their religious beliefs by offering an employee health care plan that

includes or facilitates coverage for abortifacients, sterilization, contraception, and related education and counseling about those practices.

283.   In order to qualify for the narrow exemption to the U.S. Government Mandate, Plaintiffs would have to submit to an intrusive and burdensome governmental inquisition into whether their "purpose" is the "inculcation of religious values," whether they "primarily" employ Catholics, and whether they "primarily" serve Catholics. And Plaintiffs may not meet those standards.

284.   It is unclear whether Plaintiffs are eligible for the religious employer exemption.

285.   The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

286.   The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

287.   Requiring Plaintiffs to comply with the U.S. Government Mandate is not the least restrictive means of furthering a compelling governmental interest.

288.   By enacting and threatening to enforce the U.S. Government Mandate against Plaintiffs, the Government has violated RFRA.

289.   Plaintiffs have no adequate remedy at law.

290.   The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

### COUNT II
### Substantial Burden on Religious Exercise in Violation of
### the Free Exercise Clause of the First Amendment

291.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

292.   The Free Exercise Clause of the First Amendment prohibits the Government from substantially burdening an entity's exercise of religion.

53

293.   The Free Exercise Clause protects organizations as well as individuals from Government-imposed burdens on religious exercise.

294.   Abortifacients, sterilization, and contraception violate the Catholic beliefs and tenets to which Plaintiffs must adhere according to the Church's magisterial teachings and the Catechism of the Catholic Church.

295.   Plaintiffs' religious beliefs preclude them from offering health care plans to their employees that include or facilitate coverage for abortifacients, sterilization, contraception, or related education and counseling about those practices.

296.   Plaintiffs have exercised their religious beliefs by deciding not to offer their employees health care plans that include or facilitate coverage for abortifacients, sterilization, and contraception, or related education and counseling about those practices.

297.   The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate practices and speech that are contrary to their religious beliefs concerning abortifacients, sterilization, and contraception.

298.   The U.S. Government Mandate exposes Plaintiffs to substantial monetary fines if they refuse to abandon their religious beliefs by offering health care plans that include or facilitate coverage for abortifacients, sterilization, contraception, and related education and counseling about those practices.

299.   In order to qualify for the narrow exemption to the U.S. Government Mandate, Plaintiffs would have to submit to an intrusive and burdensome governmental investigation into whether their "purpose" is the "inculcation of religious values," whether they "primarily" employ Catholics, and whether they "primarily" serve Catholics. And Plaintiffs may not meet those standards.

300. It is unclear whether Plaintiffs are eligible for the religious employer exemption.

301. The U.S. Government Mandate therefore substantially burdens Plaintiffs' exercise of religion.

302. The U.S. Government Mandate is not a neutral law of general applicability, because it is riddled with exemptions. It offers multiple exemptions from its requirement that employer-based health plans include or facilitate coverage for abortifacients, sterilization, contraception, and related education and counseling.

303. The U.S. Government Mandate is not a neutral law of general applicability, because it discriminates against certain religious viewpoints and targets certain religious organizations for disfavored treatment. Defendants enacted the U.S. Government Mandate despite being aware of the substantial burden it would place on Plaintiffs' exercise of religion.

304. The U.S. Government Mandate implicates constitutional rights in addition to the right to free exercise of religion, including, for example, the rights to free speech and to freedom from excessive government entanglement with religion.

305. The U.S. Government Mandate offers discretionary exemptions for certain religious entities, but not for others.

306. In its practical effect, the U.S. Government Mandate targets and predominantly burdens religiously motivated conduct.

307. The Government issued the U.S. Government Mandate to suppress the religious exercise of Plaintiffs and other entities with analogous religious beliefs.

308. The U.S. Government Mandate is not a neutral law of general applicability, and so is subject to strict scrutiny.

309.   The U.S. Government Mandate infringes not simply the Free Exercise Clause, but also the Free Speech Clause, and so is subject to strict scrutiny.

310.   The Government was aware of the substantial burden the U.S. Government Mandate would place on Plaintiffs' exercise of religion, but the Government did not identify any compelling governmental interest for requiring Plaintiffs to comply with the U.S. Government Mandate.

311.   The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

312.   The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

313.   By enacting and threatening to enforce the U.S. Government Mandate, the Government has burdened Plaintiffs' religious exercise in violation of the Free Exercise Clause of the First Amendment.

314.   Plaintiffs have no adequate remedy at law.

315.   The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT III
### Excessive Entanglement in Violation of the
### Free Exercise and Establishment Clauses of the First Amendment

316.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

317.   The Free Exercise Clause and the Establishment Clause of the First Amendment prohibit intrusive government inquiries into the religious beliefs of individuals and institutions, and other forms of excessive entanglement between religion and Government.

