**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

---

DIOCESE OF FORT WAYNE-SOUTH
BEND, INC.; CATHOLIC CHARITIES OF
THE DIOCESE OF FORT WAYNE-SOUTH
BEND, INC.; SAINT ANNE HOME &
RETIREMENT COMMUNITY OF THE
DIOCESE OF FORT WAYNE-SOUTH
BEND, INC.; FRANCISCAN ALLIANCE,
INC.; SPECIALTY PHYSICIANS OF
ILLINOIS, LLC; UNIVERSITY OF SAINT
FRANCIS; and OUR SUNDAY VISITOR,
INC.,

        *Plaintiffs,*

    **v.**

KATHLEEN SEBELIUS, in her official
capacity as Secretary of the U.S. Department
of Health and Human Services; THOMAS
PEREZ, in his official capacity as Secretary of
the U.S. Department of Labor; JACOB J.
LEW, in his official capacity as Secretary of
the U.S. Department of the Treasury; U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; U.S. DEPARTMENT OF
LABOR; and U.S. DEPARTMENT OF THE
TREASURY,

        *Defendants.*

Case No. 1:12-cv-159-JD-RBC

---

<u>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

    1.    This lawsuit is about one of America's most cherished freedoms: the freedom to

practice one's religion without government interference. It is not about whether people have a

right to abortion-inducing products, sterilization, and contraception. Those products and services

are widely available in the United States, and nothing prevents the Government itself from

making them more widely available. Here, however, the Government seeks to require

Plaintiffs—all of which are Catholic entities—to violate their sincerely-held religious beliefs by providing, paying for, and/or facilitating access to those products and services. American history and tradition, embodied in the First Amendment to the United States Constitution and the Religious Freedom Restoration Act ("RFRA"), safeguard religious entities from such overbearing and oppressive governmental action. Plaintiffs, therefore, seek relief in this Court to protect this most fundamental of American rights.

2.      Plaintiffs provide a wide range of spiritual, educational, and social services to members of their communities, Catholic and non-Catholic alike. Plaintiff Diocese of Fort Wayne–South Bend, Inc. (the "Diocese"), not only provides pastoral care and spiritual guidance for nearly 160,000 Catholics, but also serves individuals throughout the Fort Wayne-South Bend area through its schools and multiple charitable programs. The Diocese's programs serve those who are most often overlooked in the community, including those who are homeless, hungry, and elderly. Likewise, Plaintiff Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc. ("Catholic Charities") offers a host of social services—including access to free food, adoption and pregnancy services, refugee resettlement, immigration services, foreclosure prevention, and senior employment programs—to thousands in need throughout the Fort Wayne-South Bend area. Plaintiff Saint Anne Home & Retirement Community of Diocese of Fort Wayne-South Bend, Inc. ("Saint Anne Home") provides quality and compassionate care to the aged through residential apartments, rehab suites, adult day services, and a nursing facility with specialized dementia and Alzheimer's care. Plaintiff Franciscan Alliance ("Franciscan") provides regional health services in Indiana and Illinois, providing care to more than 100,000 inpatients and performing more than 3.5 million outpatient services annually—while remaining faithful to Catholic and Franciscan values. Plaintiff Specialized Physicians of Illinois, LLC ("Specialty Physicians") provides a

COI-1494593

myriad of physician specialist services in the South Suburban Chicago area.  For its part, Plaintiff University of Saint Francis ("Saint Francis" or "University") offers a Catholic, Franciscan-sponsored liberal arts education to nearly 2,300 undergraduate and graduate students while also serving the larger community through its Center for Service Engagement.  Moreover, Plaintiff Our Sunday Visitor, Inc. ("Our Sunday Visitor") publishes and markets religious periodicals and other education resources and provides offertory solutions to Catholic parishes throughout the United States.

　　　　3.　　Plaintiffs' work is in every respect guided by and consistent with Roman Catholic belief, including the requirement that they serve those in need, regardless of their religion.  This is perhaps best captured by words attributed to Saint Francis of Assisi:  "Preach the Gospel at all times.  Use words if necessary."  As Pope Benedict has more recently put it, "[L]ove for widows and orphans, prisoners, and the sick and needy of every kind, is as essential to [the Catholic Church] as the ministry of the sacraments and preaching of the Gospel.  The Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."  Or as Cardinal James Hickey, former Archbishop of Washington, once commented on the role of Catholic educators:  "We do not educate our students because *they* are Catholic; we educate them because *we* are Catholic."  Thus, Catholic individuals and organizations consistently work to create a more just community by serving any and all neighbors in need.

　　　　4.　　Catholic Church teachings also uphold the firm conviction that sexual union should be reserved to married couples who are open to the creation of life; thus, artificial interference with the creation of life, including through abortion, sterilization, and contraceptives, is contrary to Catholic doctrine.

5.     Defendants have promulgated various rules (collectively, "the U.S. Government Mandate") that force Plaintiffs to violate their sincerely-held religious beliefs.  These rules, first proposed on July 19, 2010, require Plaintiffs and other Catholic and religious organizations to provide, pay for, and/or facilitate insurance access to abortion-inducing products, sterilization, and contraception, in violation of their sincerely-held religious beliefs.  In response to the intense public criticism that the Government's original proposal provoked, including by some of the current Administration's most ardent supporters, the Government proposed changes to the rules that, it asserted, were intended to eliminate the substantial burden that the Mandate imposed on religious beliefs.  In fact, however, these changes made that burden worse by significantly *increasing* the number of religious organizations subject to the U.S. Government Mandate, and by driving a wedge between religious organizations, such as Plaintiff Diocese, and their equally religious charitable arms, such as Plaintiff Catholic Charities.  Reversing course from its original form, the U.S. Government Mandate now prohibits the Diocese from ensuring that all of its religious affiliates provide health insurance consistent with Catholic doctrine.

6.     In its final form, the U.S. Government Mandate contains three basic components:

7.     *First*, it requires employer group health plans to cover, without cost-sharing requirements, all "FDA-approved contraceptive methods and contraceptive counseling"—a term that includes abortion-inducing products, contraception, sterilization, and related counseling and education.

8.     *Second*, the Mandate creates a narrow exemption for certain "religious employers," defined to include only organizations that are "organized and operate[] as a nonprofit entity and [are] referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."  The referenced Code section does not, nor is it intended to, address religious liberty.

-4-

Instead, it is a paperwork-reduction provision that addresses whether and when tax-exempt nonprofit entities must file an annual informational tax return, known as a Form 990. As the Government has repeatedly affirmed, this exemption is intended to protect only "the unique relationship between a house of worship and its employees in ministerial positions." 78 Fed. Reg. 8461, 39874. Consequently, the only organizations that qualify for the exemption are "churches, synagogues, mosques, and other houses of worship, and religious orders." *Id.* at 8461. This is the narrowest "conscience exemption" ever adopted in federal law. It grants the Government broad discretion to sit in judgment of which groups qualify as "religious employers," thus favoring certain religious organizations over others and entangling the Government in matters of religious faith and practice.

9. *Third*, the U.S. Government Mandate creates a second class of religious entities that, in the Government's view, are not sufficiently "religious" to qualify for the "religious employer" exemption. These religious entities, deemed "eligible organizations," are subject to a so-called "accommodation" that is intended to eliminate the burden that the Mandate imposes on their religious beliefs. The "accommodation," however, is illusory: it continues to require "eligible organizations" to participate in a new employer-based scheme to provide, pay for, and/or facilitate access to the objectionable products and services for their employees.

10. In particular, Plaintiffs Catholic Charities, Saint Anne Home, Franciscan, Specialty Physicians, Saint Francis, and Our Sunday Visitor do not qualify under the Government's narrow definition of "religious employers," even though they are religious organizations under any reasonable definition of the term. Instead, they are "eligible organizations" subject to the so-called "accommodation." But notwithstanding the "accommodation," these Plaintiffs are required to enter into a contract with an insurance company (or, for self-insured organizations, a

COI-1494593

third party administrator), which, as a direct result, is required to provide or procure abortion-inducing products, contraception, sterilization, and related counseling for Plaintiffs' employees. Consequently, the religious organizations' actions are the trigger and but-for cause of the provision of the objectionable products and services. Plaintiffs cannot avoid facilitating the provision of the objectionable products and services—for example, by contracting with an insurance company that will not provide or procure the objectionable products and services or even dropping their health-insurance plans altogether—without subjecting themselves to crippling fines and/or lawsuits by individuals and governmental entities.

11. Plaintiffs, moreover, must facilitate the provision of the objectionable services in other ways that further exacerbate their religiously impermissible cooperation in the provision of the objectionable products and services. For example, in order to be eligible for the so-called "accommodation," Plaintiffs must provide a "certification" to their insurance provider setting forth their religious objections to the Mandate. The provision of this "certification," in turn, automatically triggers an obligation on the part of the insurance provider to provide or procure the objectionable products and services for Plaintiffs' employees. A religious organization's self-certification, therefore, is a trigger and but-for cause of the provision of the objectionable products and services.

12. In addition, notwithstanding the "accommodation," the U.S. Government Mandate "requires the objecting religious organization to fund or otherwise facilitate the morally objectionable coverage." Comments of U.S. Conference of Catholic Bishop, at 3 (Mar. 20, 2013), *available at http://www.usccb.org/about/general-counsel/rulemaking/upload/2013-NPRM-Comments-3-20-final.pdf*. The Government asserts that the provision of the objectionable products and services will be "cost-neutral." This assertion, however, ignores the

-6-

regulatory and administrative costs that will inevitably force insurance companies and third party administrators to increase the prices they charge religious employers subject to the "accommodation."  The Government's assertion of "cost neutrality" is also based on the implausible (and morally objectionable) assumption that "lower costs" from "fewer childbirths" will offset the cost of the contraceptive services.  78 Fed. Reg. at 8463.  More importantly, even if the Government's assumption were correct, it simply means that premiums previously going toward childbirths will be redirected to contraceptive and related services in order to achieve the (objectionable) goal of "fewer childbirths."

13.  In short, the "accommodation" requires non-exempt religious organizations, including Plaintiffs, to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization, and related counseling, contrary to their sincerely-held religious beliefs.

14.  Plaintiff Diocese of Fort Wayne-South Bend appears to qualify as a "religious employer," and, as such, is eligible for the "religious employer" exemption.  Nonetheless, the U.S. Government Mandate likewise requires the Diocese to act in violation of the Diocese's Catholic beliefs.  In particular, the Diocese operates a self-insurance plan that encompasses not only individuals directly employed by the Diocese itself, but, in addition, individuals employed by affiliated Catholic organizations including, but not limited to, Plaintiff Catholic Charities. Because Plaintiff Catholic Charities does not itself appear to qualify as an exempt "religious employer," the Mandate has forced the Diocese to forego substantial cost savings to maintain the "grandfathered" status of its health plan in order to continue providing a health plan to Catholic Charities' employees consistent with Catholic doctrine and beliefs.

COI-1494593

15.    Otherwise, the U.S. Government Mandate requires that the Diocese must either (1) sponsor a plan that will provide, pay for, and/or facilitate the provision of the objectionable products and services to the employees of Plaintiff Catholic Charities, and other organizations, or (2) expel them from the Diocese' self-insurance plan, which, in turn, will require Plaintiff Catholic Charities itself to provide, pay for, and/or facilitate access to the objectionable products and services.

16.    This aspect of the Mandate reflects a change from the Government's original proposal of July 19, 2010.  That proposal allowed Plaintiff Catholic Charities to remain on the Diocese' plan, which, in turn, would have shielded it from the Mandate if the Diocese was exempt.  *See* 77 Fed. Reg. 16,501, 16,502 (Mar. 21, 2012).  The Final Rule, in contrast, removes this protection and thereby *increases* the number of religious organizations subject to the Mandate.  And in so doing, the Mandate seeks to divide the Catholic Church, artificially separating its "houses of worship" from its faith in action, directly contrary to Pope Benedict's admonition that "[t]he Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."

17.    The U.S. Government Mandate is irreconcilable with the First Amendment, RFRA, the Administrative Procedure Act, and other laws.  The Government has not demonstrated any compelling interest in forcing Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, sterilization, and contraception.  Nor has the Government demonstrated that the U.S. Government Mandate is the least restrictive means of advancing any interest it has in increasing access to these products and services, which are already widely available and which the Government could make more widely available without conscripting Plaintiffs as vehicles for the dissemination of products and services to which they so strongly object.  The Government,

COI-1494593

therefore, cannot justify its decision to force Plaintiffs to provide, pay for, and/or facilitate access to these products and services in violation of their sincerely-held religious beliefs.

18.    Accordingly, Plaintiffs seek a declaration that the U.S. Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its enforcement, and an order vacating the Mandate.

