UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DIOCESE OF FORT WAYNE-SOUTH BEND, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:12-CV-159 JD |
| KATHLEEN SEBELIUS, in her official capacity as Secretary of the U.S. Department of Health and Human Services, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

<u>Memorandum Opinion and Order</u>

Plaintiffs Diocese of Fort Wayne-South Bend, Inc. ("Diocese"), Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc. ("Catholic Charities"), Saint Anne Home & Retirement Community of the Diocese of Fort Wayne-South Bend, Inc. ("Saint Anne Home"), Franciscan Alliance, Inc. ("Franciscan"), Specialized Physicians of Illinois, LLC ("Specialty Physicians"), University of Saint Francis ("University"), and Our Sunday Visitor, Inc. ("Our Sunday Visitor") (collectively "plaintiffs"), have filed their first amended verified complaint [DE 73] seeking declaratory and injunctive relief claiming that the government defendants have violated their rights under the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb *et seq.*, the First Amendment of the Constitution of the United States, and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, by enacting the "contraception mandate" which requires certain employers to provide coverage for contraception and sterilization procedures in their employee health care plans on a no-cost-sharing basis, or face stiff financial penalties and the risk of enforcement actions for the failure to do so. Although the defendants have since moved to dismiss the amended complaint and the parties have sought summary judgment on the various

claims presented [DE 85; DE 95], the Court focuses only on plaintiffs' request for injunctive relief and defendants' objection thereto,[1] in an effort to prevent the possibility of any unjust enforcement of the contraception mandate against plaintiffs come the first of the year.

For the reasons that follow, plaintiffs have shown that their RFRA claim stands a reasonable likelihood of success on the merits, that irreparable harm will result without adequate remedy absent an injunction, and that the balance of harms favor protecting the religious-liberty rights of the plaintiffs.  As such, the Court enters a preliminary injunction barring enforcement of the contraception mandate against plaintiffs.

## I.  Background

### The Contraception Mandate

Under the Patient Protection and Affordable Care Act (ACA), employment-based group health plans covered by the Employee Retirement Income Security Act must provide certain types of preventive health services. *See* 42 U.S.C. § 300gg–13; 29 U.S.C. § 1185d. One provision mandates coverage, without cost-sharing by plan participants or beneficiaries, of "preventive care and screenings" for women "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]." 42 U.S.C. § 300gg–13(a)(4).  The HRSA, an agency of the U.S. Department of Health and Human Services (HHS), then delegated the task of developing appropriate preventive-services guidelines to the Institute of Medicine (IOM), an arm of the National Academy of Sciences funded by Congress to

---

[1]The Court has also carefully considered the supplemental notices of authority and responses filed by counsel, along with the amicus curiae briefs filed by counsel for the American Civil Liberties Union and the American Center for Law & Justice along with 79 Members of the United States Congress.

provide the government with independent expert advice on matters of public health.  After reviewing the type of preventive services necessary for women's health and well-being, the IOM recommended that the following preventive services be required for coverage:  annual well-woman visits; screening for gestational diabetes and breast-feeding support, supplies, and counseling; human papillomavirus screening; screening and counseling for sexually transmitted infections and human immune-deficiency virus; screening and counseling for interpersonal and domestic violence; and contraceptive education, methods, and services so that women can better avoid unwanted pregnancies and space their pregnancies to promote optimal birth outcomes. *See* IOM, Clinical Preventive Services for Women: Closing the Gaps, http://www.iom.edu/Reports/ 2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (last visited Dec. 9, 2013).  Based on the IOM's recommendations, the HRSA issued comprehensive guidelines requiring coverage of (among other things) "[a]ll Food and Drug Administration [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling[2] for all women with reproductive capacity." HRSA, Women's Preventive Services Guidelines: Affordable Care Act Expands Prevention Coverage for Women's Health and Well–Being, http://www.hrsa.gov/womensguidelines/ (last visited Dec. 9, 2013).  These include hormonal methods such as oral contraceptives (the pill), implants and injections, barrier methods, intrauterine devices, and emergency oral contraceptives (Plan B and Ella).[3] *See* FDA, Birth

---

[2]The defendants clarify that this requirement does not indicate that such education and counseling need necessarily be 'in support of' certain contraception services or contraception in general.

[3]As the government points out, the list of FDA approved contraceptive methods does not include abortion, however, the terms "abortifacients" or "abortion inducing drugs" as used throughout this opinion refers to plaintiffs' characterization of contraception that artificially

Control: Medicines To Help You, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/ FreePublications/ucm313215.htm (lasted visited Dec. 9, 2013). On February 15, 2012, HHS published final regulations incorporating the HRSA guidelines. 77 Fed. Reg. 8725 (Feb. 15, 2012). The agency made the mandate effective in the first plan year on or after August 1, 2012, *see* 45 C.F.R. § 147.130(b)(1), however, a temporary enforcement safe harbor for nonexempt nonprofit religious organizations that objected to covering contraceptive services was also created, making the mandate effective in the first plan year on or after August 1, 2013 for those qualifying organizations who did not meet the religious employer exemption. 77 Fed. Reg. 8728-29. The government then undertook new rulemaking during the safe harbor period to adopt new regulations applicable to non-grandfathered[4] nonprofit religious organizations with religious objections to covering contraceptive services. *Id.*

On March 21, 2012, the government issued an Advance Notice of Proposed Rulemaking that stated it was part of the government's effort "to develop alternative ways of providing contraceptive coverage without cost sharing in order to accommodate non-exempt, nonprofit religious organizations with religious objections to such coverage." 77 Fed. Reg. 16,501, 16,503 (Mar. 21, 2012). On February 1, 2013, the government issued a Notice of Proposed Rulemaking (NPRM), setting forth a proposal that stated it was to "amend the criteria for the religious

---

interferes with life and conception in violation of their religious beliefs.

[4]"Grandfathered" plans are those health plans that do not need to comply with the ACA's coverage requirements because they were in existence when the ACA was adopted and did not make certain changes to the terms of the plan. 42 U.S.C. § 18011. The purpose of grandfathering plans was to allow individuals to maintain their current health insurance plan, to reduce short term disruptions in the market, and to ease the transition to market reforms that phase in over time. *See* 75 Fed. Reg.. 34,546 (June 17, 2010). The number of grandfathered plans is expected to decline over time.

employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths," and to "establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage." *See* 78 Fed. Reg. 8456 (Feb. 6, 2013).  On June 28, 2013, the government issued final rules adopting and/or modifying the proposals in the NPRM. *See* 78 Fed. Reg. 39,870.  The regulations challenged here (the "final rules") include the new regulations issued by the government and applicable to non-grandfathered, nonprofit religious organizations with religious objections to covering contraceptive services. *See* 78 Fed. Reg. 39,870.

The final rules state that they "simplify[ied] and clarify[ied]" the definition of "religious employer." 78 Fed. Reg. 39,871. Under the new definition, an exempt "religious employer" is an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended. 78 Fed. Reg. 39,874 (codified at 45 C.F.R. § 147.131(a)). The groups that are "refer[red] to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code," are "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(3)(A)(i), (iii).  The new definition of "religious employer" does "not expand the universe of religious employers that qualify for the exemption beyond that which was intended in the 2012 final regulations." 78 Fed. Reg. 39,874 (citing 78 Fed. Reg. 8461).  The 2013 final rules' amendments to the religious employer exemption apply

to group health plans and group health insurance issuers for plan years beginning on or after August 1, 2013. *See id.* at 39,871.