318.   This prohibition on excessive entanglement protects organizations as well as individuals.

56

319.   In order to qualify for the exemption to the U.S. Government Mandate for "religious employers," an entity must submit to an invasive government investigation into its religious beliefs, including whether the organization's "purpose" is the "inculcation of religious values" and whether the organization "primarily employs" and "primarily serves" individuals who share the organization's religious tenets.

320.   It is unclear how the Government will determine whether an organization meets the U.S. Government Mandate's definition of a sufficiently "religious" organization.

321.   The U.S. Government Mandate thus requires the Government to engage in invasive inquiries and judgments regarding questions of religious belief or practice.

322.   The U.S. Government Mandate results in an excessive entanglement between religion and Government.

323.   The U.S. Government Mandate is therefore unconstitutional and invalid.

324.   The enactment and impending enforcement of the U.S. Government Mandate violate the Free Exercise Clause and the Establishment Clause of the First Amendment.

325.   Plaintiffs have no adequate remedy at law.

326.   The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT IV
### Religious Discrimination in Violation of the
### Free Exercise and Establishment Clauses of the First Amendment

327.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

328.   The First Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

329. The Free Exercise Clause and the Establishment Clause of the First Amendment mandate the equal treatment of all religious faiths and institutions without discrimination or preference.

330. This mandate of equal treatment protects organizations as well as individuals.

331. The U.S. Government Mandate offers exemptions from its requirement that health plans include coverage for abortifacients, sterilization, contraception, and related education and counseling for some religious institutions on the basis of stated criteria.

332. The U.S. Government Mandate discriminates on the basis of religious views or religious status.

333. The U.S. Government Mandate's narrow exemption for certain "religious employers" but not others discriminates on the basis of religious views or religious status.

334. The U.S. Government Mandate's definition of religious employer likewise discriminates among different types of religious entities based on the nature of those entities' religious beliefs or practices.

335. The U.S. Government Mandate's definition of religious employer likewise furthers no compelling governmental interest.

336. The U.S. Government Mandate's definition of religious employer likewise is not narrowly tailored to further a compelling governmental interest.

337. The enactment and impending enforcement of the U.S. Government Mandate violate the Free Exercise Clause and the Establishment Clause of the First Amendment.

338. Plaintiffs have no adequate remedy at law.

339. The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT V
### Excessive Interference in Matters of Internal Governance in Violation of the Free Exercise and Establishment Clauses of the First Amendment

340.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

341.   The Free Exercise Clause and Establishment Clause protect the freedom of religious organizations to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

342.   Under these Clauses, the Government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, ministers, or doctrine.

343.   Under these Clauses, the Government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

344.   Plaintiffs are nonprofit, religiously based organizations which operate in a fashion consistent with and supportive of the religious mission and teachings of the Universal Roman Catholic Church.

345.   The Catholic Church views abortifacients, sterilization, and contraception as intrinsically immoral, and prohibits Catholic organizations from condoning or facilitating those practices.  Plaintiffs have abided and must continue to abide by the decision of the Catholic Church on these issues.

346.   The Government may not interfere with, or otherwise question, the final decision of the Catholic Church that its religious organizations must abide by these views.

347.   The Government may not interfere with the Catholic Church and its affiliated religious organizations, including Plaintiffs, with regard to their religious beliefs on abortifacients, sterilization, and contraception.

348.    In accordance with this Catholic doctrine, Plaintiffs' have made the internal decision that their employee health plans do not cover, subsidize, or facilitate abortifacients, sterilization, and contraception.

349.    The U.S. Government Mandate interferes with Plaintiffs' internal decisions concerning their structure and mission by requiring them to either facilitate practices that directly conflict with Catholic tenets or face substantial penalties.

350.    Plaintiffs and the Church believe that Plaintiffs are integral parts of the Church that serve from the heart of the Church.

351.    The U.S. Government Mandate and its religious employer exemption interfere with the organizational structure of Plaintiffs as part of the Church by requiring Plaintiffs to include or facilitate coverage for practices that directly conflict with their Catholic tenets but purporting to exempt the Church.

352.    Before issuing the U.S. Government Mandate, the Government made no showing that their interference with the internal decision-making and organizational structure of Plaintiffs was necessary to advance any compelling government interest.

353.    The U.S. Government Mandate's interference with Plaintiffs' internal decision-making and organizational structure is not narrowly tailored to serve any compelling government interest.

354.    Because the U.S. Government Mandate interferes with the internal decision-making and organizational structure of Plaintiffs in a manner that affects Plaintiffs' faith and mission, the U.S. Government Mandate violates the Establishment Clause and the Free Exercise Clause of the First Amendment.