## I.    <u>PRELIMINARY MATTERS</u>

19.    Plaintiff Diocese of Fort Wayne-South Bend, Inc. ("Diocese") is a nonprofit Indiana corporation with its principal place of business in Fort Wayne, Indiana.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

20.    Plaintiff  Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc. ("Catholic Charities") is a nonprofit Indiana corporation with its principal place of business in Fort Wayne, Indiana.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

21.    Plaintiff  Saint Anne Home & Retirement Community of the Diocese of Fort Wayne-South Bend, Inc. ("Saint Anne Home") is a nonprofit health care and retirement community incorporated in Indiana with its principal place of business in Fort Wayne, Indiana.  It is organized exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

22.    Plaintiff Franciscan Alliance, Inc. ("Franciscan") is a nonprofit hospital system incorporated in Indiana with eleven hospitals in Indiana, two hospitals in Illinois, and its principal place of business in Mishawaka, Indiana.  It is organized exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

COI-1494593

23.     Plaintiff Specialty Physicians of Illinois, LLC ("Specialty Physicians") (formerly known as WellGroup Health Partners, LLC or "WellGroup"), is a nonprofit Illinois limited liability company with its principal place of business in Chicago Heights, Illinois.  The sole member of Specialty Physicians is Plaintiff Franciscan.  Specialty Physicians is organized exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

24.     Plaintiff University of Saint Francis ("Saint Francis" or "University") is a nonprofit four-year liberal arts university incorporated in Indiana with its principal place of business in Fort Wayne, Indiana, and a regional campus in Crown Point, Indiana.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.  It is also an educational organization under Section 170(b)(1)(A)(ii) of the Internal Revenue Code.

25.     Plaintiff Our Sunday Visitor, Inc. ("Our Sunday Visitor") is a nonprofit Indiana corporation with its principal place of business in Huntington, Indiana.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

26.     Defendant Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services ("HHS").  She is sued in her official capacity.

27.     Defendant Thomas Perez is the Secretary of the U.S. Department of Labor.  He is sued in his official capacity.

28.     Defendant Jacob J. Lew is the Secretary of the U.S. Department of the Treasury. He is sued in his official capacity.

COI-1494593

29.     Defendant U.S. Department of Health and Human Services is an executive agency of the United States within the meaning of RFRA and the Administrative Procedure Act ("APA").

30.     Defendant U.S. Department of Labor is an executive agency of the United States within the meaning of RFRA and the APA.

31.     Defendant U.S. Department of the Treasury is an executive agency of the United States within the meaning of RFRA and the APA.

32.     This is an action for declaratory and injunctive relief under 5 U.S.C. § 702, 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 2000bb-1(c).

33.     An actual, justiciable controversy currently exists between Plaintiffs and Defendants.  Absent a declaration resolving this controversy and the validity of the U.S. Government Mandate, Plaintiffs will be required to provide, pay for, and/or facilitate access to objectionable products and services in contravention of their sincerely-held religious beliefs, as described below.

34.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

35.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(4), and 1346(a)(2).

36.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).

**A.      Diocese of Fort Wayne-South Bend, Inc. ("Diocese")**

37.     Plaintiff Diocese is the civil law entity for the Diocese of Fort Wayne-South Bend, which is the local embodiment of the Universal Roman Catholic Church, a community of the baptized confessing the Catholic faith, sharing in sacramental life, and entrusted since January 2010 to the ministry of Bishop Kevin C. Rhoades.  The Diocese encompasses fourteen counties located in Northeast Indiana, including Allen County, Indiana.  The charitable work of the

COI-1494593

Diocese is also performed through separate, affiliated corporations, including Catholic Charities and Saint Anne Home.

38.     Bishop Rhoades is the sole member of the Diocesan nonprofit corporation.

39.     The Diocese, through its eighty-one local community parishes and two oratories situated throughout the Diocese, serves the spiritual needs of its Catholic population of approximately 160,000.

40.     Through its parishes, the Diocese ensures the regular availability of the sacraments to all Catholics living in or visiting the Fort Wayne-South Bend area.  The Diocese also provides numerous other opportunities for prayer, worship, and faith formation.

41.     In 2011, approximately 2,582 adults and youth received formation in the Catholic faith through parish-level and Diocesan classes, lectures, and retreats.

42.     In addition to overseeing the sacramental life of its parishes, the Diocese coordinates Catholic campus ministries at five colleges and universities within its borders.

43.     Through its parishes, the Diocese also serves the needs of its communities with programs such as chapters of the Saint Vincent DePaul Society, food pantries, soup kitchens, adopt-a-family programs at Christmas, and visits to nursing homes.  These parishes serve an indeterminate number of persons who are homeless, hungry, elderly, or otherwise in need of material assistance without regard to whether the recipient is Catholic or non-Catholic.  In 2010, the Diocese provided over $1 million dollars in support to such programs.

44.     In the fiscal year ending June 30, 2010, the Diocese provided approximately $3.9 million dollars in financial assistance to, among others, Women's Care Center, Saint Augustine Soup Kitchen, Little Flower Food Pantry, Saint Mary's Soup Kitchen, and Catholic Charities.

COI-1494593

Each of these organizations provides services to individuals from a diversity of faiths, means, and heritages.

45.     Neither the Diocese nor its parishes keeps a tally of persons served through the parishes' outreach programs, nor do they request to know the religious affiliation of those served.

46.     Church law (canon law) requires a diocesan bishop to establish Catholic schools based on the principles of Catholic doctrine, with teachers who are outstanding for their correct doctrine and integrity of life, so that schools imparting an education imbued with the Christian spirit are available to the faithful in the diocese.  *See* Code of Canon Law, Canons 802 § 1 and 803 § 2.

47.     The Diocese conducts its educational mission through its schools.

48.     The first Catholic school opened in Fort Wayne-South Bend in 1846, at least ten years before the city had a public school system.

49.     The Diocese currently operates a total of forty-one private, Catholic schools in its geographic territory, including thirty-seven elementary schools and four high schools.

50.     Catholic schools within the Diocese have been among those schools nationwide to receive the U.S. Department of Education's Blue Ribbon Schools Award.

51.     Presently the Diocese has approximately 9,829 students enrolled in its elementary schools (K-8) and approximately 3,362 students enrolled in its high schools.  Enrollment in Diocesan schools is open to Catholics and non-Catholics.

52.     The Diocesan schools serve poor and underprivileged students; approximately 2,712 of its students for the 2012-13 school year qualified for free or reduced lunches under federal guidelines.

-13-

53.    The Diocese's educational mission is all the more important in Indiana where recent legislation gives low- to moderate-income families vouchers to transfer their children from a public school to, among others, one of the Diocese's private schools.

54.    To make a Catholic education available to as many children as possible—no matter their faith, means, or heritage—the Diocese expends substantial funds in tuition assistance programs.  For example, for the 2011-2012 academic year, the Diocese granted over $2.1 million dollars in financial aid through its four high schools.

55.    Diocesan schools also serve minorities.  For example, Bishop Luers High School has approximately 32% minority students and Saint Adalbert Elementary School has approximately 91% minority students.

56.    The Diocese employs Catholic and non-Catholic teachers in its schools who must have a knowledge of and respect for the Catholic faith, abide by the tenets of the Catholic Church as they apply to that person, exhibit a commitment to the ideal of Christian living, and be supportive of the Catholic faith.

57.    The Diocese has approximately 2,502 employees, with over 1,400 classified as full-time (working an average of at least 30 hours per week) and over 1,200 classified as part-time (working an average of less than 30 hours per week).

58.    Consistent with Church teachings on social justice, the Diocese makes health insurance benefits available to its religious personnel, seminarians, and full-time employees. Approximately 116 active and retired priests, religious sisters and seminarians of the Diocese, and approximately 1,034 of the Diocese's full-time lay employees participate in the Diocesan employee health plan.

-14-

59.    The Diocesan employee health plan is a self-insured plan.  That is, the Diocese does not contract with a separate insurance company that provides health coverage to its employees.  Instead, the Diocese itself underwrites its employees' medical costs.  The plan is administered by a third party administrator ("TPA"), which handles the administrative aspects of the plan.  The Diocese, however, not the TPA, bears the risks for benefits and provides the funds used to pay health-care providers.

60.    Plaintiff Catholic Charities also offers coverage through the Diocese's self-insurance plan.

61.    Consistent with Church teachings, this plan does not cover abortion-inducing products, contraceptives, or sterilization.  In limited circumstances, the Diocese's health plan administrator can override the exclusion of certain drugs commonly used as contraceptives if a physician certifies that they were prescribed with the intent of treating certain medical conditions, not with the intent to prevent pregnancy.

62.    The Diocesan health plan meets the Affordable Care Act's definition of a "grandfathered" plan and includes a statement in plan materials provided to participants or beneficiaries that it believes it is a grandfathered plan, as is required to maintain the status of a grandfathered health plan.  26 C.F.R. § 54.9815-1251T(a)(2)(i).

63.    In order to maintain the grandfathered status of its health plan, the Diocese foregoes approximately $180,000 a year in increased premiums.  The grandfathered Diocesan health plan covers not only the Diocese's own employees, but also the employees of Plaintiff Catholic Charities.

64.    The plan year for the Diocese (and the organizations it insures) begins on January 1st.

COI-1494593

   **B.**    **Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc.
         ("Catholic Charities")**

   65.    Plaintiff Catholic Charities—a nonprofit corporation affiliated with Plaintiff

Diocese—was created in 1922 to provide organized, concerted charitable efforts.  Bishop

Rhoades is a member of the nonprofit corporation.

   66.    Catholic Charities provided social services to over 22,500 people in 2011.

   67.    The more than twelve programs run by Catholic Charities at locations in and

around the Fort Wayne-South Bend community provide a panoply of services including the

provision of basic needs such as food, housing, and clothing, adoption and pregnancy services,

refugee resettlement, immigration services, retired senior volunteer programs, senior

employment programs, Hispanic health advocacy, foreclosure prevention, community education,

and many other community services.

   68.    For example, Catholic Charities' Resource and Referral Services, which

distributed over $233,918 in fiscal year 2011, serves as an integral part of the Fort Wayne

community's services by helping families receive assistance for their basic needs, such as

housing, utilities, food, clothing, personal products, and bus passes.  Resource and Referral

Services also helps families that are facing the disconnection of their utilities, but are above the

maximum income level to qualify for the Energy Assistance Program.

   69.    Together, Catholic Charities' two food pantries served over 15,000 individuals

from 2010 to 2011, one-third of who were new to the pantry.  When possible, the food pantries

distribute to their clients hats, scarves, blankets, mittens, toiletries, personal-care items,

nonperishable products, recipes, community referrals, and nutrition and food-handling safety

information.

70.    In Fort Wayne, Catholic Charities' Adoption and Pregnancy Services facilitates the placement of newborn infants, in addition to home studies for agency, private, stepparent, relative, special-needs, and international adoptions.  Over the years, Catholic Charities has placed more than 1,600 children in homes through its adoption program.

71.    Catholic Charities recently entered into an agreement with the U.S. Conference of Catholic Bishops Migration and Refugee Services to participate in the Unaccompanied Alien Children Program, which provides for the release and family reunification and long-term foster care of unaccompanied, undocumented children who have been taken into custody by immigration officials.  There are no statistics on this program yet.

72.    Catholic Charities' own Refugee Resettlement program, during fiscal year 2010-2011, resettled and provided services to a total of 111 refugees.  Refugee health advocates and interpreters assisted with approximately 1,051 appointments for infectious disease control.

73.    Volunteers from Catholic Charities' Retired Seniors Volunteer Program ("RSVP") provide free services to the elderly.  According to the Points of Light Institute, during fiscal year 2010-2011, RSVP volunteers provided services to the community that had a private-sector value of over $2.5 million dollars.

74.    In addition to serving older adults, in fiscal year 2010-2011, Catholic Charities' RSVP volunteers provided 900 backpacks filled with school supplies to children in need and lazy-eye screenings for more than 500 children.  RSVP volunteers also helped 100 individuals through its new Volunteer Income Tax Assistance program that provides tax assistance to low-income individuals.

COI-1494593

75.     Catholic Charities serves people in need without regard to their religion.  It does not ask whether the people it serves are Catholic and, therefore, it does not know whether they are Catholic.

76.     Catholic Charities does not inquire about the religion of its applicants for employment.  As a result, it does not know how many of its employees are Catholic.

77.     Catholic Charities' has thirty-six (36) full-time employees who are offered health insurance through the Diocesan self-insured health plan, which, in accordance with Church teachings, has historically excluded coverage for abortion-inducing products, contraceptives (except when used for non-contraceptive purposes), sterilization, and related education and counseling from its multi-employer health plan.