The 2013 final rules also included an "accommodation" regarding the contraceptive coverage requirement for group health plans established or maintained by "eligible organizations." 78 Fed. Reg. 39,874–80; 45 C.F.R. § 147.131(b)-(f).  An "eligible organization" is an organization that satisfies the following criteria:

> (1)  The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
>
> (2)  The organization is organized and operates as a nonprofit entity.
>
> (3)  The organization holds itself out as a religious organization.
>
> (4)  The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

45 C.F.R. § 147.131(b); *see also* 78 Fed. Reg. 39,874-75. The 2013 final rules state that an eligible organization is not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it has religious objections. 78 Fed. Reg. 39,874.  To be relieved of the obligations that otherwise apply to non-grandfathered, nonexempt employers, the 2013 final rules require that an eligible organization complete a self certification form, certifying that it is an eligible organization, sign the form, and provide a copy of that self-certification to its issuer or third party administrator (TPA). *Id.* at 39,878–79.  In the case of an organization with an insured group health insurance issuer, upon receipt of the self certification, the organization's health insurance issuer must provide separate payments to plan participants and beneficiaries for

contraceptive services without cost sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or it's plan. *Id.* at 39,875–77.  The government expects that its insurers will have options to achieve cost neutrality, including by way of cost savings from improvements in women's health and fewer pregnancies, and by including the cost of contraceptive services as an administrative cost that is spread across the issuer's entire risk pool (excluding plans established or maintained by eligible organizations). *Id.* at 39,877-78.  In the case of an organization with a self-insured group health plan, upon receipt of the self certification, the organization's TPA is designated as plan administrator and claims administrator for purposes of providing or arranging separate payments for contraceptive services without cost sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or it's plan. *Id.* at 39,879–80. Under the 2013 final rules, costs incurred by TPAs relating to the coverage of contraception services for employees of eligible organizations can be reimbursed through an adjustment to Federally-Facilitated Exchange user fees. *See* 78 Fed. Reg. 39,880.  The contraceptive services provided are directly tied to the employer's insurance policy, and are available only so long as the employees are enrolled in the organization's health plan. 45 C.F.R. § 147.131(c).  The 2013 final rules' "accommodation" applies to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014. 78 Fed. Reg. 39,872.

Ultimately, several exemptions from the ACA's coverage requirements have survived the law's revisions, including exemptions for smaller employers—those with fewer than fifty full time employees, 26 U.S.C. § 4980H, and employer health plans that are grandfathered, 42 U.S.C. § 18011.  In addition, religious employers meeting the narrow definition of religious employer

are exempted from the contraceptive coverage requirement. 45 C.F.R. § 147.131(a).  A noncomplying employer who does not meet an exemption will face large fines, specifically, $2,000 per year per full time employee (less 30 employees) for not providing insurance meeting the coverage requirements, 26 U.S.C. § 4980H(c), or $100 per day per employee for providing insurance that excludes the coverage required by the contraception mandate, 26 U.S.C. § 4980D, and will face the risk of other enforcement actions.

As detailed below, the Diocese itself is exempted from the mandate under the religious employer exemption, while the remaining plaintiffs are subject to its accommodation [DE 73 at ¶¶ 10, 14] created for nonprofit religiously affiliated employers—which the Seventh Circuit has characterized as "an attempted workaround whereby the objecting employer gives notice to its insurance carrier and the insurer issues a separate policy with the mandated coverage." *Korte v. Sebelius*, 735 F.3d 654, 662 (7th Cir. 2013) (Rovner, J., dissenting).  The plaintiffs argue that compliance with the contraception mandate, even via the accommodation, violates their religious exercise rights.

***Factual Background***

The plaintiffs have verified the facts applicable to their claims and request for injunctive relief via various affidavits and declarations[5] [DE 76-82; DE 98-1 at 00001-00107].

---

[5]Unless specifically noted herein, the government defendants do not contest these facts, which are admitted for preliminary injunction purposes.  In addition, no hearing was necessary given the controversy was controlled by the undisputed facts detailed in this order.

## 1.      The Plaintiffs' Religious Beliefs

In sum, Plaintiffs are all religious entities that are part of the Roman Catholic Church [DE 76 at ¶ 4; DE 77 at ¶¶ 5, 20; DE 78 at ¶ 18; DE 79 at ¶ 7; DE 80 at ¶ 10; DE 81 at ¶ 5; DE 82 at ¶¶ 4, 15]. The Catholic Church teaches that life begins at the moment of conception, that sexual union should be reserved to committed marital relationships in which the husband and wife are open to the transmission of life, and, that artificial interference with life and conception are immoral [DE 76 at ¶ 29]. Thus, plaintiffs believe that human life must be respected and protected absolutely from the moment of conception, that contraception is immoral, and that the termination of pregnancy before viability is an abortion [DE 98-1 at 99-100; DE 98-2 at 978].

Catholic religious teaching also prohibits subsidizing, providing, and/or facilitating coverage for abortion-inducing products, sterilization services, artificial contraceptives, and related counseling services [DE 98-1 at 99]. Thus, offering a health insurance plan that provides coverage for or facilitates access to[6] abortion-inducing products, contraceptives, sterilization, and related education and counseling, as permitted by the contraception mandate and its accommodation, is inconsistent with plaintiffs' core moral and religious beliefs [DE 98-1 at 99-104]. Plaintiffs' provision of health benefits to their employees reflects the Catholic social teaching that healthcare is among those basic rights that flow from the sanctity and dignity of human life [DE 98-1 at 103].

And while the government argues plaintiffs only speculate about the likely impact of any

---

[6]Defendants dispute that the regulations require plaintiffs to provide or facilitate the provision of contraceptive services to which plaintiffs object; however, this is plaintiffs' characterization of what the mandate requires of them were the plaintiffs to complete the self-certification form and provide a copy of it to their issuer/TPA.

fines, the plaintiffs assert that as a result of the substantial fines to be imposed for non-compliance with the ACA's coverage requirements, they may be forced to limit the significant services they provide to the community and they may even be required to downsize [DE 98-1 at 57-58, 64, 72, 77-78, 83, 89, 95]. Further, plaintiffs are concerned that fines will likely result in a reduction of donations because donors will be concerned that their money will be used to pay fines as opposed to being used in support of charitable and other community services. *Id.*

### 2.      The Plaintiffs

**<u>The Diocese</u>**

As Chief Financial Officer of the Diocese, Joseph Ryan, provided sworn statements indicating that the Diocese is the civil law entity for the Diocese of Fort Wayne-South Bend, which is the local embodiment of the Universal Roman Catholic Church, a community which encompasses fourteen counties located in Northeast Indiana and consists of the baptized who profess the Catholic faith, share in sacramental life, and has been entrusted since January 2010 to the ministry of Bishop Kevin C. Rhoades [DE 98-1 at 54]. Bishop Rhoades is also a member of plaintiff Catholic Charities and of Saint Anne Home, and as chairman of their boards, Bishop Rhoades oversees the management of Catholic Charities and Saint Anne Home, which are integral components to the fulfillment of the religious and charitable missions of the Diocese and Catholic Church. *Id.* at 55.

The Diocese itself has approximately 2,502 employees, with over 1,400 classified as full-time (working an average of at least 30 hours per week) and over 1,200 classified as part-time (working an average of less than 30 hours per week) [DE 76 at ¶ 23]. The Diocese employs Catholic and non-Catholic teachers in its schools who must have a knowledge of and respect for

the Catholic faith, abide by the tenets of the Catholic Church as they apply to that person, exhibit a commitment to the ideal of Christian living, and be supportive of the Catholic faith. *Id*. at ¶ 22.