355.    Plaintiffs have no adequate remedy at law.

356.   The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

### COUNT VI
### Compelled Speech in Violation of
### the Free Speech Clause of the First Amendment

357.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

358.   The First Amendment protects against the compelled affirmation of any religious or ideological proposition that the speaker finds unacceptable.

359.   The First Amendment protects organizations as well as individuals against compelled speech.

360.   Expenditures are a form of speech protected by the First Amendment.

361.   The First Amendment protects against the use of a speaker's money to support a viewpoint that conflicts with the speaker's religious or ideological beliefs.

362.   Plaintiffs consistently hold and publicly proclaim that abortifacients, sterilization, and contraception violate fundamental tenets of their Catholic religion.

363.   The U.S. Government Mandate would compel Plaintiffs to provide or sponsor health care plans for their employees that include or facilitate coverage for abortifacients, sterilization, and contraception services, practices that violate their religious beliefs.

364.   The U.S. Government Mandate would compel Plaintiffs to subsidize, promote, and facilitate education and counseling services to their employees on abortifacients, sterilization, and contraception services.

365.   By imposing the U.S. Government Mandate, Defendants are compelling Plaintiffs to publicly subsidize or facilitate the activity and speech of private entities that are contrary to their religious beliefs.

366. Plaintiffs' decisions about health care for their employees should be guided by their consciences and moral values consistent with Catholic religious standards, not artificial government guidelines.

367. The U.S. Government Mandate is viewpoint-discriminatory and subject to strict scrutiny.

368. The U.S. Government Mandate furthers no compelling governmental interest.

369. The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

370. Plaintiffs have no adequate remedy at law.

371. The U.S. Government Mandate imposes an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VII
### Failure to Conduct Notice-and-Comment Rulemaking and Improper Delegation in Violation of the APA

372. Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

373. The Affordable Care Act expressly delegates to an agency within Defendant HHS, the Health Resources and Services Administration, the authority to establish guidelines concerning the "preventive care" that a group health plan and health insurance issuer must provide.

374. Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the guidelines that group health plans and insurers must cover. Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

62

375. Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law.

376. Defendants, instead, wholly delegated their responsibilities for issuing preventive care guidelines to a non-governmental entity, the IOM (the Institute of Medicine).

377. When crafting its guidelines recommendations, the IOM did not permit or provide for the broad public comment otherwise required under the APA concerning the guidelines that it would recommend. The dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.

378. Within two weeks of the IOM issuing its guidelines, Defendant HHS issued a press release announcing that the IOM's guidelines were required under the Affordable Care Act.

379. Defendants have never explained why they failed to enact these "preventive care" guidelines through notice-and-comment rulemaking as required by the APA.

380. Defendants also failed to engage in notice-and-comment rulemaking when issuing the interim final rules and the final rule incorporating the guidelines.

381. Defendants' stated reasons for promulgating these rules without engaging in formal notice-and-comment rulemaking do not constitute "good cause." Providing public notice and an opportunity for comment was not impracticable, unnecessary, or contrary to the public interest for the reasons claimed by Defendants.

382. Defendants have since undertaken the first step toward a prolonged notice and comment process to promulgate amended regulations, which undermines their claims that good cause warranted abandoning notice and comment for the current regulations.

383.   By enacting the "preventive care" guidelines and interim and final rules through delegation to a non-governmental entity and without engaging in notice-and-comment rulemaking, Defendants failed to observe a procedure required by law and thus violated 5 U.S.C. § 706(2)(D).

384.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

385.   Plaintiffs have no adequate remedy at law.

386.   The enactment of the U.S. Government Mandate without observance of a procedure required by law and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VIII
### Arbitrary and Capricious Action in Violation of the APA

387.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

388.   The APA condemns agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

389.   The APA requires that an agency examine the relevant data and articulate an explanation for its action that includes a rational connection between the facts found and the policy choice made.

390.   Agency action is arbitrary and capricious under the APA if the agency has failed to consider an important aspect of the problem before it.

391.   A court reviewing agency action may not supply a reasoned basis that the agency itself has failed to offer.

392.   Defendants failed to consider the suggestion of many commenters that abortifacients, sterilization, and contraception as well as counsel and education for these services could not be viewed as "preventive care."

393.   Defendants failed adequately to engage with voluminous comments suggesting that the scope of the religious exemption to the U.S. Government Mandate should be broadened.

394.   Defendants did not articulate a reasoned basis for its action by drawing a connection between facts found and the policy decisions it made.

395.   Defendants failed to provide any standards or processes for how the Administration will decide which religious institutions will be included in the religious exemption.