78.     The Diocesan health plan is "grandfathered" within the meaning of the Affordable Care Act.  26 C.F.R. § 54.9815-1251T(a)(2)(i).  Every dollar foregone by the Diocese in order to maintain its employee health plan's grandfathered status is a dollar that cannot be funneled to Catholic Charities in the execution of its programs.

79.     Catholic Charities does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Catholic Charities does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

80.     The Catholic Charities plan year (like that of the Diocese) begins on January 1st.

**C.     Saint Anne Home & Retirement Community of Diocese of Fort Wayne-South Bend, Inc. ("Saint Anne Home")**

81.     Plaintiff Saint Anne Home is a nonprofit corporation affiliated with Plaintiff Diocese that provides quality and compassionate care for the aged in a home-like setting within a spiritual environment.  Bishop Rhoades is a member of the nonprofit corporation.

-18-

82.    Saint Anne Home was created by Geneva Davidson who, upon her death, left the residue of her estate in trust to the Diocese with instructions that the money be used to build a home for the aged of the Diocese.  On January 3, 1966, groundbreaking ceremonies were held on what is now Saint Anne Home.  This home was intended to be a partial solution to the lack of critical housing in the area for the elderly.

83.    Since opening, Saint Anne Home has become the benchmark for high-quality health care for the aged in Fort Wayne, Indiana.

84.    Today, Saint Anne Home offers residential apartments, a nursing facility, rehab suites, and adult day services.  The ninety-five (95) residential apartments include both independent and assisted living.  The nursing facility with approximately 164 beds includes specialized programs for Alzheimer's and dementia care.

85.    Saint Anne Home's Alzheimer's and dementia care unit provides care for approximately fifty-two (52) people, the majority of which are women.

86.    Saint Anne Home serves over 500 people a year.

87.    All of Saint Anne Home's facilities are operated in a manner that abides by *The Ethical and Religious Directives for Catholic Health Care Services* as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop and as modified from time to time.  Saint Anne Home also abides by The National Catholic Bioethics Center's *A Catholic Guide to End-of-Life Decisions:  An Explanation of Church Teaching on Advanced Directives, Euthanasia, and Physician-Assisted Suicide*.

88.    Saint Anne Home's mission is to "offer[] residents a culture of self-respect and dignity in a Christian atmosphere.  Each resident is offered individualized, high quality health care that encourages freedom and independence while preserving their dignity and uniqueness as

-19-

creations of God." This mission is driven by the Catholic belief that all human life is equally valuable and worthy of respect and support.

89.    Saint Anne Home's goal is to maintain the highest level of self esteem and dignity for its residents, and it strives to enrich its residents' spiritual, social, cognitive, and physical well-beings.

90.    Since opening its doors, Saint Anne Home has been committed to serving the aged of all faiths, and that commitment continues to the present day. The residents at Saint Anne Home also serve the local community through their Tools for Schools program. Residents donate funds that are then used to purchase "tools" for children to use in local elementary schools.

91.    Saint Anne Home collects religious census information in order to meet the physical and spiritual needs of its residents, but does not discriminate on the basis of religion. Although the census shows that most residents identify themselves as Catholic, Saint Anne Home does not know or inquire into their religious tenets.

92.    Saint Anne Home has approximately 310 employees and does not inquire about the religious persuasion of its applicants for employment. As a result, it does not know how many of its employees are Catholic. Approximately 220 of Saint Anne Home's employees are eligible for health insurance.

93.    Saint Anne Home's employees are offered health coverage under the Saint Anne Home of the Diocese of Fort Wayne-South Bend Employee Benefit Plan, a self-insured health plan. As a self-insured health plan, Saint Anne Home does not contract with a separate insurance company that provides health coverage to its employees, except for re-insurance coverage for excess claims. Instead, Saint Anne Home itself primarily underwrites its employees' medical

-20-

costs.  The plan is administered by a TPA, which handles the administrative aspects of the plan.

Saint Anne Home, however, not the TPA, bears the risks for benefits and provides the funds used

to pay health-care providers.

94.    This health plan does not cover abortion-inducing products, contraceptives, or

sterilization.

95.    Saint Anne Home's self-insured health plan has undergone a number of changes

and amendments since March 23, 2010, and, accordingly, does not meet the Affordable Care

Act's definition of a "grandfathered" health plan.  Additionally, the Saint Anne Home plan has

not included and does not include a statement in any plan materials provided to participants or

beneficiaries that it believes it is a grandfathered plan, as is required to maintain the status of a

grandfathered health plan.  26 C.F.R. § 54.9815-1251T(a)(2)(i).

96.    Saint Anne Home does not appear to qualify as an entity described in section

6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Saint Anne Home does not

qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

97.    Saint Anne Home's plan year begins on January 1st.

**D.    Franciscan Alliance, Inc. ("Franciscan")**

98.    Plaintiff Franciscan is a nonprofit health system that includes eleven facilities in

Indiana, two facilities in Illinois, and a number of support companies for these facilities.  It is one

of the strongest regional health systems in the country and in the State of Indiana.

99.    Performing more than 3.5 million outpatient services and caring for more than

100,000 inpatients annually, Franciscan's vision is to be a recognized leader in the provision of

high quality, value based, compassionate care through collaboration with others in the

communities it is privileged to serve.

-21-

100.    Franciscan's major service locations have at least 3,500 beds and it has significant market share in the markets where it provides health care.

101.    Franciscan, since its founding by Mother Maria Theresia Bonzel in 1875, has been and is faithful to the Catholic Church.  For example, one of Franciscan's core values is that the witness of Franciscan presence throughout the institution encompasses, but is not limited to, joyful availability, compassionate and respectful care, and dynamic stewardship in the service of the Church.

102.    Another of Franciscan's core values is that Christian stewardship is evidenced by the just and fair allocation of human, spiritual, physical, and financial resources in a manner respectful of the individual, responsive to the needs of society, and consistent with Church teachings.

103.    All of Franciscan's facilities are operated in a manner that abides by *The Ethical and Religious Directives for Catholic Health Care Services* as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop and as modified from time to time.

104.    Franciscan's goal to advocate for those in need is demonstrated by its commitment to providing charity medical care at cost.  For example, from January to December of 2011, Franciscan spent over $189.3 million dollars through its various medical care and community service programs helping over 503,000 people living in poverty.

105.    Franciscan's benefits to the broader community—including health screenings; health fairs; programs for children, the elderly, and the community at large; and health professions education—from January to December 2011, benefitted more than 2.3 million individuals at a cost to Franciscan of over $63.2 million dollars.

COI-1494593

106.    Franciscan specifically serves women through its Franciscan Alliance Spirit of Women membership program, which seeks to bring together women of all ages and backgrounds by motivating and inspiring them to make positive changes in their lives.  Franciscan does this through innovative clinical care, education, and wellness programs.

107.    In December of 2011, Franciscan was selected by the Center for Medicare & Medicaid Services as one of thirty-two Pioneer Accountable Care Organizations ("ACOs"). ACOs are groups of doctors, hospitals, and other health care providers who come together voluntarily to give coordinated high quality care to their Medicare patients.  The goal of coordinated care is to ensure that patients, especially the chronically ill, get the right care at the right time, while avoiding unnecessary duplication of services and preventing medical errors.

108.    Franciscan serves individuals of all faiths.  Franciscan receives religious information in order to meet the physical and spiritual needs of its patients, but does not discriminate on the basis of religion.

109.    Franciscan has approximately 18,000 employees, approximately 600 of which are physicians.  Franciscan does not inquire about the religious commitments of its applicants for employment; as a result, it does not know how many of its employees are Catholic.

110.    Franciscan's benefits-eligible employees may participate in a number of health benefits programs, depending on the region in which they work:  Central Indiana Region, Northern Indiana Region, Western Indiana Region, and the South Suburban Chicago Region in Illinois.

111.    Franciscan's approximately 4,369 benefits-eligible employees in its Central Indiana Region are offered six (6) Advantage Health Solutions, Inc. fully-insured benefits program options.  All six (6) of these Advantage health plans lost their grandfathered status as of

-23-

January 1, 2012 after Franciscan added various co-pay and co-insurance provisions to those plans. The Advantage health plan materials also have not included and do not include a statement in plan materials provided to participants or beneficiaries informing them that Franciscan believes they are grandfathered health plans within the meaning of section 1251 of the Affordable Care Act. *See, e.g.*, 26 C.F.R. § 54.9815-1251T(a)(2)(i).

112.   Franciscan's approximately 8,719 benefits-eligible employees in its Western Indiana and Northern Indiana Regions are offered six (6) benefits plan options, four (4) of which are self-insured plans administered by Advantage Health Solutions, Inc. (third party administrator), and two (2) of which are Blue Cross Blue Shield of Illinois ("Blue Cross") fully-insured benefits plans. All four (4) of the self-insured Advantage plans lost their grandfathered status as of January 1, 2012 after various co-insurance provisions were added to those plans. The Advantage health plan materials have not included and do not include a statement in plan materials provided to participants or beneficiaries informing them that Franciscan believes they are grandfathered health plans within the meaning of section 1251 of the Affordable Care Act. *See, e.g.*, 26 C.F.R. § 54.9815-1251T(a)(2)(i). The two (2) Blue Cross fully-insured benefits plans are not grandfathered, and never were, because they were not in existence as of March 23, 2010.

113.   Franciscan's approximately 1,733 benefits-eligible employees in its South Suburban Chicago Region are offered three (3) benefits plan options, two (2) of which are Blue Cross fully-insured benefits plans, and one (1) of which is a self-insured benefits plan that is administered by Blue Cross (third party administrator). All three of these plans lost their grandfathered status as of January 1, 2011 after employee premiums were increased. The Blue Cross health plan materials have not included and do not include a statement in plan materials

-24-

provided to participants or beneficiaries informing them that Franciscan believes they are grandfathered health plans within the meaning of section 1251 of the Affordable Care Act.  *See, e.g.*, 26 C.F.R. § 54.9815-1251T(a)(2)(i).

114.    For the five (5) Franciscan health plans that are self-insured, Franciscan itself underwrites its employees' medical costs.  The plans are administered by Advantage Health Solutions, Inc. (Western Indiana and Northern Indiana Regions) and Blue Cross (South Suburban Chicago Region), which handles the administrative aspects of the plans.  Franciscan, however, not the third party administrators, bears the risks for benefits and provides the funds used to pay health-care providers.

115.    None of the benefits plans offered by Franciscan covers abortion-inducing products, contraceptives, or sterilization.

116.    Franciscan does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Franciscan does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

117.    All of Franciscan's employee health benefits plan years begin on January 1st.

**E.    Specialty Physicians of Illinois, LLC ("Specialty Physicians")**

118.    Specialty Physicians (formerly known as WellGroup Health Partners, LLC) is a nonprofit organization providing specialty healthcare services with five (5) practice sites in Cook and Will Counties in Illinois.  Specialty Physicians is a member managed limited liability company, of which Franciscan is the sole member.

119.    Specialty Physicians endeavors to offer a wide range of testing, treatments and therapies for patients with circulatory, pulmonary, nervous system and orthopaedic problems.

120.    Like its sole member Plaintiff Franciscan, Specialty Physicians is faithful to the Catholic Church.  Specialty Physicians' core values are that the witness of Franciscan presence

-25-

throughout the institution encompasses, but is not limited to, joyful availability, compassionate and respectful care, and dynamic stewardship in the service of the Church.

121.    Another of Specialty Physicians' core values is that Christian stewardship is evidenced by the just and fair allocation of human, spiritual, physical, and financial resources in a manner respectful of the individual, responsive to the needs of society, and consistent with Church teachings.

122.    All of Specialty Physicians' facilities are operated in a manner that abides by *The Ethical and Religious Directives for Catholic Health Care Services* as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop and as modified from time to time.

123.    Specialty Physicians' commitment to providing care to those in need is demonstrated by the approximately $200,000 in charity care that it provides annually to the residents of Cook and Will Counties, Illinois.  Further, Specialty Physicians provides more than $1.2 million a year in uncompensated care.

124.    Specialty Physicians serves individuals of all faiths.  Specialty Physicians receives religious information in order to meet the physical and spiritual needs of its patients, but does not discriminate on the basis of religion.

125.    Specialty Physicians has approximately 342 employees, which includes physicians.  Specialty Physicians does not inquire about the religious commitments of its applicants for employment; as a result, it does not know how many of its employees are Catholic.

126.    Specialty Physicians' approximately 317 benefits-eligible employees are offered the choice of a Blue Cross Blue Shield of Illinois ("Blue Cross") fully-insured health

maintenance organization option, or a Blue Cross fully-insured preferred provider organization option.