Consistent with Church teachings on social justice, the Diocese makes health insurance benefits available to its religious personnel, seminarians, and full-time employees through the Diocesan Health Plan. *Id*. at ¶ 24. Approximately 116 active and retired priests, religious sisters and seminarians of the Diocese, and approximately 1,034 of the Diocese's full-time employees participate in the Diocesan employee health plan. *Id*. The Diocesan Health Plan is a self-insured plan that is administered by a TPA, which handles the administrative aspects of the plan. *Id*. at ¶ 25. While the Diocese itself meets the religious employer exemption, *id*. at ¶ 31, the Diocesan Health Plan also includes the employees of non-exempt, affiliated entities such as Catholic Charities. *Id*. at ¶ 26. 33. Currently, the Diocesan Health Plan also meets the ACA's definition of a grandfathered plan and includes a statement in plan materials provided to participants or beneficiaries that it believes it is a grandfathered plan, as is required to maintain its grandfathered status [DE 76 at ¶ 27]. But in order to maintain its grandfathered status, the Diocese foregoes approximately $180,000 a year in increased premiums, so that it can protect Catholic Charities from the contraceptive mandate. *Id*. at ¶¶ 27, 32. Absent maintaining its grandfathered status at great expense, the only other options would be to either (1) sponsor a plan that will provide the employees of Catholic Charities with access to "free" contraception, abortion-inducing products, sterilization, and related counseling, or (2) no longer extend its plan to Catholic Charities, subjecting it to massive fines if it does not contract with another insurance provider that will provide the objectionable coverage [DE 76 at ¶ 33]. The Diocese asserts that the first option forces the Diocese to act contrary to its sincerely-held religious beliefs, and the

second option makes the Diocese complicit in the provision of objectionable coverage and compels the Diocese to submit to the Government's interference with its structure and internal operations by accepting a construct that divides churches from their ministries. *Id*. ¶¶ 33- 36. The Diocesan Health Plan year begins on January 1. *Id*. at ¶ 28.

### Catholic Charities

Interim Executive Director of Catholic Charities, Lisa Young, confirms in her affidavit that Catholic Charities is a nonprofit corporation affiliated with the Diocese and created in 1922 to provide organized, concerted charitable efforts [DE 77 at ¶¶ 2, 5, 7].  Catholic Charities' 36 full-time employees are offered health insurance through the Diocesan Health Plan, which, in accordance with Catholic Church teachings (as Catholic Charities bears witness to), has historically excluded coverage for abortion, contraceptives (except when used for non-contraceptive purposes), sterilization, and related education and counseling from its multi-employer health plan. *Id*. at ¶¶ 16, 20.  And every dollar foregone by the Diocese in order to maintain its employee health plan's grandfathered status is a dollar that cannot be funneled to Catholic Charities in the execution of its programs, and yet compliance with the contraception mandate or its accommodation would be contrary to Catholic Charities' beliefs. *Id*. at ¶¶ 19, 21.

### Saint Anne Home

According to the affidavit of Jason Wardwell, the Director of Human Resources of Saint Anne Home and Retirement Community of the Diocese, Saint Anne Home serves the local community by offering residential apartments, a nursing facility, rehab suites, and adult day services [DE 78 at ¶¶ 2, 8, 14].  It has approximately 310 employees, of which approximately 220 are eligible for health insurance via the Saint Anne Home Health Plan, which is a

12

self-insured plan administered by a TPA. *Id*. at ¶¶ 15, 23.  Because the Saint Anne Home Health Plan is not grandfathered and the plan year begins on January 1, at that time it must be prepared to comply with the contraception mandate. *Id*. at ¶¶ 16, 17.

Saint Anne Home is part of the Roman Catholic Church which bears witness to the Church's teachings [DE 78 at ¶¶ 18, 22].  All of Saint Anne Home's facilities are operated in a manner that abides by *The Ethical and Religious Directives for Catholic Health Care Services* as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop and as modified from time to time. *Id.* at ¶ 11.  Saint Anne Home also abides by The National Catholic Bioethics *Center's A Catholic Guide to End-of-Life Decisions: An Explanation of Church Teaching on Advanced Directives, Euthanasia, and Physician-Assisted Suicide*. *Id*.  Accordingly, though Saint Anne Home provides health insurance to its employees, it has historically excluded coverage for abortion, abortion-inducing products, contraceptives, sterilization, and related education and counseling from its health plan. *Id*. at ¶ 19.  To comply with the contraception mandate and its accommodation, in order to avoid significant fines, would violate Saint Anne Home's religious beliefs by facilitating access to objectionable contraceptive services. *Id*. at ¶¶ 20-25.

### Franciscan

Sister Jane Marie Klein, O.S.F., the Chair of Franciscan, provided an affidavit on behalf of the Franciscan Alliance, Inc., establishing that Franciscan is a nonprofit health system that includes eleven facilities in Indiana and two facilities in Illinois [DE 79 at ¶¶ 2, 4].  Franciscan's benefits-eligible employees may participate in a number of health benefits programs, depending on the region in which they work:  Central Indiana Region, Northern Indiana Region, Western

Indiana Region, and the South Suburban Chicago Region in Illinois. *Id*. at ¶ 13.  Franciscan's approximately 4,369 benefits-eligible employees in its Central Indiana Region are offered six Advantage Health Solutions, Inc. fully-insured benefits program options that are not grandfathered. *Id*. at ¶ 14.  Franciscan's approximately 8,719 benefits-eligible employees in its Western Indiana and Northern Indiana Regions are offered six benefits plan options, four of which are self-insured plans administered by a TPA, Advantage Health Solutions, Inc., and two of which are Blue Cross Blue Shield of Illinois fully-insured benefits plans—none of them are grandfathered. *Id*. at ¶ 15.  Franciscan's approximately 1,733 benefits-eligible employees in its South Suburban Chicago Region are offered three benefits plan options, two of which are Blue Cross Blue Shield of Illinois fully-insured benefits plans, and one of which is a self-insured benefits plan that is administered by the TPA Blue Cross Blue Shield of Illinois—none of the plans have grandfathered status. *Id*. at ¶ 16.  Because Franciscan's health plans' years begin on January 1, Franciscan must comply with the contraception mandate by that date. *Id.* at ¶ 18.

Since its founding in 1875, Franciscan has been faithful to the tenets of the Catholic Church [DE 79 at ¶¶ 7, 19, 23].  All of Franciscan's facilities are operated in a manner that abides by *The Ethical and Religious Directives for Catholic Health Care Services* as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop and as modified from time to time. *Id*. at ¶ 9.  Accordingly, none of the benefits plans offered by Franciscan covers abortion, sterilization, or contraceptives, and yet, compliance with the accommodation forces Franciscan to facilitate access to contraceptive products and services antithetical to its Catholic faith. *Id.* at ¶¶ 20-26.

**Specialty Physicians**

Sister Jane Marie Klein, O.S.F., also filed an affidavit on behalf of Specialty Physicians establishing that Specialty Physicians is a member managed nonprofit limited liability company providing physician and related healthcare services in Illinois, and its sole member is Franciscan Alliance, Inc. [DE 80 at ¶¶ 2, 4]. The approximately 317 benefits-eligible employees are offered the choice of a Blue Cross Blue Shield of Illinois fully-insured health maintenance organization option, or a BCBSI fully-insured preferred provider organization option. *Id*. at ¶ 7. As of January 1, 2014, both of Specialty Physicians' plans will no longer be grandfathered because of changes made to the amount of employee contributions [DE 73 ¶ 128; DE 80 at ¶ 15], which means Specialty Physicians must comply with the contraception mandate by that date or face significant fines [DE 80 at ¶¶ 9, 15].

All of Specialty Physicians' facilities are operated in a manner that abides by *The Ethical and Religious Directives for Catholic Health Care Services* as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop and as modified from time to time [DE 80 at ¶ 6]. And because Specialty Physicians is faithful to the Roman Catholic Church and its teachings, *see id.* at ¶¶ 10, 14, Specialty Physicians has historically excluded coverage for abortion, contraceptives (except when used for noncase contraceptive purposes), sterilization, and related education and counseling from its multi-employer health plan. *Id*. at ¶ 11. The contraception mandate and its accommodation does not resolve Specialty Physicians' religious objection to the provision or facilitating access to objectionable contraceptive services. *Id*. at ¶¶ 12-17.