396.   Defendants failed to consider the use of broader religious exemptions in many other federal laws and regulations.  Defendants' promulgation of the U.S. Government Mandate violates the APA.

397.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

398.   Plaintiffs have no adequate remedy at law.

399.   The enactment of the U.S. Government Mandate that is not in accordance with law and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT IX
### Acting Illegally in Violation of the APA

400.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

401.   The APA requires that all government agency action, findings, and conclusions be "in accordance with law."

402.   The U.S. Government Mandate and its exemption are illegal and therefore in violation of the APA.

403.   The Weldon Amendment states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat 786, 1111 (2011).

404.   The Affordable Care Act states that "nothing in this title (or any amendment by this title) shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."
42 U.S.C. § 18023(b)(1)(A)(i). It adds that "the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion.]"  *Id.* § 18023(b)(1)(A)(ii).

405.   The Affordable Care Act contains no clear expression of an affirmative intention of Congress that employers with religiously motivated objections to the provision of health plans that include coverage for abortifacients, sterilization, contraception, or related education and counseling should be required to provide such plans.

406.   The U.S. Government Mandate requires employer based-health plans to provide coverage for abortion-inducing drugs, contraception, sterilization, and related education. It does not permit employers or issuers to determine whether the plan covers abortifacients, as the Act requires. By issuing the U.S. Government Mandate, Defendants have exceeded their authority, and ignored the direction of Congress.

407. The U.S. Government Mandate violates RFRA.

408. The U.S. Government Mandate violates the First Amendment.

409. The U.S. Government Mandate is not in accordance with law and thus violates

5 U.S.C. § 706(2)(A).

410. Plaintiffs have no adequate or available administrative remedy, or, in the

alternative, any effort to obtain an administrative remedy would be futile.

411. Plaintiffs have no adequate remedy at law.

412. The enactment of the U.S. Government Mandate that is not in accordance with

law and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that

warrants relief.

## V.    **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray that this Court:

1.    Enter a declaratory judgment that the U.S. Government Mandate violates
      Plaintiffs' rights under RFRA;

2.    Enter a declaratory judgment that the U.S. Government Mandate violates
      Plaintiffs' rights under the First Amendment;

3.    Enter a declaratory judgment that the U.S. Government Mandate was
      promulgated in violation of the APA;

4.    Enter an injunction prohibiting Defendants from enforcing the U.S.
      Government Mandate against Plaintiffs;

5.    Enter an order vacating the U.S. Government Mandate;

6.    Award Plaintiffs attorneys' and expert fees under 42 U.S.C. § 1988; and

7.    Award all other relief as the Court may deem just and proper.

## VI.    **JURY DEMAND**

1.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby

demand a trial by jury of all issues so triable.

Respectfully submitted, this the 21st day of May, 2012.

By: _Matthew A Kairis_ _____

Matthew A. Kairis (OH No. 55502)
Eric E. Murphy (OH No. 83284)
Brandy H. Ranjan (OH No. 86984)*
JONES DAY
325 John H. McConnell Blvd., Suite 600
P.O. Box 165017
Columbus, OH 43216
(614) 469-3939

Carol A. Hogan (IL No. 06202430)*
Brian J. Murray (IL No. 06272767)
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
(312) 782-8585

Leon F. DeJulius, Jr. (PA No. 90383)
Alison M. Kilmartin (PA No. 306422)*
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
(412) 391-3939

*Counsel for Plaintiffs*

Scott Hall (IN No. 12060-49)
HALL & GOODEN LLP
810 South Calhoun Street, Suite 100
Fort Wayne, IN 46802
(260) 422-2035

*Counsel for Plaintiffs the Diocese of Fort Wayne-South Bend, Inc., Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc., and Saint Anne Home & Retirement Community of the Diocese of Fort Wayne-South Bend, Inc.*

W. Patrick Downes (IN No. 4587-45)
General Counsel
FRANCISCAN ALLIANCE, INC.
1515 South Court Street
Crown Pointe, IN 46307
(219) 662-3754

*Counsel for Plaintiff Franciscan Alliance, Inc.*

William T. Hopkins, Jr. (IN No. 8074-02)
BARNES & THORNBURG LLP
600 One Summit Square
110 E. Wayne Street
Fort Wayne, IN  46802-3119
(260) 425-4644

*Counsel for Plaintiff the University of Saint Francis*

Robert E. Doelling, Jr. (IN No. 14540-49)
BURT BLEE DIXON SUTTON & BLOOM, LLP
200 East Main Street, Suite 1000
1st Source Banking Center
Fort Wayne, IN  46802
(260) 426-1300

*Counsel for Plaintiff Our Sunday Visitor, Inc.*

\* pending *pro hac vice* admission