127.    Blue Cross informed Specialty Physicians that it would not provide health plans without the objectionable services during the current plan year, when the safe harbor applies, unless Specialty Physicians signed an agreement indemnifying Blue Cross against any cost Blue Cross incurs relating to Blue Cross' obligations to comply with the U.S. Government Mandate. Accordingly, Specialty Physicians is currently indemnifying Blue Cross for any fines assessed against Blue Cross pursuant to the U.S. Government Mandate, and Specialty Physicians has a current financial obligation pursuant to this indemnification agreement.

128.    Both of Specialty Physicians' plans are grandfathered and the plan materials provided to participants or beneficiaries contain a statement that Specialty Physicians believes the plans are grandfathered, as is required to maintain the status of a grandfathered health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i).  As of January 1, 2014, Specialty Physicians' plans will no longer be grandfathered because of changes made to the amount of employee contributions.

129.    None of the benefits plans offered by Specialty Physicians cover abortion-inducing products, sterilization, or contraceptives.

130.    Specialty Physicians' employee health benefits plan years begin on January 1st.

**F.    University of Saint Francis ("Saint Francis" or "University")**

131.    Plaintiff Saint Francis is a nonprofit corporation that confers undergraduate and graduate degrees.  The University's members are the Sisters of Saint Francis of Perpetual Adoration Provincial and her Council.

132.    The University was established in 1890 in Lafayette, Indiana as a teacher training school for the Sisters of Saint Francis and transformed into a Catholic, Franciscan-sponsored,

coeducational, liberal arts college in 1940.  In 1944, Saint Francis moved to its current location

in Fort Wayne, Indiana, and was designated a "university" in 1998.

133.    Saint Francis has approximately 2,400 undergraduate and graduate students

enrolled, the majority of which are from the Midwest, although students from other regions of

the United States and foreign countries attend as well.

134.    As described in its mission statement, "Rooted in the Catholic and Franciscan

traditions of Faith and Reason, the University of Saint Francis engages a diverse community in

learning, leadership and service."  The University's five widely held Franciscan values are:  (1)

reverence the unique dignity of each person; (2) encourage a trustful, prayerful community of

learners; (3) serve one another, society and the Church; (4) foster peace and justice; and (5)

respect creation.

135.    At the same time, the University's commitment to continuous study and

improvement is underscored by its participation in the Academic Quality Improvement Program

of the Higher Learning Commission, and by the variety of professional accreditations for its

academic programs.  Quality at the University of Saint Francis is a persistent quest for excellence

shaped by the needs of students, professional and academic standards, and best practices.

136.    Saint Francis pursues the highest academic achievement in every discipline.  To

that end, the University is composed of five (5) undergraduate schools—Arts & Sciences,

Business, Creative Arts, Health Sciences, and Professional Studies—and one Graduate School.

The Graduate School offers degree and certification programs in art, business, education,

environmental science, school and mental health counseling, nursing, physician assistant,

theology, and psychology.  In the past two decades, Saint Francis has conferred more than 5,000

graduate degrees.

COI-1494593

137.    Nearly half of the University's students are studying health care, which makes Saint Francis the largest provider of health care graduates in the northern half of Indiana.  For example, Saint Francis offers an associate, bachelor, and master's degree in nursing, in addition to programs such as radiologic technology, physical therapy, and surgical technology.

138.    Students currently enrolled in the University's Crown Point, Indiana campus are exclusively pursuing health care degrees.

139.    At the core of the University's curriculum is the Franciscan value of service to all, and its mission to educate and serve others extends beyond the borders of campus.

140.    The Saint Francis community, through its Center for Service Engagement, creates positive change in local, national, and global communities.  Saint Francis also acknowledges that although many in its community do not daily experience social justice issues such as hunger, homelessness, poverty, or illiteracy, these issues continue to affect the lives of many in the global community.  Through service, God calls the Saint Francis community to work for the common good in the world.

141.    Service opportunities through the Center for Service Engagement help nonprofit agencies and organizations maintain and/or expand their programs to those in need, while providing students, faculty, staff, and alumni with opportunities to build awareness, appreciation, and commitment to social justice issues that impact everyone.  Through community/volunteer service, service-learning, service days or projects, and service/missions trips, the University is committed to the Franciscan values of "Serve one another, society and the Church" and "Foster Peace and Justice."

142.    For example, during academic year 2010-2011, campus clubs, organizations, and residence hall students engaged in multiple service activities.  Campus-wide events included the

COI-1494593

3rd Annual "USF Feeds the Fort," a collection to benefit a local food bank, through which over 34,200 items were collected and approximately $9,000 was raised. The University's 8th annual MLK Day of Service involved approximately 256 faculty, staff, students, and alumni in service at eighteen local agencies, providing around 910 hours of service.

143. During the 2009-2010 academic year, approximately 1,820 students contributed around 12,125 service hours to alleviating issues related to homelessness, feeding the hungry, and preserving the environment. These service hours aided programs such as Fort Wayne's Rescue Mission, Habitat for Humanity, Community Harvest Food Bank, Black Pine Animal Park, and Great Tree Canopy Comeback.

144. For its service, the University has been awarded the President's Volunteer Service Award, created by the President's Council on Service and Civic Participation.

145. In addition, Saint Francis hosts a number of educational events, lectures, and programs on its campuses that are open to the public. For example, for the past eighteen years the University has hosted a "CEO Forum," which is a three-quarter day seminar attended by around 500 business people from the community.

146. The University is also committed to providing a quality education to students of all financial backgrounds. More than 99% of the University's students apply for and receive some form of financial aid, with the Office of Student Financial aid awarding nearly $16 million in institutional grants and scholarships as well as more than $24 million in federal and state grant funds to undergraduate students in the 2010-2011 school year. Over 50% of the University's students are low income, first generation college attendees who qualify for federal grants.

147. Faith is at the heart of the University's efforts. The apostolic constitution *Ex Corde Ecclesiae*, which governs and defines the role of Catholic colleges and universities,

COI-1494593

provides that "the objective of a Catholic University is to assure . . . [f]idelity to the Christian message as it comes to us through the Church."

148.    In accordance with the *Ex Corde Ecclesiae*, Saint Francis believes and teaches that "besides the teaching, research and services common to all Universities," it must "bring[] to its task the inspiration and light of the Christian message."  "Catholic teaching and discipline are to influence all university activities," and  "[a]ny official action or commitment of the University [must] be in accord with its Catholic identity."  Further, "[i]n a word, being both a University and Catholic, it must be both a community of scholars representing various branches of human knowledge, and an academic institution in which Catholicism is vitally present and operative."

149.    Though committed to remaining a distinctly Catholic institution, the University opens its doors to students, academics, and prospective employees of all faiths and creeds.  The majority of the University's faculty, students, and staff are not Catholic.

150.    The University has approximately 2,400 students.  Approximately 30% of the undergraduate population is Catholic and approximately 20% of the graduate population is Catholic.  The University's students are not offered a health plan.

151.    The University has approximately 413 total faculty and staff members.  While approximately 50% of the faculty is Catholic, only 31% of all University employees are Catholic.  Saint Francis retains approximately 346 full-time employees eligible for health care benefits.

152.    The University's employees are offered a self-insured health care plan.  That is, the University does not contract with a separate insurance company that provides health coverage to its employees.  Instead, the University itself underwrites its employees' medical costs.  The plan is administered by a TPA, which handles the administrative aspects of the plan.

The University, however, not the TPA, bears the risks for benefits and provides the funds used to pay health-care providers.

153.    This plan does not cover abortion-inducing products, sterilization, or contraception.

154.    The health plan offered by Saint Francis to its employees was at one point in time grandfathered under the Affordable Care Act's definition of a "grandfathered" plan.  Changes made to the University's employee health plan in 2012, however, caused the plan to lose its grandfathered status.  Going forward, Saint Francis's employee health plan will not include a statement in any plan materials provided to participants or beneficiaries that it believes it is a grandfathered plan, as is required to maintain the status of a grandfathered health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i).

155.    Saint Francis does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Saint Francis does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

156.    The plan year for Saint Francis' health plan begins on January 1st.

**G.    Our Sunday Visitor, Inc. ("Our Sunday Visitor")**

157.    Plaintiff Our Sunday Visitor is a nonprofit Catholic publishing company located in Huntington, Indiana.  Our Sunday Visitor is comprised of a publishing division and an offertory solutions division.

158.    The publishing division is responsible for the writing and promotion of six (6) religious periodicals, which include:  *OSV Newsweekly; Take Out: Family Faith on the Go; The Catholic Answer; The Priest; My Daily Visitor;* and *Grace In Action*.  It is also the official distributor of the English-language weekly edition of the Vatican's *newspaper L'Osservatore Romano* in this country.  In addition to the religious periodicals, Our Sunday Visitor publishes

-32-

and markets over 1,800 products including books, parish education resources, and curricula materials.

159.    The offertory solutions division offers envelope products and services to Catholic parishes throughout the United States.

160.    As a nonprofit company, Our Sunday Visitor serves the Church not only with its products and services, but also by financially supporting charitable activities of other Catholic organizations.  The Our Sunday Visitor Institute funds Catholic projects throughout the United States, including projects that address evangelization, catechesis, service to the needy, vocation, and stewardship.

161.    For example, the Institute supports a program at Seton Hall University that is designed to encourage graduate students to teach for two years in New Jersey's poorest Catholic schools while earning their master's degrees.  New Jersey's poorest Catholic schools serve students of all faiths, in keeping with the Catholic value to serve all.

162.    The Institute also supports Bethlehem Farm, Inc., which is a Catholic community in Appalachia dedicated to serving the area's poor in various ways, including home repair, soup kitchens, and visiting the sick.

163.    In the past five years, the Institute has granted approximately $30,000 to seven (7) dioceses in Florida that developed a one year volunteer program for fifteen to twenty-five recent college graduates from throughout the United States to serve in health care, homeless shelters, food banks, prisons, and inner-city Catholic schools.

164.    Between its publishing and offertory solutions divisions, Our Sunday Visitor employs approximately 317 benefits-eligible employees.  Our Sunday Visitor does not document the religious status of its employees.

165.    Our Sunday Visitor's employees are offered a self-insured health care plan.

166.    This plan does not cover abortion-inducing products, sterilization, or contraceptives for non-therapeutic purposes.

167.    The health plan offered by Our Sunday Visitor to its employees was at one point in time grandfathered under the Affordable Care Act's definition of a "grandfathered" plan. Changes made to its employee health plan as of January 1, 2012 caused that plan to lose its grandfathered status.  Going forward, Our Sunday Visitor's employee health plan will not include a statement in any plan materials provided to participants or beneficiaries that it believes it is a grandfathered plan, as is required to maintain the status of a grandfathered health plan. 26 C.F.R. § 54.9815-1251T(a)(2)(i).

168.    Our Sunday Visitor does not appear to qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Our Sunday Visitor does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

169.    Our Sunday Visitor's plan year begins on October 1st.

## II.    STATUTORY AND REGULATORY BACKGROUND

### A.    Statutory Background

170.    In March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010)  (collectively, the "Affordable Care Act" or the "Act").  The Affordable Care Act established many new requirements for "group health plan[s]," broadly defined as "employee welfare benefit plan[s]" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), that "provide[] medical care . . . to employees or their dependents."  42 U.S.C. § 300gg-91(a)(1).

COI-1494593

171.   As relevant here, the Act requires an employer's group health plan to cover certain women's "preventive care."  Specifically, it indicates that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum[,] provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph."  42 U.S.C. § 300gg-13(a)(4).  Because the Act prohibits "cost sharing requirements," the health plan must pay for the full costs of these "preventive care" services without any deductible or co-payment.

172.   "[T]he Affordable Care Act preserves the ability of individuals to retain coverage under a group health plan or health insurance coverage in which the individual was enrolled on March 23, 2010."  Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726, 41,731 (July 19, 2010) ("Interim Final Rules"); 42 U.S.C. § 18011.  These so-called "grandfathered health plans do not have to meet the requirements" of the U.S. Government Mandate.  75 Fed. Reg. at 41,731.  HHS estimates that "98 million individuals will be enrolled in grandfathered group health plans in 2013."  *Id.* at 41,732.