**Saint Francis University**

The president of Saint Francis University, Sister Elise Kriss, O.S.F., provided an affidavit indicating that the University is a Catholic, Franciscan-sponsored co-educational, liberal arts college that bears responsibility to witness the Church's teachings [DE 81 at ¶¶ 2, 5, 28, 32]. Faith is at the heart of the University's efforts, and the apostolic constitution *Ex Corde Ecclesiae*, which governs and defines the role of Catholic colleges and universities, provides that "the objective of a Catholic University is to assure . . . [f]idelity to the Christian message as it comes to us through the Church." *Id*. at ¶ 20.

Saint Francis University has approximately 413 total faculty and staff members, of which approximately 346 full-time employees are eligible for health care benefits. *Id*. at ¶ 24. The University's employees (but not its students) are offered a self-insured health care plan, which is administered by a TPA and is not grandfathered, thus it must comply with the contraception mandate on January 1. *Id*. at ¶¶ 23, 25-27. The current Saint Francis employee health plan complies with Catholic teachings, which means abortion and sterilization are not covered, and contraceptives are not covered when prescribed for contraceptive purposes. *Id*. at ¶ 29. In fact, Sister Kriss indicates that the University will never provide objectionable services to its employees because such services violate Catholic teachings, Franciscan Values and the moral conscience of the Sisters of Saint Francis. *Id*. at ¶ 28. Further, the accommodation still forces the University to initiate the provision of objectionable contraceptive benefits to its employees in a manner contrary to Saint Francis' beliefs. *Id*. at 31-33.

**Our Sunday Visitor**

Gregory Erlandson, President of Our Sunday Visitor, established by way of affidavit that

Our Sunday Visitor is a nonprofit Catholic publishing company located in Huntington, Indiana which publishes religious periodicals and other parish materials [DE 82 at ¶¶ 2, 4, 5, 15].  Our Sunday Visitor is organized under the Indiana Nonprofit Corporation Act of 1991, it is organized and operated exclusively for the benefit of, and to carry out the purposes of, the Roman Catholic Church, and it is operated in connection with the Diocese. *Id*. at ¶ 20.  Between its publishing and offertory solutions divisions, Our Sunday Visitor employs approximately 317 benefits-eligible employees who are offered a self-insured health care plan that is administered by a TPA. *Id*. at ¶¶ 11, 12.  The plan is not grandfathered and will need to comply with the contraception mandate when its new plan begins on October 1, 2014. *Id*. at ¶¶ 13, 14.

Because Our Sunday Visitor is a Catholic entity which bears witness to the Church's teachings in its words and deeds, Our Sunday Visitor's current employee health plan does not cover abortion and sterilization, or contraceptives that are prescribed for contraceptive purposes (although hormone therapies for non-contraceptive purposes are covered) [DE 82 at ¶¶ 15, 16, 19].  The accommodation does not resolve Our Sunday Visitor's religious objections to the contraception mandate because it would still require Our Sunday Visitor to facilitate access to products and services antithetical to the Catholic faith or face significant fines. *Id*. at ¶¶ 18, 22.

## II.  Preliminary Injunction Standard

To obtain a preliminary injunction, the moving party must demonstrate that (1) it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied; and (2) there is some likelihood of success on the merits of the claim. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If the moving party meets this threshold burden, the court weighs the competing harms to the parties if an injunction is granted or denied and also

considers the public interest. *See Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012); *Ezell*, 651 F.3d at 694. This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor.[7] *See Planned Parenthood*, 699 F.3d at 972. The aim is to minimize the costs of a wrong decision. *See Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012).

The appropriateness of a preliminary injunction in this case rests on plaintiffs' RFRA claim and presents the following issues: does the contraception mandate and accommodation substantially burden the religious exercise rights of the plaintiffs, and if so, has the government discharged its burden of justifying its regulations under strict scrutiny. Here, plaintiffs have shown some likelihood of success on the merits of their RFRA claim, that no adequate remedy at law exists, and that they will suffer irreparable harm without an injunction. And, a weighing of the injunction equities and consideration of the public interest also strongly supports issuance of an injunction at this stage of the litigation.

### III.  Analysis

To begin, for purposes of determining whether a preliminary injunction is appropriate in the instant case, no one questions that the issues presented based on the 2013 final rules are ripe

---

[7]As an aside, the government noted an objection to applying the sliding scale approach, arguing that the approach is inconsistent with the Supreme Court's holding in *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) requiring a plaintiff to show all of the preliminary injunction factors. But the government also recognized that the undersigned is nonetheless bound to apply the Seventh Circuit's sliding scale approach to an injunction. In fact, the Seventh Circuit has recently determined that its sliding scale approach is "a variant of, though consistent with, the Supreme Court's recent formulations of the standard . . ." *Planned Parenthood of Wisc., Inc. v. Van Hollen*, No. 13-2726, 2013 WL 6698596 (7th Cir. Dec. 20, 2013) (citing *Winter*, 555 U.S. at 20).

for ruling, that the threat of financial penalty and other enforcement action is sufficient to establish the plaintiffs' standing to challenge the accommodation, and that plaintiffs—nonprofit religious organizations—exercise religion in the sense that their activities are religiously motivated.  The Court will thus consider the appropriateness of injunctive relief in the instant case.

### Success on the Merits of the RFRA Claim

The RFRA prohibits the federal government from placing substantial burdens on "a person's exercise of religion," 42 U.S.C. § 2000bb–1(a), unless it can demonstrate that applying the burden is "in furtherance of a compelling government interest" and is the "least restrictive means of furthering that compelling governmental interest," *id*. § 2000bb–1(b).  RFRA creates a broad statutory right to case-specific exemptions from laws that substantially burden religious exercise even if the law is neutral and generally applicable, unless the government can satisfy the compelling-interest test. *Korte*, 735 F.3d at 671-72 (reasoning that with RFRA, Congress expressly required accommodation rather than neutrality) (citation and quotation marks omitted). RFRA is structured as a "sweeping 'super-statute,' cutting across all other federal statutes (now and future, unless specifically exempted) and modifying their reach." *Id*. at 673 (quoting Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 Mont. L. Rev. 249, 253 (1995)).

Once a RFRA claimant makes a *prima facie* case that the application of a law or regulation substantially burdens his religious practice, the burden shifts to the government to justify the burden under strict scrutiny. *Id.* (citing *Gonzales v. O Centro Espirita*, 546 U.S. 418, 428 (2006)). "Congress's express decision to legislate the compelling interest test indicates that

RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test . . .". *Id*. (citing *O Centro Espirita*, 546 U.S. at 430).  Thus, in RFRA litigation, as in First Amendment litigation, "the burdens at the preliminary injunction stage track the burdens at trial." *Id*. (citing *O Centro Espirita*, 546 U.S. at 429).

      1.      **Substantial Burden**

While neither the United States Supreme Court nor any Circuit Courts have had the opportunity to consider whether the contraception mandate creates a substantial burden on a non-secular, nonprofit organization's religious exercise rights given the "accommodation" created for eligible organizations,[8] the Seventh Circuit recently discussed in *Korte* the substantial burden analysis in the context of RFRA:

> Recall that "exercise of religion" means "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A) (emphases added). At a minimum, a substantial burden exists when the government compels a religious person to "perform acts undeniably at odds with fundamental tenets of [his] religious beliefs." *Wisc. v. Yoder*, 406 U.S.