173.   Federal law provides several mechanisms to enforce the requirements of the Act, including the U.S. Government Mandate.  For example:

a.   Under the Internal Revenue Code, certain employers who fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" will be exposed to

-35-

significant annual fines of $2,000 per full-time employee.  *See* 26 U.S.C. § 4980H(a),

(c)(1).

      b.      Under the Internal Revenue Code, group health plans that fail to provide

certain required coverage may be subject to a penalty of $100 a day per affected

beneficiary.  *See* 26 U.S.C. § 4980D(b); *see also* Jennifer Staman & Jon Shimabukuro,

Cong. Research Serv., RL 7-5700, Enforcement of the Preventative Health Care Services

Requirements of the Patient Protection and Affordable Care Act (2012) (asserting that

this applies to employers who violate the "preventive care" provision of the Affordable

Care Act).

      c.      Under ERISA, plan participants can bring civil actions against insurers for

unpaid benefits.  29 U.S.C. § 1132(a)(1)(B); *see also* Cong. Research Serv., RL 7-5700.

      d.      Similarly, the Secretary of Labor may bring an enforcement action against

group health plans of employers that violate the U.S. Government Mandate, as

incorporated by ERISA.  *See* 29 U.S.C. § 1132(b)(3); *see also* Cong. Research Serv., RL

7-5700 (asserting that these penalties can apply to employers and insurers who violate

the "preventive care" provision of the Affordable Care Act).

174.     Several of the Act's provisions, along with other federal statutes, reflect a clear

congressional intent that the executive agency charged with identifying the "preventive care"

required by § 300gg-13(a)(4) should exclude all abortion-related services.

175.     For example, the Weldon Amendment, which has been included in every HHS

and Department of Labor appropriations bill since 2004, prohibits certain agencies from

discriminating against an institution based on that institution's refusal to provide abortion-related

services.  Specifically, it states that "[n]one of the funds made available in this Act [to the

Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).  The term "health care entity" is defined to include "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, *a health insurance plan*, or any other kind of health care facility, organization, or plan." *Id.* § 507(d)(2) (emphasis added).

176.    The legislative history of the Act also demonstrates a clear congressional intent to prohibit the executive branch from requiring group health plans to provide abortion-related services.  For example, the House of Representatives originally passed a bill that included an amendment by Congressman Bart Stupak prohibiting the use of federal funds for abortion services.  *See* H.R. 3962, 111th Cong. § 265 (Nov. 7, 2009).  The Senate version, however, lacked that restriction.  S. Amend. No. 2786 to H.R. 3590, 111th Cong. (Dec. 23, 2009).  To avoid a filibuster in the Senate, congressional proponents of the Act engaged in a procedure known as "budget reconciliation" that required the House to adopt the Senate version of the bill largely in its entirety.  Congressman Stupak and other pro-life House members, however, indicated that they would refuse to vote for the Senate version because it failed to adequately prohibit federal funding of abortion.  In an attempt to address these concerns, President Barack Obama issued an executive order providing that no executive agency would authorize the federal funding of abortion services.  *See* Exec. Order No. 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).

COI-1494593

177.    The Act, therefore, was passed on the central premise that all agencies would uphold and follow "longstanding Federal laws to protect conscience" and to prohibit federal funding of abortion.  *Id.*  That executive order was consistent with a 2009 speech that President Obama gave at the University of Notre Dame, in which he indicated that his Administration would honor the consciences of those who disagree with abortion, and draft sensible conscience clauses.

B.    **Regulatory Background – Defining "Preventive Care" and the Narrow Exemption**

178.    In a span of less than two years, Defendants promulgated the U.S. Government Mandate, subverting the Act's clear purpose to protect the rights of conscience.  The Mandate immediately prompted intense criticism and controversy, in response to which the Government has undertaken various revisions.  None of these revisions, however, alleviates the burden that the Mandate imposes on Plaintiffs' religious beliefs.  To the contrary, these revisions have resulted in a final rule that is significantly worse than the original one.

**(1) The Original Mandate**

179.    On July 19, 2010, Defendants issued interim final rules addressing the statutory requirement that group health plans provide coverage for women's "preventive care."  75 Fed. Reg. 41,726 (citing 42 U.S.C. § 300gg-13(a)(4)).  Initially, the rules did not define "preventive care," instead noting that "[t]he Department of HHS is developing these guidelines and expects to issue them no later than August 1, 2011."  *Id.* at 41,731.

180.    To develop the definition of "preventive care," HHS outsourced its deliberations to the Institute of Medicine ("IOM"), a non-governmental "independent" organization.  The IOM in turn created a "Committee on Preventive Services for Women," composed of sixteen (16) members who were selected in secret without any public input.  At least eight (8) of the

COI-1494593

Committee members had founded, chaired, or worked with "pro-choice" advocacy groups (including five (5) different Planned Parenthood entities) that have well-known political and ideological views, including strong animus toward Catholic teachings on abortion and contraception.

181.    Unsurprisingly, the IOM Committee invited presentations from several "pro-choice" groups, such as Planned Parenthood and the Guttmacher Institute (named for a former president of Planned Parenthood), without inviting any input from groups that oppose government-mandated coverage for abortion, contraception, and sterilization.  Instead, opponents were relegated to lining up for brief open-microphone sessions at the close of each meeting.

182.    At the close of this process, on July 19, 2011, the IOM issued a final report recommending that "preventive care" for women be defined to include "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for [all] women with reproductive capacity."  Inst. Of Med., Clinical Preventive Services for Women:  Closing the Gaps," at 218-219 (2011).

183.    The extreme bias of the IOM process spurred one member of the Committee, Dr. Anthony Lo Sasso, to dissent from the final recommendation, writing:  "[T]he committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition.  Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy."  *Id*. at 232.

184.    At a press briefing the next day, the chair of the IOM Committee fielded a question from a representative of the U.S. Conference of Catholic Bishops regarding the "coercive dynamic" of the Mandate, asking whether the Committee considered the "conscience rights" of those who would be forced to pay for coverage that they found objectionable on moral

and religious grounds. In response, the chair illustrated her cavalier attitude toward the religious-liberty issue, stating bluntly: "[W]e did not take into account individual personal feelings." *See* Linda Rosenstock, Chair, Inst. Of Med. Comm. On Preventive Servs. For Women, Press Briefing (July 20, 2011), *available at* http://www.iom .edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx. The chair later expressed concern to Congress about considering religious objections to the Mandate because to do so would risk a "slippery slope" that could occur by "opening up that door" to religious liberty. *See* Executive Overreach: The HHS Mandate Versus Religious Liberty: Hearing Before the H. Comm. On the Judiciary, 112th Cong. (2012) (testimony of Linda Rosenstock, Chair, Inst. Of Med. Comm. On Preventive Servs. For Women).

185.    Less than two weeks after the IOM report, without pausing for notice and comment, HHS issued a press release on August 1, 2011, announcing that it would adopt the IOM's definition of "preventive care," including all "FDA-approved contraception methods and contraceptive counseling." *See* U.S. Dept. of Health and Human Services, "Affordable Care Act Ensures Women Receive Preventive Services at No Additional Cost," *available at* http://www.hhs.gov/news/press/2011pres/08/20110801b.html. HHS ignored the religious, moral and ethical dimensions of the decision and the ideological bias of the IOM Committee and stated that it had "relied on independent physicians, nurses, scientists, and other experts" to reach a definition that was "based on scientific evidence." Under the final "scientific" definition, the category of mandatory "preventive care" extends to "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." *See* "Women's Preventive Services: Required Health Plan Coverage Guidelines," http://www.hrsa.gov/womensguidelines.

186.    The Government's definition of mandatory "preventive care" also includes abortion-inducing products.  For example, the FDA has approved "emergency contraceptives" such as the morning-after pill (otherwise known as Plan B), which can prevent an embryo from implanting in the womb, and Ulipristal (otherwise known as HRP 2000 or ella), which likewise can induce abortions.

187.    Shortly after announcing its definition of "preventive care," the Government proposed a narrow exemption from the Mandate for a small category of "religious employers" that met all of the following four criteria:  "(1) The inculcation of religious values is the purpose of the organization"; "(2) The organization primarily employs persons who share the religious tenets of the organization"; "(3) The organization serves primarily persons who share the religious tenets of the organization"; and "(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46,626 (Aug. 3, 2011) (codified at 45 C.F.R. § 147.130(a)(iv)(B)).

188.    As the Government itself admitted, this narrow exemption was intended to protect only "the unique relationship between a house of worship and its employees in ministerial positions."  *Id.* at 46,623.  It provided no protection for religious universities, elementary and secondary schools, hospitals, and charitable organizations.

189.    The sweeping nature of the Mandate was subject to widespread and withering criticism.  Religious leaders from across the country protested that they should not be punished or considered less religious simply because they chose to live out their faith by serving needy members of the community who might not share their beliefs.  As Cardinal Donald Wuerl later wrote, "Never before has the government contested that institutions like Archbishop Carroll High

COI-1494593

School or Catholic University are religious.  Who would?  But HHS's conception of what constitutes the practice of religion is so narrow that even Mother Teresa would not have qualified."

190.    Despite such pleas, the Government at first refused to reconsider its position. Instead, the Government "finalize[d], without change," the narrow exemption as originally proposed.  77 Fed. Reg. at 8,729 (Feb. 15, 2012).  At the same time, the Government announced that it would offer a "a one-year safe harbor from enforcement" for religious organizations that remained subject to the Mandate.  *Id.* at 8,728.  As noted by Cardinal Timothy Dolan, the "safe harbor" effectively gave religious groups "a year to figure out how to violate our consciences."

191.    A month later, under continuing public pressure, the Government issued an Advance Notice of Proposed Rulemaking ("ANPRM") that, it claimed, set out a solution to the religious-liberty controversy created by the Mandate.  77 Fed. Reg. 16,501 (Mar. 21, 2012).  The ANPRM did not revoke the Mandate, and in fact reaffirmed the Government's view at the time that the "religious employer" exemption would not be changed.  *Id.* at 16,501-08.  Instead, the ANPRM offered hypothetical "possible approaches" that would, in the Government's view, somehow solve the religious-liberty problem without granting an exemption for objecting religious organizations.  *Id.* at 16,507.  As the U.S. Conference of Catholic Bishops soon recognized, however, any semblance of relief offered by the ANPRM was illusory.  Although it was designed to "create an appearance of moderation and compromise, it [did] not actually offer any change in the Administration's earlier stated positions on mandated contraceptive coverage." *See* Comments of U.S. Conference of Catholic Bishops, at 3 (May 15, 2012), *available at* http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-on-advance-notice-of-proposed-rulemaking-on-preventive-services-12-05-15.pdf.

COI-1494593

### (2) Plaintiffs' Original Complaint and the Government's Promise of Non-Enforcement

192.    On May 21, 2012, Plaintiffs (except for Specialty Physicians) filed suit in the U.S. District Court for the Northern District of Indiana seeking to enjoin the U.S. Government Mandate on the ground that, among other things, it violated their rights of religious conscience under RFRA and the First Amendment.  *See Diocese of Fort Wayne-South Bend, Inc., et al. v. Sebelius, et al.*, Docket No. 1:12-cv-00159 (N.D. Ind.).  In response to this and similar litigation, the Government promised that "the regulations will change before defendants could ever enforce them against plaintiffs," Defs.' Reply Br. Supp. Mot. to Dismiss [Dkt. #42] at 1, and that the Government was planning to "finalize the amendments to the regulations such that they are effective before the end of the temporary enforcement safe harbor."  Defs.' Br. Supp. Mot. to Dismiss [Dkt. #27] at 10.

193.    According to the Government, "the forthcoming amendments [were] intended to address the very issue that plaintiffs raise here by establishing alternative means of providing contraceptive coverage without cost-sharing while accommodating religious organizations' religious objections to covering contraceptive services." *Id.* at 18.  Indeed, the Government assured this Court, "[o]nce defendants complete the rulemaking outlined in the ANPRM, plaintiffs' challenge to the current regulations likely will be moot." *Id.* at 20.

194.    In response to the Government's motion to dismiss, Plaintiffs made clear that even if the ANPRM were enacted, it would still require them to provide, pay for, and/or facilitate the provision of objectionable insurance coverage for their employees and, therefore, would *not* relieve the burden on their religious exercise.  Indeed, Plaintiffs submitted six uncontested factual affidavits expressly so stating.  *See* Pls.' Br. in Opp. [Dkt. #30]; Affidavit of Diocese of Fort Wayne-South Bend, Chief Financial Officer [Dkt. #31] ¶¶ 20-22 (noting that the ANPRM

"force[s the Diocese] to provide, directly or indirectly pay for, or facilitate the provision of abortifacients, sterilization, and contraception" and that "[i]t is a violation of Catholic doctrine and the Diocese's sincerely-held religious beliefs to engage in the facilitation of those services."); Affidavit of Saint Anne Home, Director of Human Resources [Dkt. #33] ¶¶ 17-19 (same); Affidavit of University of Saint Francis, President [Dkt. #34] ¶¶ 18-19 (same); Affidavit of Franciscan Alliance, Chair [Dkt. #35] ¶¶ 22-25 (same); Affidavit of Our Sunday Visitor, President [Dkt. #36] ¶¶ 21-24 (same); Affidavit of Catholic Charities, Executive Director [Dkt. #32] ¶ 7 (noting that Catholic Charities' employees are covered under the Diocesan employee health plan).