---

[8]In fact, not many district courts have had the opportunity to consider this question relative to nonprofit religious organizations, and their conclusions vary. Three courts have upheld the accommodation. *See Catholic Diocese of Nashville v. Sebelius,* No. 3:13-01303 (M.D. Tenn. Dec. 26, 2013); *University of Notre Dame v. Sebelius*, No. 3:13-cv-1276-PPS-CAN (N.D. Ind. Dec. 20, 2013) (Simon, C.J.); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 1:13-cv-01261-EGS (D.D.C. Dec. 19, 2013).  While the other courts have found the accommodation to pose a substantial burden. *See East Texas Baptist Univ. v. Sebelius*, No. 4:12-cv-3009 (S.D. Tex. Dec. 27, 2013); *Geneva College v. Sebelius,* No. 12-0207 (W.D. Pa. Dec. 23, 2013); *Southern Nazarene Univ. v. Sebelius*, No. CIV-13-1015-F (W.D. Okla. Dec. 23, 2013); *Legatus v. Sebelius*, No. 12-12061, 2013 WL 6768607 (E.D. Mich. Dec. 20, 2013); *Roman Catholic Archdiocese of New York v. Sebelius,* No. 1:12-cv-02542-BMC, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013); *Zubik (and Persico) v. Sebelius*, Nos. 13cv1459 and 13cv0303, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013); *Geneva College v. Sebelius*, No. 2:12-cv-00207, 2013 WL 3071481 (W.D. Pa. June 18, 2013); *see also Roman Catholic Archbishop of Washington v. Sebelius*, No. 13-1441 (ABJ), 2013 WL 6729515 (D.D.C. Dec. 20, 2013) (drawing a distinction between self insured and group insured plans and granting a preliminary injunction only with respect to a self insured plaintiff despite the fact that all eligible organizations are confronted with the self certification process created by the accommodation).

205, 218, 92 S.Ct. 1526 (1972). But a burden on religious exercise also arises when the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425 (1981); *see also Nelson v. Miller*, 570 F.3d 868, 878 (7th Cir. 2009); *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008). Construing the parallel provision in RLUIPA, we have held that a law, regulation, or other governmental command substantially burdens religious exercise if it "bears direct, primary, and fundamental responsibility for rendering [a] religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). The same understanding applies to RFRA claims.

Importantly, the substantial-burden inquiry does not invite the court to determine the centrality of the religious practice to the adherent's faith; RFRA is explicit about that.  And free-exercise doctrine makes it clear that the test for substantial burden does not ask whether the claimant has correctly interpreted his religious obligations. *See United States v. Lee*, 455 U.S. 252, 257, 102 S.Ct. 1051 (1982); *Thomas*, 450 U.S. at 715–16, 101 S.Ct. 1425. Indeed, that inquiry is prohibited. "[I]n this sensitive area, it is not within the judicial function and judicial competence to inquire whether the [adherent has] correctly perceived the commands of [his] . . . faith. Courts are not arbiters of scriptural interpretation." *Thomas*, 450 U.S. at 716, 101 S.Ct. 1425. It is enough that the claimant has an "honest conviction" that what the government is requiring, prohibiting, or pressuring him to do conflicts with his religion. *Id.*; *see also id.* at 715, 101 S.Ct. 1425 ("Thomas drew a [religious] line, and it is not for us to say that the line he drew was an unreasonable one.").

Checking for sincerity and religiosity is important to weed out sham claims. The religious objection must be both sincere and religious in nature. *Cf. United States v. Seeger*, 380 U.S. 163, 184–86, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (military-conscription exemption applies only to objections based on sincerely held religious beliefs as opposed to philosophical views or a personal moral code). These are factual inquiries within the court's authority and competence. But we agree with our colleagues in the Tenth Circuit that the substantial-burden test under RFRA focuses primarily on the "intensity of the coercion applied by the government to act contrary to [religious] beliefs." *Hobby Lobby Stores, Inc., v. Sebelius*, 723 F.3d 114, 1137 (10th Cir. 2013). Put another way, the substantial-burden inquiry evaluates the coercive effect of the governmental pressure on the adherent's religious practice and steers well clear of deciding religious questions.

*Korte*, 735 F.3d at 682-83.  With these principles in mind, the Seventh Circuit determined, in

relevant part, that it was a substantial burden on the for profit company plaintiffs and their

21

owners to require them to *purchase or provide* the required contraception coverage (or self-insure for these services). *Korte*, 735 F.3d at 668.

In the instant case, the government defendants posit that *Korte* and other similar for profit plaintiff cases, *see, e.g., Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013); *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208 (D.C. Cir. 2013), are distinguishable because the burden on plaintiffs in the instant litigation to comply with the accommodation[9] is merely de minimus where they would barely have to modify their behavior by complying with the purely administrative self certification requirement which should take a matter of minutes. Moreover, the government believes that any burden cast upon plaintiffs is too attenuated to constitute a substantial burden.

The Court acknowledges that the burden on plaintiffs to complete and submit a self certification is different than the burden imposed on the *Korte* plaintiffs. Simply put, these plaintiffs are not required "to contract, arrange, pay, or refer for contraceptive coverage" to which they have religious objections, 78 Fed. Reg. 39,874. Rather the non-exempted plaintiffs must complete a self certification form stating that each is an eligible organization which objects to providing the contraceptive coverage on religious grounds and provide a copy of that self certification to its issuer or TPA, so that the payment for the services can then be provided or arranged for by the issuer or TPA at no cost to plaintiffs. 45 C.F.R. § 147.131(b); 78 Fed. Reg. 39,874-75. But even so, the Court cannot agree with the government that the plaintiffs have not

---

[9]Admittedly, the Diocese does not have to submit a self certification on its own behalf because it is considered a religious employer exempted from the contraception mandate. However, the government does not contest the fact that the Diocesan Health Plan currently insures employees of the non-exempt Catholic Charities. The burden placed on the Diocese as a result of these facts, although mostly overlooked by the government, is discussed *infra*.

shown at least some reasonable likelihood of success on the merits relative to the showing of a substantial burden as defined in *Korte.*

According to the Seventh Circuit, the pertinent inquiry for the substantial burden test under RFRA is whether the claimant has an honest conviction that what the government is requiring or pressuring him to do conflicts with his religious beliefs and whether the governmental pressure exerts a sufficiently coercive influence on the plaintiffs' religious practice. *Korte,* 735 F.3d at 683; *see Hobby Lobby*, 723 F.3d at 1137 ("Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief."); *Gilardi*, 733 F.3d at 1217-18 (" . . . the burden becomes substantial because the government commands compliance by giving the Gilardis a Hobson's choice. They can either abide by the sacred tenets of their faith, pay a penalty of over $14 million, and cripple the companies they have spent a lifetime building, or they become complicit in a grave moral wrong.").  And in this case, the government defendants concede that plaintiffs' religious beliefs are sincerely held.  In fact, the plaintiffs' undisputed affirmations concerning their religious views indicate that their beliefs are indeed sincere and religious in nature.  Therefore, the government rests its argument on its belief that plaintiffs cannot establish a substantial burden on plaintiffs' religious exercise rights where the regulations do not, according to the government, require the plaintiffs to modify their religious behavior.