195.    Confronted with these undisputed affidavits, the Government assured the Court that "the ANPRM is a mere starting point, and plaintiffs have ample opportunity to express their concerns and help shape the forthcoming amendments," elaborating: "[t]he entire purpose of amending the preventive services coverage regulations is to accommodate religious objections such as those raised by plaintiffs. But plaintiffs simply assume that no such amendment could ever alleviate the need for judicial review. That assumption is baseless, and prejudges defendants' ongoing rulemaking process." Defs.' Reply Br. Supp. Mot. to Dismiss [Dkt. #42] at 9 & 11 n.10.

### (3) The Government's Final Offer and the Empty "Accommodation"

196.    On February 1, 2013, the Government issued a Notice of Proposed Rulemaking ("NPRM"), setting forth in further detail its proposal to "accommodate" the rights of Plaintiffs and other religious organizations. Contrary to the Government's previous assurances, however, the NPRM adopted the proposals contained in the ANPRM. The NPRM, like the Government's previous proposals, was once again met with strenuous opposition, including over 400,000 comments. For example, the U.S. Conference of Catholic Bishops stated that "the

-44-

'accommodation' still requires the objecting religious organization to fund or otherwise facilitate the morally objectionable coverage. Such organizations and their employees remain deprived of their right to live and work under a health plan consonant with their explicit religious beliefs and commitments." Comments of U.S. Conference of Catholic Bishop, at 3 (Mar. 20, 2013), *available at http://www.usccb.org/about/general-counsel/rulemaking/upload/2013-NPRM-Comments-3-20-final.pdf.*

197.    Despite this opposition, on June 28, 2013, the Government issued a final rule that adopted substantially all of the NPRM's proposal without significant change. *See* 78 Fed. Reg. 39870 (July 2, 2013) ("Final Rule").

198.    The Final Rule makes three changes to the Mandate. As described below, none of these changes relieves the unlawful burdens placed on Plaintiffs and other religious organizations. Indeed, one of them significantly *increases* that burden by greatly increasing the number of religious organizations subject to the Mandate.

199.    *First*, the Final Rule makes what the Government concedes to be a non-substantive, cosmetic change to the definition of "religious employer." In particular, it eliminates the first three prongs of that definition, such that, under the new definition, an exempt "religious employer" is simply "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 78 Fed. Reg. 39874 (codified at 45 CFR § 147.131(a)). As the Government has admitted, this new definition does "not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." 78 Fed. Reg. 8456, 8461 (Feb. 6, 2013). Instead, it continues to "restrict[]the exemption primarily to group health plans established or maintained by churches, synagogues, mosques, and other houses of worship, and

religious orders." *Id.* In this respect, the Final Rule mirrors the intended scope of the original "religious employer" exemption, which focused on "the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. at 46,623. Religious organizations that have a broader mission are still not, in the Government's view, "religious employers."

200. The "religious employer" exemption, moreover, creates an official, Government-favored category of religious groups that are exempt from the Mandate, while denying this favorable treatment to all other religious groups. The exemption applies only to those groups that are "referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code." This category includes only (i) "churches, their integrated auxiliaries, and conventions or associations of churches," and (iii) "the exclusively religious activities of any religious order." The IRS has adopted an intrusive fourteen (14)-factor test to determine whether a group meets these qualifications. *See Foundation of Human Understanding v. United States*, 88 Fed. Cl. 203, 220 (Fed. Cl. 2009). Among these fourteen (14) factors is whether the group has " a recognized creed and form of worship," "a definite and distinct ecclesiastical government," "a formal code of doctrine and discipline," "a distinct religious history," "an organization of ordained ministers," "a literature of its own," "established places of worship," "regular congregations, "regular religious services," "Sunday schools for the religious instruction of the young," and "schools for the preparation of its ministers." *Id.* Not only do these factors favor some religious groups at the expense of others, but they also require the Government to make intrusive judgments regarding religious beliefs, practices, and organizational features to determine which groups fall into the favored category.

-46-

201.     *Second*, the Final Rule establishes an illusory "accommodation" for certain non-exempt objecting religious entities that qualify as "eligible organizations."  To qualify as an "eligible organization," a religious entity must (1) "oppose[] providing coverage for some or all of [the] contraceptive services"; (2) be "organized and operate[] as a non-profit entity"; (3) "hold[] itself out as a religious organization"; and (4) self-certify that it meets the first three criteria, and provide a copy of the self-certification either to its insurance company or, if the religious organization is self-insured, to its third party administrator.  26 CFR § 54.9816-2713A(a).  The provision of this self-certification then automatically requires the insurance issuer or third party administrator to provide or arrange "payments for contraceptive services" for the organization's employees, without imposing any "cost-sharing requirements (such as a copayment, coinsurance, or a deductible)."  *Id*. § 54.9816-2713A(b)(2), (c)(2).  The objectionable coverage, moreover, is directly tied to the organization's health plan, lasting only as long as the employee remains on that plan.  *See* 29 CFR § 2590.715-2713 45 CFR § 147.131(c)(2)(i)(B).  In addition, self-insured organizations are prohibited from "directly or indirectly, seek[ing] to influence the[ir] third party administrator's decision" to provide or procure contraceptive services.  26 CFR § 54.9815–2713.

202.     This so-called "accommodation" fails to relieve the burden on religious organizations.  Under the original version of the Mandate, a non-exempt religious organization's decision to offer a group health plan resulted in the provision of  coverage for abortion-inducing products, contraception, sterilization, and related counseling.  Under the Final Rule, a non-exempt religious organization's decision to offer a group health plan still results in the provision of coverage—now in the form of "payments"—for abortion-inducing products, contraception, sterilization, and related counseling.  *Id*. § 54.9816-2713A(b)-(c).  In both scenarios, Plaintiffs'

decision to provide a group health plan triggers the provision of "free" contraceptive coverage to their employees in a manner contrary to their beliefs.  The provision of the objectionable products and services are directly tied to Plaintiffs' insurance policies, as the objectionable "payments" are available only so long as an employee is on the organization's health plan.  *See* 29 CFR § 2590.715-2713 (for self-insured employers, the third party administrator "will provide or arrange separate payments for contraceptive services . . . for so long as [employees] are enrolled in [their] group health plan"); 45 CFR § 147.131(c)(2)(i)(B) (for employers that offer insured plans, the insurance issuer must "[p]rovide separate payments for any contraceptive services . . . for plan participants and beneficiaries for so long as they remain enrolled in the plan").  For self-insured organizations, moreover, the self-certification constitutes the religious organization's "*designation* of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits."  78 Fed. Reg. at 39,879 (emphasis added).  Thus, employer health plans offered by non-exempt religious organizations are the vehicle by which "free" abortion-inducing products, contraception, sterilization, and related counseling are delivered to the organizations' employees.

203.    Needless to say, this shell game does not address Plaintiffs' fundamental religious objection to improperly facilitating access to the objectionable products and services.  As before, Plaintiffs are coerced, through threats of crippling fines and other pressure, into facilitating access to contraception, abortion-inducing products, sterilization, and related counseling for their employees, contrary to their sincerely-held religious beliefs.

204.    The so-called "accommodation," moreover, requires Plaintiffs to cooperate in the provision of objectionable coverage in other ways as well.  For example, in order to be eligible for the so-called "accommodation," Plaintiffs must provide a "certification" to their insurance

-48-

provider setting forth their religious objections to the Mandate. The provision of this "certification," in turn, automatically triggers an obligation on the part of the insurance provider to provide Plaintiffs' employees with the objectionable coverage. A religious organization's self-certification, therefore, is a trigger and but-for cause of the objectionable coverage.

205.    The U.S. Government Mandate also requires Plaintiffs to subsidize the objectionable products and services.

206.    For organizations that procure insurance through a separate insurance provider, the Government asserts that the cost of the objectionable products and services will be "cost neutral" and, therefore, that Plaintiffs will not actually be paying for it, notwithstanding the fact that Plaintiffs' premiums are the only source of funding that their insurance providers will receive for the objectionable products and services.

207.    The Government's "cost-neutral" assertion, however, is implausible. It rests on the assumption that cost "savings" from "fewer childbirths" will be at least as large as the direct costs of paying for contraceptive products and services and the costs of administering individual policies. 78 Fed. Reg. at 8,463. Some employees, however, will choose not to use contraception notwithstanding the Mandate. Others would use contraception regardless of whether it is being paid for by an insurance company. And yet others will shift from less expensive to more expensive products once coverage is mandated and cost-sharing is prohibited. Consequently, there can be no assurance that cost "savings" from "fewer childbirths" will offset the cost of providing contraceptive services.

208.    More importantly, even if the Government's "cost-neutral" assertion were true, it is irrelevant. The so-called "accommodation" is nothing more than a shell game. Premiums previously paid by the objecting employers to cover, for example, "childbirths," will now be

COI-1494593

redirected to pay for contraceptive products and services. Thus, the objecting employer is still required to pay for the objectionable products and services.

209. For self-insured organizations, the Government's "cost-neutral" assumption is likewise implausible. The Government asserts that third party administrators required to provide or procure the objectionable products and services will be compensated by reductions in user fees that they otherwise would pay for participating in federally-facilitated health exchanges. *See* 78 Fed. Reg. 39,882. Such fee reductions are to be established through a highly regulated and bureaucratic process for evaluating, approving, and monitoring fees paid in compensation to third party administrators. Such regulatory regimes, however, do not fully compensate the regulatory entities for the costs and risks incurred. As a result, few if any third party administrators are likely to participate in this regime, and those that do are likely to increase fees charged to the self-insured organizations.

210. Either way, as with insured plans, self-insured organizations likewise will be required to subsidize contraceptive products and services notwithstanding the so-called "accommodation."

211. For all of these reasons, the U.S. Government Mandate continues to require Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization, and related education and counseling, in violation of their sincerely-held religious beliefs.

212. *Third,* the Final Rule actually *increases* the number of religious organizations that are subject to the U.S. Government Mandate. Under the Government's initial "religious employer" definition, if a non-exempt religious organization "provided health coverage for its employees through" a plan offered by a separate, "affiliated" organization that was "exempt from

COI-1494593

the requirement to cover contraceptive services, then neither the [affiliated organization] nor the [non-exempt entity would be] required to offer contraceptive coverage to its employees." 77 Fed. Reg. 16,501, 16,502 (Mar. 21, 2012).

213.    For example, Plaintiff Diocese of Fort Wayne-South Bend operates a self-insurance plan that covers not only the Diocese itself, but other affiliated Catholic organizations—such as Catholic Charities.  Under the religious employer exemption that was originally proposed, if the Diocese was an exempt "religious employer," then affiliated organizations such as Catholic Charities received the benefit of that exemption, regardless of whether they independently qualified as a "religious employer," because they could continue to participate in the Diocese's exempt plan.  These affiliated organizations, therefore, could benefit from the Diocese's exemption even if they, themselves, could not meet the Government's unprecedentedly narrow definition of "religious employer."

214.    The Final Rule eliminates this safeguard.  Instead, it provides that "each employer" must "independently meet the definition of eligible organization or religious employer in order to take advantage of the accommodation or the religious employer exemption with respect to its employees and their covered dependents." 78 Fed. Reg. 39,886.  *See also* 78 Fed. Reg. at 8467 (NPRM).  Because Plaintiff Catholic Charities does not appear to meet the Government's narrow definition of "religious employer," it is now subject to the U.S. Government Mandate.

215.    Thus, because Plaintiff Catholic Charities is a part of Plaintiff Diocese's self-insurance plan, the Mandate has forced Plaintiff Diocese to forego substantial cost savings to maintain the "grandfathered" status of its health plan in order to continue providing a health plan to Catholic Charities' employees that adheres to Catholic doctrine and beliefs.

COI-1494593

216.    Because of the Final Rule, Plaintiff Diocese's only other options would be to (1) sponsor a plan that will provide Catholic Charities and other affiliated Catholic organizations with access to the objectionable products and services, or (2) no longer extend their plans to Catholic Charities and other Catholic organizations thereby subjecting these organizations to massive fines if they do not contract with another insurance provider that will provide the objectionable coverage.

217.    The first option forces the Diocese to act contrary to its sincerely-held religious beliefs.

218.    The second option not only makes the Diocese complicit in the provision of objectionable coverage, by forcing their affiliates out of their plans and to obtain the objectionable coverage through another insurance provider, but also compels the Diocese to submit to the Government's interference with their structure and internal operations by accepting a construct that divides churches from their ministries.