The plaintiffs have established that the accommodation compels them to facilitate and serve as the conduit through which objectionable contraceptive products and services are ultimately provided to their employees, in violation of their unquestionably sincerely held religious beliefs.  While it is true that prior to the ACA's enactment, plaintiffs had notified their

insurers/TPAs that objectionable contraceptive services were to be excluded from their health plans, never before had that notification triggered the provision of the services, nor were plaintiffs designating another to provide the services.  In other words, the government's argument relative to the de minimus nature of any burden created by the accommodation is too narrow of a focus.  The government's argument, that the completion of a simple self certification form that takes minutes doesn't create a substantial burden, misses the point.  It is not the mere filling out and submitting the certification that creates a burden.  Rather, if plaintiffs choose to provide health insurance coverage for employees (to comply with their own religious tenants and to avoid the ACA's fines for failing to meet coverage requirements), then they must either directly provide contraceptive services themselves (which are clearly contrary to their religious beliefs) or they must invoke the accommodation and facilitate, indeed in their mind enable, the availability of contraceptive services (which is also contrary to their sincerely held religious beliefs).  Thus, although plaintiffs avoid paying for the services, the compulsion to offer group health insurance results in their direct facilitation of insurance coverage and the potential use of contraceptive services by their employees, services which plaintiffs morally oppose.  That the accommodation scheme allows the plaintiffs to avoid the costs of such services provides no comfort or relief.  It's the facilitation of the objectionable services, not the related cost, that offends their religious beliefs.  Ultimately, the plaintiffs would be forced to modify their behavior *and* violate their religious beliefs by either giving up their health insurance plans or by providing insurance but taking critical steps to facilitate another's extension of the objectionable coverage. *See Korte*, 735 F.3d at 682-83; *see also Geneva College v. Sebelius*, No. 2:12-cv-00207, 2013 WL 3071481 (W.D. Pa. June 18, 2013) (citing *Thomas*, 450 U.S. at 718).  And,

their failure to comply with insurance requirements or provide contraceptive services results in enormous penalties that would be financially detrimental to their operations likely resulting in the reduction of necessary community services and even layoffs.  In short, the government's accommodation results in the plaintiffs violating their sincerely held religious beliefs, as well as the choice between conformity with the ACA's requirements or face substantial fines. *See Korte*, 735 F.3d at 683; *see also Southern Nazarene Univ. v. Sebelius*, No. CIV-13-1015-F (W.D. Okla. Dec. 23, 2013) (DE 45 at 16) ("The self certification is, in effect, a permission slip which must be signed by the institution to enable the plan beneficiary to get access, free of charge, from the institution's insurer or third party administrator, to the products to which the institution objects. If the institution does not sign the permission slip, it is subject to very substantial penalties or other serious consequences. If the institution does sign the permission slip, and only if the institution signs the permission slip, institution's insurer or third party administrator is obligated to provide the free products and services to the plan beneficiary.").

Thus, given the nature of the analysis utilized, the undersigned believes that *Korte* may logically be extended to conclude that the completion and submission of the self certification is an alteration in plaintiffs' behavior such that it constitutes a substantial burden under RFRA. *See University of Notre Dame*, No. 3:13-cv-1276-PPS-CAN ("Perhaps upon review of this case, *Korte* will be extended by the Seventh Circuit to say that the filing of a certification is an alteration in Notre Dame's behavior such that it constitutes a substantial burden under RFRA"); *see also Zubik (and Persico) v. Sebelius*, Nos. 13cv1459 and 13cv0303, 2013 WL 6118696, at *23-25 (W.D. Pa. Nov. 21, 2013) ("although the 'accommodation' legally enables Plaintiffs to avoid directly paying for the portion of the health plan that provides contraceptive products,

services, and counseling, the "accommodation" requires them to shift the responsibility of purchasing insurance and providing contraceptive products, services, and counseling, onto a secular source. The Court concludes that Plaintiffs have a sincerely-held belief that "shifting responsibility" does not absolve or exonerate them from the moral turpitude created by the "accommodation"; to the contrary, it still substantially burdens their sincerely-held religious beliefs."). Given *Korte's* guidance, the lack of mandatory authority on the precise issue at hand, and the divergence of case holdings demonstrating the difficulty of the issue and the uncertainty of the ultimate decision on the merits, the Court believes that plaintiffs have shown at least some reasonable likelihood of success on the merits relative to the substantial burden analysis. And even if that likelihood was just more than slight, the balance of harms could support injunctive relief.[10]

The government's alternative argument is that any burden on plaintiffs' religious exercise is too attenuated to render it substantial. In summary, the government believes that because plaintiffs are not required to actually contract or pay for contraceptive coverage, any burden is too attenuated to be substantial because plaintiffs are separated by a series of events that must occur before the objectionable contraceptive services would be utilized. Specifically, after receiving the certification from plaintiffs, the TPA or issuer would actually pay for or arrange payment for the contraceptive services should employees independently decide to even use those services.

---

[10]*See Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 315 (7th Cir. 1994) ("Once the district court determined that [plaintiff's] likelihood of success on the merits of its claim was slight, it required [plaintiff] to make a proportionately stronger showing that the balance of harms was in its favor.") (citing *Accord Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

Similarly, in *Korte*, the government argued that the contraception mandate's burden was insubstantial because any use of contraceptive services could not be attributed to the corporate plaintiffs or their owners since the provision of the contraceptive coverage was several steps removed from an employee's independent determination to use contraception. *See Korte*, 735 F.3d at 684. However, the Seventh Circuit's majority opinion reasoned that the government's attenuation argument is equivalent to improperly asking whether "providing this coverage impermissibly assist[s] the commission of a wrongful act in violation of the moral doctrines of the [plaintiffs' religion]." *Id*. at 685.[11] But, "[n]o civil authority can decide that question". *Id.*; *see Roman Catholic Archdiocese of New York,* No. 1:12-cv-02542-BMC, 2013 WL 6579764, at *14 ("The Government feels that the accommodation sufficiently insulates the plaintiffs from the objectionable services, . . . [but] it is not the Court's role to say that plaintiffs are wrong about their religious beliefs."); *see also Hobby Lobby,* 723 F.3d at 1142 (the question here is not whether the reasonable observer would consider the plaintiffs complicit in an immoral act, but rather how the plaintiffs themselves measure their degree of complicity).

Here, no one questions that among the plaintiffs' religious tenets is that life begins at conception and that providing all FDA approved contraceptive service violates those tenets. And so it follows that plaintiffs object to deliberately providing health insurance that will trigger access to objectionable contraceptive services and related education and counseling. By completing the self certification, plaintiffs sincerely believe that they will be facilitating, and actually supporting, a step in the process by which their employees will eventually secure access

---

[11]Judge Rovner understood the majority to be rejecting any assessment on how direct or attenuated the burden imposed on the plaintiff's religious practices may be. *Korte,* 735 F.3d at 705 (Rovner, J., dissenting).

to free contraceptive services. In their minds, this makes them complicit in the provision and use of such services. Again, the government does not contest the sincerity of these beliefs. Because plaintiffs hold these honest religious convictions and because failing to comply with the law will result in heavy financial penalties and the risk of enforcement actions (which will significantly impact their ability to provide religiously based services), *id*. at 683, plaintiffs have shown that the contraception mandate and accommodation constitute a substantial burden on their religious exercise.

And while the government gives short shrift to any burden imposed specifically on the Diocese simply because it is exempted from the mandate, the Court would note the uncontested fact that the Diocese has foregone almost $200,000 annually in order to maintain its grandfathered status in an effort to protect Catholic Charities from having to comply with the contraceptive mandate and its religiously objectionable self certification requirement. Thus, despite being exempted as a religious employer, the Diocese is forced to modify its behavior and incur substantial costs to stay grandfathered under the ACA, or else it will be compelled to violate its religious beliefs by having Catholic Charities' employees provided with a plan that covers objectionable contraceptive services or access to the same. Essentially, absent forgoing the annual increased premiums, the Diocese would be prevented from exercising supervisory authority over its constituents in a way that ensures compliance with Church teachings.