219.    In this respect, the Mandate seeks to divide the Catholic Church.  The Church's faith in action, carried out through its charitable and educational arms, is every bit as central to the Church's religious mission as is the administration of the Sacraments.  In the words of Pope Benedict, "[t]he Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."  Yet the Mandate seeks to separate these consubstantial aspects of the Catholic faith, treating one as "religious" and the other as not.  The Mandate, therefore, deeply intrudes into internal Church governance.

220.    In sum, the Final Rule not only fails to alleviate the burden that the U.S. Government Mandate imposes on Plaintiffs' religious beliefs; it in fact makes that burden significantly worse by increasing the number of religious organizations that are subject to the

-52-

Mandate.  The U.S. Government Mandate, therefore, requires Plaintiffs to forego substantial cost savings, act contrary to their sincerely-held religious beliefs, or submit to the Government's interference with their structure and internal operations—all of which severely burden Plaintiffs' exercise of religion.

III.    **THE U.S. GOVERNMENT MANDATE IMPOSES A SUBSTANTIAL BURDEN ON PLAINTIFFS' RELIGIOUS LIBERTY**

   A.    **The U.S. Government Mandate Substantially Burdens Plaintiffs' Religious Beliefs**

221.    Responding to the U.S. Government Mandate, Cardinal Wuerl has declared that "what is at stake here is a question of human freedom."  And indeed it is.  Since the founding of this country, our law and society have recognized that individuals and institutions are entitled to freedom of conscience and religious practice.  Absent a compelling reason, no government authority may compel any group or individual to act contrary to their religious beliefs.  As noted by Thomas Jefferson, "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of civil authority."

222.    The U.S. Government Mandate violates Plaintiffs' rights of conscience by forcing them to participate in an employer-based scheme to provide insurance coverage to which they strenuously object on moral and religious grounds.

223.    It is a core tenet of Plaintiffs' religion that abortion, contraception, and sterilization are serious moral wrongs.

224.    Plaintiffs' Catholic beliefs, therefore, prohibit them from providing, paying for, and/or facilitating access to abortion-inducing products, contraception, or sterilization.

225.    As a corollary, Plaintiffs' Catholic beliefs prohibit them contracting with an insurance company or third party administrator that will, as a result, provide or procure the objectionable products and services to Plaintiffs' employees.

COI-1494593

226.    Plaintiffs' beliefs are deeply and sincerely held.

227.    The U.S. Government Mandate, therefore, requires Plaintiffs to do precisely what their sincerely-held religious beliefs prohibit—provide, pay for, and/or facilitate access to objectionable products and services or else incur crippling sanctions.

228.    The U.S. Government Mandate, therefore, imposes a substantial burden on plaintiffs' religious beliefs.

229.    The Mandate's exemption for "religious employers" does not alleviate the burden.

230.    The "religious employers" exemption does not apply to Plaintiffs Catholic Charities, Saint Anne Home, Franciscan, Specialty Physicians, Saint Francis, or Our Sunday Visitor.

231.    Although Plaintiff Diocese is a "religious employer," the Mandate still burdens its sincerely-held religious beliefs by requiring it forego substantial cost savings to maintain the "grandfathered" status of its health care plan in order to provide Plaintiff Catholic Charities and other affiliated organizations with non-objectionable coverage.

232.    Otherwise Plaintiff Diocese must either choose to (1) sponsor a plan that will provide Plaintiff Catholic Charities, and other affiliated Catholic organizations, with access to the objectionable products and services, or (2) expel these affiliates from its insurance plan, thereby forcing them into an arrangement with another insurance provider that will, in turn, provide or procure the objectionable products and services.

233.    This first alternative violates Plaintiff Diocese' sincerely-held religious beliefs.

234.    The second option compels the Diocese to submit to the government's interference with its structure and internal operations by accepting a construct that divides churches from their ministries.

-54-

235.     Thus, the so-called "accommodation" does not alleviate the burden on Plaintiffs' religious freedom.

236.     Notwithstanding the so-called "accommodation," Plaintiffs are still financially penalized or required to provide, pay for, and/or facilitate access to the objectionable products and services.

237.     Plaintiffs' Catholic beliefs do not simply prohibit them from using or directly paying for the objectionable coverage.  Their beliefs also prohibit them from facilitating access to the objectionable products and services in the manner required by the Mandate.

238.     Finally, the Plaintiffs cannot avoid the U.S. Government Mandate without incurring crippling fines.  If they eliminate their employee health plans, they are subject to annual fines of $2,000 per full-time employee.  If they keep their health plans but refuse to provide or facilitate the objectionable coverage, they are subject to daily fines of $100 a day per affected beneficiary.  The fines, therefore, coerce Plaintiffs into violating their religious beliefs.

239.     In short, while the President claims to have "found a solution that works for everyone" and that ensures that "religious liberty will be protected," his promised "accommodation" does neither.  Unless and until this issue is definitively resolved, the U.S. Government Mandate does and will continue to impose a substantial burden on Plaintiffs' religious beliefs.

**B.     The U.S. Government Mandate Is Not a Neutral Law of General Applicability**

240.     The U.S. Government Mandate is not a neutral law of general applicability.  It offers multiple exemptions from its requirement that employer-based health plans include or facilitate coverage for abortion-inducing products, sterilization, contraception, and related education and counseling.  It was, moreover, implemented by and at the behest of individuals and

-55-

organizations who disagree with Plaintiffs' religious beliefs regarding abortion and contraception, and thus targets religious organizations for disfavored treatment.

241.   For example, the Mandate exempts all "grandfathered" plans from its requirements, thus excluding tens of millions of people from the mandated coverage.  As the government has admitted, while the numbers are expected to diminish over time, "98 million individuals will be enrolled in grandfathered group health plans in 2013."  75 Fed. Reg. 41726,41732 (July 19, 2010).  Elsewhere, the government has put the number at 87 million.  *See* "Keeping the Health Plan You Have" (June 14, 2010), http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html.  And according to one district court last year, "191 million Americans belong[ed] to plans which may be grandfathered under the ACA."  *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1291 (D. Colo. 2012).

242.   Similarly, small employers (*i.e.*, those with fewer than 50 employees) are exempt from certain enforcement mechanisms to compel compliance with the Mandate.  *See* 26 U.S.C. §§ 4980D(d) (exempting small employers from penalties imposed for failing to provide the objectionable services), 4980H(a) (exempting small employers from the assessable payment for failure to provide health coverage).

243.   In addition, the Mandate exempts an arbitrary subset of religious organizations that qualify for tax-reporting exemptions under Section 6033 of the Internal Revenue Code.  The Government cannot justify its protection of the religious-conscience rights of the narrow category of exempt "religious employers," but not of Plaintiffs and other religious organizations that remain subject to the Mandate.

244.     The U.S. Government Mandate, moreover, was promulgated by Government officials, and supported by non-governmental organizations, who strongly oppose certain Catholic teachings and beliefs.  For example, on October 5, 2011, Defendant Sebelius spoke at a fundraiser for NARAL Pro-Choice America.  Defendant Sebelius has long supported abortion rights and criticized Catholic teachings and beliefs regarding abortion and contraception. NARAL Pro-Choice America is a pro-abortion organization that likewise opposes many Catholic teachings.  At that fundraiser, Defendant Sebelius criticized individuals and entities whose beliefs differed from those held by her and the other attendees of the NARAL Pro-Choice America fundraiser, stating:  "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services?  Not so much."  In addition, the Mandate was modeled on a California law that was motivated by discriminatory intent against religious groups that oppose contraception.

245.     Consequently, Plaintiffs allege that the purpose of the U.S. Government Mandate, including the narrow exemption, is to discriminate against religious institutions and organizations that oppose abortion and contraception.

### (4) The U.S. Government Mandate Is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest

246.     The U.S. Government Mandate is not narrowly tailored to serve a compelling governmental interest.

247.     The Government has no compelling interest in forcing Plaintiffs to violate their sincerely-held religious beliefs by requiring them to participate in a scheme for the provision of abortion-inducing products, sterilization, contraceptives, and related education and counseling. The Government itself has relieved numerous other employers from this requirement by exempting grandfathered plans and plans of employers it deems to be sufficiently religious.

-57-

Moreover, these services are widely available in the United States. The U.S. Supreme Court has held that individuals have a constitutional right to use such services. And nothing that Plaintiffs do inhibits any individual from exercising that right.

248. Even assuming the interest was compelling, the Government has numerous alternative means of furthering that interest without forcing Plaintiffs to violate their religious beliefs. For example, the Government could have provided or paid for the objectionable services itself through other programs established by a duly enacted law. Or, at a minimum, it could have created a broader exemption for religious employers, such as those found in numerous state laws throughout the country and in other federal laws. The Government, therefore, cannot possibly demonstrate that requiring Plaintiffs to violate their consciences is the least restrictive means of furthering its interest.

249. The U.S. Government Mandate, moreover, would simultaneously undermine both religious freedom—a fundamental right enshrined in the U.S. Constitution—and access to the wide variety of social and educational services that Plaintiffs provide. Plaintiff Diocese educates inner-city children whose families want an alternative to the public school system, and Catholic Charities provides a range of social services to the citizens of the Fort Wayne-South Bend area. Saint Anne Home provides high quality compassionate health care for the aged and mentally infirm whereas Franciscan and Specialty Physicians provide vital medical care and community services in Indiana and Illinois to those who otherwise could not afford these services. Likewise, Saint Francis provides its students with a high-quality education in numerous fields of study including health care, and Our Sunday Visitor, through its Institute, funds Catholic service projects throughout the country. As President Obama acknowledged in his announcement of February 10, 2012, religious organizations like Plaintiffs do "more good for a community than a

government program ever could."  The U.S. Government Mandate, however, puts these good works in jeopardy.

250.    That is unconscionable.  Accordingly, Plaintiffs seek a declaration that the U.S. Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its enforcement, and an order vacating the Mandate.

## IV.    THE U.S. GOVERNMENT MANDATE THREATENS PLAINTIFFS WITH IMMINENT INJURY THAT SHOULD BE REMEDIED BY A COURT

251.    The U.S. Government Mandate is causing serious, ongoing hardship to Plaintiffs that merits relief now.

252.    On June 28, 2013, Defendants finalized the U.S. Government mandate, including the narrow "religious employer" exemption and the so-called "accommodation" proposed in the NPRM.  By the terms of the Final Rule and its transitional safe harbor, Plaintiffs must comply with the Mandate by the beginning of the next plan year on or after January 1, 2014.

253.    For all Plaintiffs (except for Our Sunday Visitor), the next plan year begins on January 1, 2014.

254.    For Our Sunday Visitor, the next plan year begins on October 1, 2014.

255.    Defendants have given no indication that they will not enforce the essential provisions of the Mandate that impose a substantial burden on Plaintiffs' rights.  Consequently, absent the relief sought herein, Plaintiffs will be required to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization, and related education and counseling, in violation of their sincerely-held religious beliefs.

256.    The U.S. Government Mandate is also harming Plaintiffs in other ways.

257.    Health plans do not take shape overnight.  A number of analyses, negotiations, and decisions must occur each year before Plaintiffs can offer a health benefits package to their

-59-

employees.  For example, an employer using an outside insurance issuer—such as Franciscan (as to some plans) or Specialty Physicians—must work with actuaries to evaluate its funding reserves, and then negotiate with the insurer to determine the cost of the products and services it wants to offer its employees.  An employer that is self-insured—like the Diocese, Franciscan (as to some plans), Saint Anne Home, Saint Francis, and Our Sunday Visitor—after consulting with its actuaries, must similarly negotiate with its third party administrator.

258.    Under normal circumstances, Plaintiffs must begin the process of determining their health care package for a plan year at least one year before the plan year begins.  The multiple levels of uncertainty surrounding the U.S. Government Mandate make this already lengthy process even more complex.

259.    In addition, if Plaintiffs do not comply with the U.S. Government Mandate, they may be subject to government fines and penalties.  Plaintiffs require time to budget for any such additional expenses.

260.    The U.S. Government Mandate and its uncertain legality, moreover, undermine Plaintiffs' ability to hire and retain employees, thus placing them at a competitive disadvantage in the labor market relative to organizations that do not have a religious objection to the Mandate.

261.    Plaintiffs, therefore, need judicial relief now in order to prevent the serious, ongoing harm that the U.S. Government Mandate is already imposing on them.

COI-1494593

V.    **CAUSES OF ACTION**

**COUNT I**
**Substantial Burden on Religious Exercise**
**in Violation of RFRA**

262.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

263.    RFRA prohibits the Government from substantially burdening an entity's exercise of religion, even if the burden results from a rule of general applicability, unless the Government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

264.    RFRA protects organizations as well as individuals from Government-imposed substantial burdens on religious exercise.