The application of the two regulations—the exemption and the accommodation—has the ultimate effect of dividing the Catholic Church into two separate entities, despite overlapping membership and leadership. *See Zubik*, 2013 WL 6118696, at *26-27. The regulations protect those who work inside a church's walls, but not those engaging in the fulfillment of the religious

and charitable missions of the Diocese and Catholic Church—despite the fact that all of the plaintiffs claim the same burden is imposed on their religious exercise rights by the mandate and its accommodation.  The Court concludes that this divide and its resulting consequences has similarly created a substantial burden on the Diocese and Catholic Charities, and as a result, the government must justify its regulations under the compelling interest test.

### 2.        Least Restrictive Means and Compelling Government Interest

RFRA requires the government to demonstrate that applying the contraception mandate and its accommodation are "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb–1(b).  Again, the Court follows the precedent set forth in *Korte*, in applying the appropriate test in this context.  In fact, the government has since conceded that the recent decision in *Korte* forecloses its arguments that the regulations satisfy strict scrutiny, even in this context [DE 105 at 2, fn. 1].  Regardless, the Court will conduct an analysis for completeness of the record.

Consistent with *Korte*, the Supreme Court has instructed courts to look beyond "broadly formulated interests justifying the general applicability of government mandates" and "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Korte*, 735 F.3d at 685 (citing *O Centro Espirita*, 546 U.S. at 431).  In other words, under RFRA's version of strict scrutiny, the government must establish a compelling and specific justification for burdening these claimants. *Id*.

The compelling-interest test generally requires a "high degree of necessity." *Id*. (citing *Brown v. Entm't Merchs. Ass'n*, — U.S. — , 131 S.Ct. 2729, 2741 (2011)).  The government must "identify an 'actual problem' in need of solving, and the curtailment of [the right] must be

actually necessary to the solution." *Id*. (citing *Brown,* 131 S.Ct. at 2738). In the free-exercise

context, "only those interests of the highest order and those not otherwise served can

overbalance legitimate claims to the free exercise of religion." *Id*. (citing *Yoder*, 406 U.S. at

215). "[I]n this highly sensitive constitutional area, only the gravest abuses, endangering

paramount interests, give occasion for permissible limitation . . .". *Id.* (citing *Sherbert*, 374 U.S.

at 406). The regulated conduct must "pose[ ] some substantial threat to public safety, peace[,] or

order." *Korte*, 735 F.3d at 686 (citing *Sherbert*, 374 U.S. at 403). Finally, "a law cannot be

regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to

that supposedly vital interest unprohibited." *Id.* (citing *Church of the Lukumi Babalu Aye, Inc. v.

City of Hialeah*, 508 U.S. 520, 547 (7th Cir. 1993)).

Similar to the interests claimed by the government in *Korte*, the government identified

two legitimate public interests in the instant case, improving the public health and providing

equal access to health care services for women. The government (prior to the issuance of *Korte*)

had argued that the contraception mandate and the accommodation furthers these interests in a

narrowly tailored fashion by not requiring nonprofit religious organizations with religious

objections to providing contraceptive coverage to contract, pay, arrange, or refer for that

coverage.

The Court agrees that the government's stated interests are indeed important, and for the

sake of argument (and a thorough analysis) will assume they are even compelling. However, the

government has not shown that the contraception mandate employs the least restrictive means of

furthering the government's interests, because strict scrutiny requires a substantial congruity—a

close "fit"—between the governmental interest and the means chosen to further that interest.

30

*Korte*, 735 F.3d at 686.

As discussed, the regulatory scheme exempts or excludes certain employers from the contraception mandate and does not apply the ACA's requirements to employers with grandfathered plans or those with less than 50 employees.  Since the government grants so many exceptions already, it cannot legitimately argue that its regulations are narrowly tailored, nor can they argue against exempting these plaintiffs—by the government's estimate, approximately 20,000 employees (not including the already exempted Diocese). *See Korte*, 735 F.3d at 686; *Gilardi*, 733 F.3d at 1222 ("underinclusiveness can suggest an inability to meet the narrow-tailoring requirement, as it raises serious questions about the efficacy and asserted interests served by the regulation").  Also, there is nothing to suggest the ACA would become unworkable if employers objecting on religious grounds could opt out of one part of a comprehensive coverage requirement. *See Gilardi*, 733 F.3d at 1223-24.

Further, the government's reason for creating the religious employer exemption in particular was that houses of worship and their integrated auxiliaries are more likely than other employers to employ people of the same faith who share the same objection to contraceptive coverage, and who would be less likely than others to use contraceptive services even if such services were covered. *See* 78 Fed. Reg. 39,874.  This may in fact be true, however, the government amended the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified "because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths." *See* 78 Fed. Reg. 8456 (Feb. 6, 2013).  So even though these plaintiffs provide religiously based community services outside the confines of the church and employ people of

different faiths, these plaintiffs share the same legitimate claim to the free exercise of religion as those exempted as "religious employers."  And despite the religiously affiliated nature of the plaintiffs and their longstanding religious stance (and public pronouncement) against abortion and contraception, *these* plaintiffs have not received the same exemption as "religious employers" from having to facilitate or initiate the provision of objectionable contraceptive services, merely because they are not organized and operated as a nonprofit entity referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986—a basis which has nothing to do with the government's stated interests for imposing the requirements of the contraception mandate. *See Zubik*, 2013 WL 6118696 at *29 (noting that the religious employer exemption was not predicated on the government's stated interests).  And so again, even assuming the government's interests are compelling, there is no basis indicating the government would be unable to enforce its legislation simply because these plaintiffs could avoid compliance with the contraception mandate.

Finally, there are certainly other ways to promote public health and gender equality less burdensome on religious liberty, and the government has not carried its burden of demonstrating that it cannot achieve its policy goals in ways less damaging to religious-exercise rights.  Pre-*Korte*, the government maintained that the accommodation provides the least restrictive means because the self certification requires the plaintiffs to act just as they would without the mandate—by informing their TPAs or insurers that coverage should not include certain contraceptive services.  But the argument falls short.  First, the government has made exemptions from the coverage requirements for other employers, like the Diocese, without requiring the same form of self certification (and resulting consequences), despite the fact that plaintiffs share

32

the same legitimate claim to the free exercise of religion as those exempted as religious employers.  And second, the self certification process created in the accommodation (and being avoided by the Diocese and Catholic Charities at great expense) essentially transforms a voluntary act that plaintiffs may have utilized to ensure that the objectionable services are not provided, consistent with their religious beliefs, into a compelled act that they sincerely believe provides and promotes conduct that is forbidden by their religious beliefs. *See Roman Catholic Archdiocese of New York,* No. 1:12-cv-02542-BMC, 2013 WL 6579764, at *14.  And so the nature of the act itself has changed, not merely the consequences of that act.

And as identified in *Korte* and as offered by plaintiffs in the instant action, there are many ways to increase access to free contraception without doing damage to the religious-liberty rights of conscientious objectors.  For instance, the government can provide a "public option" for contraception insurance; it can give tax incentives or grants to contraception suppliers to provide these medications and services at no cost to consumers; and it can give tax incentives to consumers of contraception and sterilization services—all without requiring plaintiffs to self certify their religious objections to the contraception mandate and thereby directly facilitate access to objectionable contraceptive services to be arranged or paid for by third parties.  Simply because these options may make it more difficult for the government to administer the regulations in a manner that would achieve the government's stated interests, greater efficacy does not equate to the least restrictive means. *See Zubik*, 2013 WL 6118696 at *23. And as the government has conceded in the instant case, *Korte* has recently made clear that its regulations fail the strict scrutiny analysis.

Bearing in mind that at this stage the court need not be certain about the outcome of the

33

case to grant a preliminary injunction, the Court concludes the plaintiffs have shown some reasonable likelihood of success on the merits relative to their RFRA claim. *See S.E.C. v. Lauer*, 52 F.3d 667, 671 (7th Cir. 1995) ("The case is before us on an appeal from the grant of a preliminary injunction, and as is too familiar to require citation such a grant is proper even if the district judge is uncertain about the defendant's liability.").