265.    RFRA applies to all federal law and the implementation of that law by any branch, department, agency, instrumentality, or official of the United States.

266.    The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate access to products, services, practices, and speech that are contrary to their religious beliefs.

267.    The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

268.    The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

269.    Requiring Plaintiffs to comply with the U.S. Government Mandate is not the least restrictive means of furthering a compelling governmental interest.

270.    By enacting and threatening to enforce the U.S. Government Mandate against Plaintiffs, Defendants have violated RFRA.

271.    Plaintiffs have no adequate remedy at law.

-61-

272.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT II
### Substantial Burden on Religious Exercise in Violation of the Free Exercise Clause of the First Amendment

273.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

274.    The Free Exercise Clause of the First Amendment prohibits the Government from substantially burdening an entity's exercise of religion.

275.    The Free Exercise Clause protects organizations as well as individuals from Government-imposed burdens on religious exercise.

276.    The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate practices and speech that are contrary to their religious beliefs.

277.    The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

278.    The U.S. Government Mandate is not a neutral law of general applicability, because it is riddled with exemptions for which there is not a consistent, legally defensible basis. It offers multiple exemptions from its requirement that employer-based health plans include or facilitate access to abortion-inducing products, sterilization, contraception, and related education and counseling.

279.    The U.S. Government Mandate is not a neutral law of general applicability because it was passed with discriminatory intent.

280.    The U.S. Government Mandate implicates constitutional rights in addition to the right to free exercise of religion, including, for example, the rights to free speech, free association, and freedom from excessive government entanglement with religion.

COI-1494593

281.    The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

282.    The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

283.    By enacting and threatening to enforce the U.S. Government Mandate, the Government has burdened Plaintiffs' religious exercise in violation of the Free Exercise Clause of the First Amendment.

284.    Plaintiffs have no adequate remedy at law.

285.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT III**
**Compelled Speech in Violation of**
**the Free Speech Clause of the First Amendment**

286.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

287.    The First Amendment protects against the compelled affirmation of any religious or ideological proposition that the speaker finds unacceptable.

288.    The First Amendment protects organizations as well as individuals against compelled speech.

289.    Expenditures are a form of speech protected by the First Amendment.

290.    The First Amendment protects against the use of a speaker's money to support a viewpoint that conflicts with the speaker's religious beliefs.

291.    The U.S. Government Mandate would compel Plaintiffs to provide health care plans to their employees that include or facilitate access to products and services that violate their religious beliefs.

-63-

292.    The U.S. Government Mandate would compel Plaintiffs to subsidize, promote, and facilitate education and counseling services regarding these objectionable products and services.

293.    The U.S. Government Mandate would compel Plaintiffs to issue a certification of its beliefs that, in turn, would result in the provision of objectionable products and services to Plaintiffs' employees.

294.    By imposing the U.S. Government Mandate, Defendants are compelling Plaintiffs to publicly subsidize or facilitate the activity and speech of private entities that are contrary to their religious beliefs, and compelling Plaintiffs to engage in speech that will result in the provision of objectionable products and services to Plaintiffs' employees.

295.    The U.S. Government Mandate is viewpoint-discriminatory and subject to strict scrutiny.

296.    The U.S. Government Mandate furthers no compelling governmental interest.

297.    The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

298.    Plaintiffs have no adequate remedy at law.

299.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT IV
### Prohibition of Speech
### in Violation of the First Amendment

300.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

301.    The First Amendment protects the freedom of speech, including the right of religious groups to speak out to persuade others to refrain from engaging in conduct that may be considered immoral.

COI-1494593

302.    The Mandate violates the First Amendment freedom of speech by imposing a gag order that prohibits Plaintiffs from speaking out in any way that might "influence," "directly or indirectly," the decision of a third party administrator to provide or procure contraceptive products and services to Plaintiffs' employees.

303.    Plaintiffs have no adequate remedy at law.

304.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

<u>COUNT V</u>
<u>Official "Church" Favoritism and Excessive Entanglement with Religion<br>in Violation of the Establishment Clause of the First Amendment</u>

305.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

306.    The Establishment Clause of the First Amendment prohibits the Government from adopting an official definition of a "religious employer" that favors some religious groups while excluding others.

307.    The Establishment Clause also prohibits the Government from becoming excessively entangled in the affairs of religious groups by scrutinizing their beliefs, practices, and organizational features to determine whether they meet the Government's favored definition.

308.    The "religious employer" exemption violates the Establishment Clause in two ways.

309.    First, it favors some religious groups over others by creating an official definition of "religious employers."  Religious groups that meet the Government's official definition receive favorable treatment in the form of an exemption from the Mandate, while other religious groups do not.

310.    Second, even if it were permissible for the Government to favor some religious groups over others, the "religious employer" exemption would still violate the Establishment

-65-

Clause because it requires the Government to determine whether groups qualify as "religious employers" based on intrusive judgments about their beliefs, practices, and organizational features.  The exemption turns on an intrusive fourteen (14)-factor test to determine whether a group meets the requirements of section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  These fourteen (14) factors probe into matters such as whether a religious group has "a distinct religious history" or "a recognized creed and form of worship."  But it is not the Government's place to determine whether a group's religious history is "distinct," or whether the group's "creed and form of worship" are "recognized."  By directing the Government to partake of such inquiries, the "religious employer" exemption runs afoul of the Establishment Clause prohibition on excessive entanglement with religion.

311.    Plaintiffs have no adequate remedy at law.

312.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VI
### Interference in Matters of Internal Church Governance in Violation of the Religion Clauses of the First Amendment

313.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

314.    The Free Exercise Clause and Establishment Clause and the RFRA protect the freedom of religious organizations to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

315.    Under these Clauses, the Government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, ministers, or doctrine.

COI-1494593

316.     Under these Clauses, the Government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

317.     Plaintiffs are religious organizations affiliated with the Roman Catholic Church.

318.     The Catholic Church views abortion, sterilization, and contraception as intrinsically immoral, and prohibits Catholic organizations from condoning or facilitating those practices.

319.     Plaintiffs have abided and must continue to abide by the decision of the Catholic Church on these issues.

320.     The Government may not interfere with or otherwise question the final decision of the Catholic Church that its religious organizations must abide by these views.

321.     Plaintiffs have, therefore, made the internal decision that the health plans they offer to their employees may not cover, subsidize, or facilitate abortion, sterilization, or contraception.

322.     Plaintiff Diocese has further made the internal decision that its affiliated religious entities, including Catholic Charities, should offer their employees health-insurance coverage through the Diocesan plan, which allows the Diocese to ensure that these affiliates do not offer coverage for services that are contrary to Catholic teaching.

323.     The U.S. Government Mandate interferes with Plaintiffs' internal decisions concerning their structure and mission by requiring them to facilitate practices that directly conflict with Catholic beliefs.

COI-1494593

324.    The U.S. Government Mandate's interference with Plaintiffs' internal decisions affects their faith and mission by requiring them to facilitate practices that directly conflict with their religious beliefs.

325.    Because the U.S. Government Mandate interferes with the internal decision-making of Plaintiffs in a manner that affects Plaintiffs' faith and mission, it violates the Establishment Clause and the Free Exercise Clause of the First Amendment and the RFRA.

326.    Plaintiffs have no adequate remedy at law.

327.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT VII**
**Illegal Action in Violation of the APA**

328.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

329.    The APA condemns agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

330.    The U.S. Government Mandate, its exemption for "religious employers," and its so-called "accommodation" for "eligible" religious organizations are illegal and therefore in violation of the APA.

331.    The Weldon Amendment states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).

-68-

332.    The Affordable Care Act contains no clear expression of an affirmative intention of Congress that employers with religiously motivated objections to the provision of health plans that include coverage for abortion-inducing products, sterilization, contraception, or related education and counseling should be required to provide such plans.

333.    The U.S. Government Mandate nevertheless requires employer-based health plans to provide coverage for abortion-inducing products, contraception, sterilization, and related education.  It does not permit employers or issuers to determine whether the plan covers abortion, as the Weldon Amendment requires.  By issuing the U.S. Government Mandate, Defendants have exceeded their authority, and ignored the direction of Congress.

334.    The U.S. Government Mandate violates the Weldon Amendment, RFRA, and the First Amendment.

335.    The U.S. Government Mandate therefore is not in accordance with law and thus violates 5 U.S.C. § 706(2)(A).

336.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

337.    Plaintiffs have no adequate remedy at law.

338.    Defendants' failure to act in accordance with law imposes an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VIII
### Failure to Conduct Notice-and-Comment Rulemaking in Violation of the APA

339.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

340.    The Affordable Care Act expressly delegates to an agency within HHS, the Health Resources and Services Administration, the authority to establish guidelines concerning the "preventive care" that a group health plan and health insurance issuer must provide.

341.    Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the "preventive care" guidelines that group health plans and insurers must cover.  Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

342.    Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law.

343.    Defendants, instead, wholly delegated their responsibilities for issuing "preventive care" guidelines to a non-governmental entity, the IOM.

344.    The IOM did not permit or provide for the broad public comment otherwise allowed under the APA concerning the "preventive care" guidelines that it would recommend. The dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.

345.    Within two weeks of the IOM issuing its women's "preventive care" guidelines, HHS issued a press release announcing that the IOM's guidelines regarding women's "preventive care" were required to be covered under the Affordable Care Act.

346.    Defendants have never indicated reasons for failing to enact the "preventive care" guidelines through notice-and-comment rulemaking as required by the APA.

347.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

348.    Plaintiffs have no adequate remedy at law.

349.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## VI.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiffs respectfully pray that this Court:

1.    Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under RFRA;

2.    Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under the First Amendment;

3.    Enter a declaratory judgment that the U.S. Government Mandate was promulgated in violation of the APA;

4.    Enter an injunction prohibiting the Defendants from enforcing the U.S. Government Mandate against Plaintiffs;

5.    Enter an order vacating the U.S. Government Mandate;

6.    Award Plaintiffs attorneys' and expert fees under 42 U.S.C. § 1988; and

7.    Award all other relief as the Court may deem just and proper.

## VII.    <u>JURY DEMAND</u>

1.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted, this 6th day of September, 2013.

By: _s/ Matthew A. Kairis_____
Matthew A. Kairis (OH No. 55502) (Trial Attorney)
Brandy H. Ranjan (OH No. 86984)
JONES DAY
325 John H. McConnell Blvd., Suite 600
P.O. Box 165017
Columbus, OH  43216
(614) 469-3939

Carol A. Hogan (IL No. 06202430)
Brian J. Murray (IL No. 06272767)
JONES DAY
77 West Wacker Drive
Chicago, IL  60601
(312) 782-8585

Leon F. DeJulius, Jr. (PA No. 90383)
Alison M. Kilmartin (PA No. 306422)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA  15219-2514
(412) 391-3939
*Counsel for Plaintiffs*

Scott Hall (IN No. 12060-49)
HALL & GOODEN LLP
810 South Calhoun Street, Suite 100
Fort Wayne, IN  46802
(260) 422-2035
*Counsel for Plaintiffs the Diocese of Fort Wayne-
South Bend, Inc., Catholic Charities of the Diocese
of Fort Wayne-South Bend, Inc., and Saint Anne
Home & Retirement Community of the Diocese of
Fort Wayne-South Bend, Inc.*

W. Patrick Downes (IN No. 4587-45)
General Counsel
FRANCISCAN ALLIANCE, INC.
1515 South Court Street
Crown Point, IN  46307
(219) 662-3754
*Counsel for Plaintiffs Franciscan Alliance, Inc. and
Specialty Physicians of Illinois, LLC*

William T. Hopkins, Jr. (IN No. 8074-02)
BARNES & THORNBURG LLP
600 One Summit Square
110 E. Wayne Street
Fort Wayne, IN  46802-3119
(260) 425-4644
*Counsel for Plaintiff the University of Saint Francis*

Robert E. Doelling, Jr. (IN No. 14540-49)
BURT BLEE DIXON SUTTON & BLOOM, LLP
200 East Main Street, Suite 1000
1st Source Banking Center
Fort Wayne, IN  46802
(260) 426-1300
*Counsel for Plaintiff Our Sunday Visitor, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2013, I electronically filed the foregoing Plaintiffs'

Amended Complaint with the Clerk of the United States District Court for the Northern District

of Indiana using the CM/ECF system, which will send notification of such filing to the following

counsel of record:

> Benjamin Berwick (MA Bar No. 679207)
> Trial Attorney
> United States Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave. N.W. Room 7306
> Washington, DC 20530
> Tel:  (202) 305-8573
> Fax:  (202) 616-8470
> Email:  Benjamin.L.Berwick@usdoj.gov
> *Attorney for Defendants*

*s/ Matthew A. Kairis*
One of the Attorneys for Plaintiff

COI-1494593