### *Adequate Remedy at Law and Irreparable Harm*

Although the claim is statutory, RFRA protects First Amendment free-exercise rights, and "in First Amendment cases, 'the likelihood of success on the merits will often be the determinative factor.'" *Korte*, 735 F.3d at 666 (citing *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Joelner v. Village of Washington Park, Ill*., 378 F.3d 613, 620 (7th Cir. 2004))). "This is because the 'loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury . . .'. " *Korte*, 735 F.3d at 666 (citing *Alvarez*, 679 F.3d at 589 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). Furthermore, injunctions are especially appropriate in the context of first amendment violations because the "quantification of injury is difficult and damages are therefore not an adequate remedy." *Alvarez*, 679 F.3d at 589 (citing *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982)).

In the instant case, the non-exempt plaintiffs must decide by December 31, 2013 whether or not to provide insurance coverage and sign the self certification with respect to its employee health plan, with the exception of Our Sunday Visitor, who must also make the same decisions in October. Relative to the Diocese, by December 31, 2013, it will have to decide whether to continue to forgo increased premiums in order to maintain its grandfathered status, or permit Catholic Charities to be faced with the same decisions that need be made by the non-exempt

plaintiffs. Ultimately, should plaintiffs fail to comply with the insurance coverage requirements of the ACA and its contraception mandate, the plaintiffs face financially devastating fines and enforcement actions.  Thus, plaintiffs will be irreparably harmed if forced to forgo their religious beliefs by facilitating access to the objected to services in order to avoid detrimental fines, and there simply is insufficient time to litigate the merits of the plaintiffs' claims without the relief of a preliminary injunction. Given that plaintiffs' religious exercise rights are at stake in the immediate future, that a loss of these freedoms for even a minimal period of time unquestionably constitutes irreparable injury which cannot be prevented or fully rectified by waiting for a final judgment, *see Elrod*, 427 U.S. at 373; *Anderson v. U.S.F. Logistics (IMS), Inc.*, 274 F.3d 470, 478 (7th Cir. 2011), and that injunctions are designed to offer relief when legal remedies are inadequate to protect the parties' rights, *see Roland Machinery Co. v. Dresser Indus., Inc*., 749 F.2d 380, 397 (7th Cir. 1984) (Swygert, J., dissenting), the Court concludes that these factors weigh strongly in favor of granting the requested relief.

### *Weighing the Equities and Public Interest*

In weighing the equities, the court balances each party's likelihood of success against the potential harms. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S., Inc*., 549 F.3d 1079, 1100 (7th Cir. 2008).  To do so, the court compares the potential irreparable harms faced by both parties to the suit—the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted. *Id*. (citing *Ty, Inc. v. Jones Group, Inc*., 237 F.3d 891, 895 (7th Cir. 2001)). We evaluate these harms using a sliding scale approach. *Id*. (citing *Ty, Inc.*, 237 F.3d at 895).  The more likely it is that plaintiffs will win their case on the merits, the less the balance

of harms need weigh in their favor. *Id.* (citations omitted).  Conversely, if it is very unlikely that plaintiffs will win on the merits, the balance of harms need weigh much more in plaintiffs' favor. *Id.* (citations omitted).  When conducting this balancing, it is also appropriate to take into account any public interest, which includes the ramifications of granting or denying the preliminary injunction on nonparties to the litigation. *Id.* (other citations omitted).  This analysis is "'subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1100 (citations omitted).

As the Court has previously detailed herein, the harm likely to be caused the plaintiffs without an injunction is imminent and irreparable, whereas the government likely faces no risk of harm, let alone irreparable harm, if the preliminary injunction is granted.  The Court agrees with the district court's comments in *Zubik*, in that the combined nationwide total of the millions of Americans whose employers fall within some type of exclusion, exemption, or plan grandfathered from the ACA and contraception mandate's requirements demonstrates that the government will not be harmed in any significant way by the exclusion of these plaintiffs. *Zubik*, 2013 WL 6118696 at *34; *see also Geneva College v. Sebelius*, No. 2:12-cv-00207, 2013 WL 3071481, *10 (W.D. Pa. June 18, 2013) ("tens of millions of individuals . . . remain unaffected by the mandate's requirements").  Moreover, the government has itself delayed the enforcement of the contraception mandate by initially granting a safe harbor from its enforcement and agreeing to injunctions in other cases involving challenges to the mandate.

Additionally, granting the preliminary injunction furthers the public interest.  While it is true that employees and dependents of the plaintiffs will face an economic burden not shared by

employees and dependants of organizations that cover all of the contraceptive methods imposed by the mandate, plaintiffs' long-standing and publically made religious stance regarding contraception and abortion, have kept them from offering procuring, participating in, facilitating, or paying for objectionable contraceptive services up until this point.  And while not all employees of the plaintiffs share in the plaintiffs' religious objections to certain contraceptive services, the plaintiffs' employees and the public are best served if the plaintiffs can continue to provide needed (and expected) religiously based community services, and the needed (and expected) insurance coverage to its employees, without the threat of substantial fines and the risk of layoffs for noncompliance with the contraception mandate and its accommodation.  Moreover, injunctions protecting First Amendment freedoms are always in the public interest, *see Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006), and the Court sees no reason to make an exception here.

The Court would also note that plaintiffs quickly filed an amended complaint and sought an injunction after the 2013 final rules were passed.  Thus, there has been no delay in their pursuit of a preliminary inunction. *See Ty, Inc.*, 237 F.3d at 903 (a delay in pursuing a preliminary injunction may raise questions regarding irreparable harm).  And, it cannot be said that there was any expectation that the plaintiffs would ever facilitate access to all FDA approved contraceptive services for its employees.  Undoubtedly, the balance of harms in this case weighs heavily in plaintiffs' favor, enough so that any weakness in the merits of their case is overcome, thereby making injunctive relief appropriate to maintain the status quo until a decision on the merits of the case is rendered. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Michigan v. U.S. Army Corps of Engineers,* 667 F.3d 765, 783 (7th Cir. 2011) ("The

preliminary injunction, after all, is often seen as a way to maintain the status quo until merits issues can be resolved at trial. By moving too quickly to the underlying merits, the district court required too much of the plaintiffs . . .").

## IV.  Conclusion

Accordingly, it is hereby ORDERED that plaintiffs' motion for a preliminary injunction [DE 74] is GRANTED, and as a result, defendants, their agents, servants, officers, employees, representatives, and all persons in active concert or participation with them are hereby ENJOINED from:

> Applying or enforcing against plaintiffs, Diocese of Fort Wayne-South Bend, Inc., Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc., Saint Anne Home & Retirement Community of the Diocese of Fort Wayne-South Bend, Inc., Franciscan Alliance, Inc., Specialized Physicians of Illinois, LLC, University of Saint Francis, and Our Sunday Visitor, Inc., or their employee health insurance plans, including their plan brokers, plan insurers, or third party administrators, the requirements set out in 42 U.S.C. § 300gg-13(a)(4) and 45 C.F.R. § 147.130(a)(1)(iv), corresponding guidelines, and corresponding press releases to provide, pay for, or otherwise facilitate access to coverage for FDA approved contraceptive methods, abortion-inducing drugs, sterilization procedures, and related patient education and counseling.

It is further ORDERED that plaintiffs shall not be required to post bond; however, should circumstances change prior to the Court's making a determination on the merits of the case, including new developments in the law, which may make the preliminary injunction or its terms no longer appropriate, then counsel are free to file a motion seeking a modification or vacatur of

the injunction.

       SO ORDERED.

       ENTERED:  December 27, 2013  

                           /s/ JON E. DEGUILIO     
                        Judge
                        United States District Court